E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# IN THE IOWA DISTRICT COURT
## IN AND FOR
## PAGE COUNTY

| | |
|---|---|
| JAMES HUNTER; SHERI HUNTER; BRADLEY HUTCHISON; KATHERINE HUTCHISON; SUSAN KELLEY; WILLIAM MCCONNELL; CINDY O'HEARN; MICHAEL O'HEARN; BARBARA OLIVER; JAMES RINE; MARY RINE; STEPHANIE SHOLES | Case No. _____ |

Petitioners,

v.

PAGE COUNTY, IOWA; BOARD OF
SUPERVISORS OF PAGE COUNTY,
IOWA; ALAN ARMSTRONG; JACOB
HOLMES; JAMES KING; CHUCK
MORRIS; CARL SONKSEN

Respondents
.

**PETITION**

**FOR**

**WRITS OF CERTIORARI,**

**ORDERS OF MANDAMUS,**

**DECLARATORY JUDGEMENT,**

**AND**

**TEMPROARY & PERMANENT
INJUNCTIONS**

COMES NOW the above named Petitioners, by and through the undersigned counsel, and petitions this Court for the relief at law and at equity for the Writs of Certiorari, Orders of Mandamus, Declaratory Judgments and Temporary and Permanent Injunctions as set forth below, and would show the Court as follows:

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

## TABLE OF CONTENTS

I.    PARTIES ....................................................................................... 4

II.   JURISDICTION AND VENUE ...................................................... 5

III.  OVERVIEW .................................................................................. 6

IV.   FACTS COMMON TO ALL CLAIMS ......................................... 15

   A.  Wind Turbine Ordinance Adoption & Amendment Promises ............... 15

   B.  Invenergy's Wind Turbine System Application ................................ 27

CLAIM 1:    WRITS OF MANDAMUS & CERTIORARI ......................... 45

   A.  General Legal and Factual Allegations ........................................ 45

     1.  Source, Scope and Limits of the County's and Board's Authority ....... 45

     2.  General Factual and Remedies Allegations ................................ 49

     3.  Standards for Mandamus & General Description of Requested
        Mandamus Relief ............................................................ 50

     4.  Standards for Certiorari & General Description of Requested
        Certiorari Relief ............................................................ 51

   B.  Section 9 of the Ordinance is an Illegal Act in Violation of the
     Specific Repeal Requirements in Iowa Code § 331.302(4) ..................... 51

   C.  The Board of Supervisors Illegally Abdicated and Sub-Delegated
     Legislative Power to Private Entities in Contravention of Iowa Code
     §§ 331.301 & 331.302 .......................................................... 54

   D.  The WECS Application Failed to Comply with the Ordinance and
     Approval of the WECS Application is Invalid .................................. 63

     1.  Invenergy's Knowing and Intentional Omission of Information
        Regarding Threatened and Endangered Species Invalidates the
        WECS Application Approval ................................................ 65

     2.  Invenergy's Knowing and Intentional Omission of Information
        Regarding a Shallowly Buried, Active Petroleum Product Pipeline
        in the Project Area Invalidates the WECS Application Approval ........ 76

     3.  Invenergy's Knowing and Intentional Omission of Radio
        Interference Information  and Lack of FCC Authorization
        Invalidate the WECS Application Approval ............................... 77

     4.  Invenergy's Knowing and Intentional Omission of Information
        Regarding Planned Encroachments on Required Setbacks for
        Public Lands Invalidates the WECS Application Approval ............... 80

     5.  Requested Relief – Approval of an Application Containing Knowingly
        False Information Must be Revoked ....................................... 81

**E. Approval of the WECS Application was an Illegal Act of the Board in Violation of Page County Wind Moratorium Resolution.** ..................82

**F. Adoption of the Ordinance was an Illegal Act in Violation of the Page County Zoning Ordinance.** ..................84

**G. Adoption of Section 9 of Ordinance, Adoption of the Ordinance as a Whole, and Approval of the WECS Application, were Each Illegal as Unreasonable and Capricious Acts of the Board.** ..................87

**1. The Adoption of Section 9 of the Ordinance was Unreasonable and Capricious** ..................87

**2. The Adoption of the Ordinance and Approval of the WECS Application were Unreasonable and Capricious** ..................91

**H. Adoption of the Ordinance and WECS Application Approval are Abuses of Zoning Discretion in Violation of Iowa Law** ..................97

**I. The WECS Application Approval was an Illegal Act Under Iowa Code § 331.302(14) Because the Decisive Vote was Cast by a Conflicted Supervisor** ..................97

**J. The Adoption of the Ordinance, the WECS Application Approval, and the Board's Negotiating Process for Road Use Agreement and Decommissioning Plan are Each Illegal Acts Arising from Violations of the Open Meetings Act** ..................102

**K. Requested Orders of Mandamus and Writs of Certiorari** ..................106

**CLAIM 2:    THE ORDINANCE IS VOID FOR VAGUENESS** ..................108

**CLAIM 3:    TEMPORARY AND PERMANENT INJUNCTION AGAINST COUNTY** ..................113

**CLAIM 4:    DECLARATORY JUDGMENT** ..................114

**V.  REMEDIES AND REQUESTS FOR RELIEF** ..................115

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

## I.  **PARTIES**

**1.**  Each Petitioner identified in the caption of this Petition is a resident of Page County.

**2.**  The Respondents identified in the caption to this Petition are identified below and referred to herein jointly as the "Page County Respondents":

**a.**  Page County is an Iowa county subject to home rule power and authority under Article III, Section 39A of the Iowa Constitution, and may be served under Iowa Rule of Civil Procedure 1.305(9) by service upon the Page County Auditor or upon the Chair of the Page County Board of Supervisors, each at 112 E. Main Street, Clarinda, IA 51632.

**b.**  The Board of Supervisors of Page County is vested to exercise the authority and duties delegated to the County by the Iowa general assembly pursuant to Iowa Code Chapter 331, and may be served under Iowa Rule of Civil Procedure 1.305(13) by service upon the presiding officer, secretary or clerk of the Page County Board of Supervisors, each at 112 E. Main Street, Clarinda, IA 51632.

**c.**  Alan Armstrong ("Armstrong") is a resident of Page County and a member of the Page County Board of Supervisors and may be served at 112 E. Main Street, Clarinda, IA 51632.

**d.**  Chuck Morris ("Morris") is a resident of Page County and a member of the Page County Board of Supervisors and may be served 112 E. Main Street, Clarinda, IA 51632.

**e.**  Jacob Holmes ("Holmes") is a resident of Page County and a member of the Page County Board of Supervisors and may be served at 112 E. Main Street, Clarinda, IA 51632.

**f.**  James King ("King") is the Page County Zoning Administrator and may be

served at 112 E. Main Street, Clarinda, IA 51632.

   **g.**  Carl Sonksen ("Sonksen") is the Page County Attorney, and may be served at 112 E. Main Street, Clarinda, IA 51632.

**3.**  Petitioner reserves the right to amend this Petition to add additional respondents that may be discovered during the course of litigation.

## II.   JURISDICTION AND VENUE

**4.**  This Court has general jurisdiction and original jurisdiction over all actions, proceedings, and remedies, and is empowered to hear all cases in law and equity under Iowa Const. art. V, § 6 and Iowa Code § 602.6101.

**5.**  This Court has jurisdiction to issue orders of mandamus and related injunctions pursuant to Iowa Code Chapter 661.

**6.**  This Court has jurisdiction to issue writs of certiorari and related stays pursuant to Iowa R. Civ. P. 1.1404 & 1.1405.

**7.**  The Court has jurisdiction and authority to issue declaratory judgments under Iowa R. Civ. P. 1.1101.

**8.**  The Court has personal jurisdiction over all Respondents as each is one or more of the following: (i) an Iowa county; (ii) an organization, elected representative, officer, or employee of Page County; (iii) a resident of Page County, or (iv) a business enterprise qualified to do business in Iowa and has transacted business in Page County.

**9.**  Venue is proper in Page County as all of the material events involved actions by Page County and the Board of Supervisors and occurred in Page County.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

### III.   OVERVIEW

**10.**   This cases concerns illegal acts and omissions of Respondents Armstrong and Morris to faithfully exercise their duties as members of the Board of Supervisors ("Board") of Page County ("Page County" or "County), and the failure of Respondent Sonksen to fulfill his obligations as County Attorney.

**11.**   As used herein, "Invenergy" means Invenergy, LLC, Shenandoah Hills Wind Project, LLC ("SHW"), Invenergy MET, LLC, Invenergy Services, LLC, Invenergy Wind Development, LLC, and their affiliates, agents, employees, contractors, and owners.

**12.**   The Petitioners allege the Respondents conduct constituted illegal collusion and an illegal intra- & interstate enterprise formed among Respondents and Invenergy (including each of their representatives, agents, and staff (the "Enterprise")).

**13.**   The Enterprise engaged in more than one predicate act involving undue influence of public officials and self-dealing among those within the Enterprise.

**14.**   The Enterprise's actions, and their efforts to convince the citizens of Page County to believe falsehoods, designed to further the Enterprise's goals, included (i) passage of an intentionally vague and knowingly deficient ordinance (ii) creating an aura that the Respondents, all County representatives, within the Enterprise were unable to remedy or attempt to remedy deficiencies in the ordinance, and (iii) creating a façade of threats of litigation by Invenergy to provide legal cover to hide conversations and meetings from public view.

**15.**   The Respondents cooperated with Invenergy by quickly passing a knowingly deficient ordinance provided to them by Invenergy.

**16.**   Respondents then refused to amend the ordinance to the deficiencies for nearly

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

three years after its passage.

17. The passage of the ordinance gave Invenergy a "toe-hold" to threaten litigation if changes were made.

18. From the time of passage of the ordinance until the time of Invenergy's first threat of litigation, Invenergy engaged in a process of obtaining real estate interests in Page County speculating that their co-conspirator Respondents would approve an application when their real estate interests needed were acquired.

19. The "threat of litigation" was then used by the Respondents as justification to refuse amendments and hold closed-meetings outside of public scrutiny.

20. The Respondents then approved a knowingly deficient application by Invenergy because of a "threat of litigation" if it was not approved.

21. Respondents Armstrong, Morris, and Sonksen directly, knowingly, and intentionally cooperated with Invenergy for the benefit of the Enterprise.

22. The goal of the Enterprise is to provide Invenergy exclusive access to wind assets available in Page County, and the profits therefrom, to be distributed by Invenergy in its discretion, to benefit of members of the Enterprise.

23. The illegal interstate Enterprise, and its effort to hide information from the citizens of Page County, renders the members of the Enterprise in public office unable to continue to make decisions for the County in matters related to wind energy.

24. This case seeks writs, injunctions, and orders to prevent any further decisions in matters related to wind energy in Page County from being made by the members of the Enterprise until such time as this Petition can be heard and adjudicated.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**25.**   The indicia of the Respondents Armstrong, Morris and Sonksen participating in this Enterprise include:

**a.**   In 2019, Respondents Armstrong and Morris adopted a wind ordinance without any on-the-record discussion of the terms of the Ordinance.

**b.**   In 2019, Respondents Armstrong and Morris used a procedure designed for adopting ordinances in emergencies for the non-emergency adoption of the ordinance, and in doing so waived the normal statutory procedure requiring public hearing at two meetings prior to final adoption of an ordinance.

**c.**   Respondents Armstrong and Morris adopted the 2019 wind ordinance without providing the public the typical month of time to review the ordinance's terms and make comments.

**d.**   The adopted ordinance was drafted by Invenergy, its agents, or other wind energy interests.

**e.**   The wind ordinance given to Respondents was then adopted by Respondents Armstrong and Morris in 2019 without modification, or public input.

**f.**   Respondents Armstrong and Morris repeatedly admitted, from late 2019 through early 2022, that the wind ordinance was deficient in its protections of the interests of the County and its citizens.

**g.**   From late 2019 through early 2022, Respondents Armstrong, Morris and Sonksen repeatedly placated the public with promises of amendments to address the deficiencies of the ordinance; yet, no amendments have ever been considered or voted upon.

**h.**   Before any application to under the ordinance was submitted, Respondents Armstrong and Morris, with the advice and influence of Respondent

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Sonksen, rejected resolutions to establish a moratorium on wind turbine applications and approvals while the ordinance was revised.

**i.** Respondents Armstrong and Morris postponed consideration of amendments to the Ordinance.

**j.** Respondents Armstrong and Morris lied to residents when they stated that they would consider amendments to the Ordinance when a specific application proposal was submitted.

**k.** For more than two years after adopting the ordinance, the public repeatedly demanded amendments, and Respondents Armstrong, Morris, and Sonksen deflected and obstructed consideration of any amendments with promises of action to be taken to correct deficiencies later.

**l.** Respondent Armstrong was the beneficiary of television advertisements on an Omaha station in support of his wind position during a 2022 primary election for the supervisor position.

**m.** This advertisement in support of Respondent Armstrong was broadcast from Omaha across numerous uninterested counties in western Iowa and eastern Nebraska for a county board of supervisors' primary in Page County Iowa.

**n.** Respondent Armstrong has never been truthful about his knowledge of the creation, or ultimate funding source, for this advertisement.

**o.** Respondent Morris has been observed wearing socks that say "wind energy."

**p.** No publicly recorded action related to wind turbine energy by Respondents Armstrong or Morris has been inconsistent with the interests of Invenergy.

**q.** All publically recorded actions related to wind turbine energy by Respondents Armstrong, Morris and Sonksen have uniquely benefited

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Invenergy's plans and economic interests.

**r.**   Invenergy submitted an application in March 2022 under the ordinance.

**s.**   Despite many on the record admissions that the wind ordinance was defective, Respondents Armstrong and Morris accepted Invenergy's March 2022 commercial wind turbine system application.

**t.**   Invenergy had a representative present at nearly all board meetings relevant to discussions of the defects in the Ordinance.

**u.**   Respondents Armstrong, Morris, and Sonksen met with Invenergy in off-the-record meetings.

**v.**   Invenergy was aware that Respondents Armstrong and Morris admitted prior to Invenergy's application that the ordinance was deficient and that amendment of the Ordinance was probable.

**w.**   With full knowledge that Board has stated the Ordinance was deficient and would be amended upon an application being submitted, Invenergy chose to submit its application.

**x.**   Respondents Armstrong, Morris and Sonksen told the public, after Invenergy's application that changing the ordinance would expose the County to liability and litigation because Invenergy (their co-conspirator) had relied upon the language of the ordinance as adopted.

**y.**   After Invenergy's application was submitted, Respondent Armstrong, with the legal advice of Respondent Sonksen, changed his vote on a moratorium against wind turbine system applications solely with intent to protect Invenergy by, in Respondent Armstrong's mind, grand-fathering in Invenergy's application under the deficient ordinance while blocking

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

consideration of other potential proposals.

**z.**   Respondent Sonksen was aware that Invenergy had full knowledge of the deficient Ordinance at the time they submitted their proposal.

**aa.**   Respondent Sonksen was aware that Invenergy cannot make a legitimate claim against Page County for failing to pass a moratorium when Invenergy knew that no such moratorium existed at the time their proposal was submitted.

**bb.**   Respondent Armstrong changed his vote on the moratorium for the sole stated reason that Page County needed to avoid potential litigation with Respondent Armstrong's co-conspirator, Invenergy.

**cc.**   Respondent Morris refused to change his vote on the moratorium, giving rise to the question as to whether he was being influenced not just by Invenergy, but also by other wind interests seeking control over the people of Page County.

**dd.**   Respondents Armstrong and Morris demonstrated their participation in the Enterprise by accepting Invenergy's proposal as a predicate act so as to give the impression that the County would be legally bound to Invenergy.

**ee.**   Page County is not legally bound to Invenergy. There is no contract between the County and Invenergy for C-WECS development.

**ff.**   Respondents Armstrong and Morris colluded, lied and furthered the interests of the Enterprise by attempting to create a catch-22 situation for the County – adopting a knowingly deficient ordinance, then putting-off amendments until an application was filed, and then when Invenergy's application was filed stating that any changes would expose the County to

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

litigation from Invenergy's reliance on the terms of the defective ordinance.

**gg.** Irrespective of whether or not Page County is, in fact, legally bound to Invenergy, Representatives Armstrong and Morris illegally used their positions as Board Supervisors to enrich the Enterprise on that basis.

**hh.** Respondents Armstrong and Morris knew the Invenergy application was deficient, failed to include all required information, and that material changes to the disclosed plan would be required.

**ii.** With this knowledge of deficiencies, Respondents Armstrong and Morris (i) strong-armed Respondent King into blessing the Invenergy application as being in compliance with the ordinance, (ii) then approved the application, in part based on Respondent Sonksen's legal advice that failure to approve the application Respondent Sonksen conclude complied with the ordinance (which conclusion was knowingly false) would expose the County to litigation.

**jj.** Respondents' primary sources of information regarding the project was Invenergy.

**kk.** Respondents did not engage an outside consulting firm to evaluate the economic impact of the project on projected revenue, projected expenses, projected damage to roads and resources of the County.

**ll.** Indicia of corruption, graft, and an illegal Enterprise run throughout the below plead facts.

**mm.** No rational basis, other than economic or personal advantage for Respondents Armstrong, Morris, and/or Sonksen, can explain their repeated "kicking-the-can-down-the-road" for the benefit of Invenergy, and then

changing the rules and reneging on representations to the citizens they represent with the intent to protect Invenergy's interests to the detriment of the citizens of Page County.

26. Actions taken by the Respondents over the following five distinct time periods establishes a pattern of corrupt Enterprise activities:

   a. October 2019 – Respondents Morris, Armstrong, and Sonksen rush adoption of a knowingly weak Ordinance, without study, and without normal public comment;

   b. October 2019 to March 2022 – Respondents Armstrong, Morris, and Sonksen continually refuse to consider amendments to the Ordinance until a concrete proposal for a project is submitted to them;

   c. March 2022 to July 2022 –  A proposal is submitted by Invenergy and then Respondents Armstrong, Morris and Sonksen (i) refuse to consider amendments to the ordinance because Invenergy had submitted a proposal had threatened litigation exposing the County to liability if amendments were made; and (ii) Respondent Armstrong switching his vote on the moratorium to, in his mind, prevent any competitors of Invenergy entering Page County.

   d. August 2, 2022 – Respondents approval of a knowingly deficient Invenergy application.

   e. August 2, 2022 to Present – Respondents Armstrong, Morris and Sonksen create a procedure to keep road use and decommissioning agreement negotiation processes away from Respondent Holmes and the public to avoid the Open Meetings Act.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

27. The above pattern is an illegal and corrupt enterprise cooperating with Invenergy, lying to the public, and trying to keep the enterprises actions from scrutiny.

28. Respondents Armstrong, Morris and Sonksen abandoned their duties to the public and became entangled in Invenergy's plans.

29. Once entangled, Respondents Armstrong, Morris, and Sonksen, in fear of Invenergy's threats of litigation against the County, further abandoned their duties and supplicated themselves to Invenergy and the Enterprise.

30. The citizens of Page County have constitutional and statutory rights to a county government that operates in compliance with the law.

31. The citizens of Page County have constitutional and statutory rights to a county government that is free from undue and illegal influence on its elected representatives.

32. Any action by Respondents to the further the interests of Invenergy while this litigation is pending serves as further evidence and proof of their willful participation in the Enterprise and Invenergy's undue influence on the representatives of the citizens of Page County.

33. The Petitioners ask that this Court dismantle the Enterprise, remove Invenergy's undue and illegal influence over the public's elected representatives, and return the lawful and legal operation of the County to the people as provided under the Iowa Constitution and the laws of the Iowa legislature.

## IV.   FACTS COMMON TO ALL CLAIMS

### A. Wind Turbine Ordinance Adoption & Amendment Promises

**34.** On September 17, 2019, the Page County, Iowa ("Page County" or "County") Board of Supervisors ("Board") approved the publication of an ordinance summary and notice of public hearing for a proposed ordinance entitled "An Ordinance Regulating the Placement of Wind Energy Conversion Systems (WECS) on Property Located in the Unincorporated Areas of Page County, Iowa."

**35.**  Jon Herzberg ("Herzberg"), then a supervisor, and Respondents Morris and Armstrong, both supervisors, approved publication and notice.

**36.** References to "minutes" of the Board in this Petition refer to the written minutes as approved by the Board and publically available through the County's web site.

**37.** The minutes of the September 17, 2019 meeting do not reflect any discussion of:

    **a.** the substantive terms of the proposed wind ordinance, or

    **b.** the processes and procedures to implement the proposed ordinance.

**38.** On September 24, 2019, the Board minutes report that the ordinance summary and notice had been delivered to the paper for publication.

**39.** On October 15, 2019, the minutes indicate:

    **a.** The Board met with Gary Davidson and Keith Wagner to discuss setbacks for wind turbines;

    **b.** The nature of these discussions or the content of the discussions with Davidson and Wagner are not documented; and

    **c.** The capacity Davidson and Wagner appearing with the Board was not set forth.

**40.** The minutes do not reflect any discussion of wind turbines at the Board's October 22, 2019 meeting.

**41.** On October 29, 2019, the Board held a public hearing on the proposed wind ordinance.

**42.** According to the minutes of the October 29, 2019 meeting:

    **a.** Mark Zaccone, a representative of Invenergy, was in attendance at the meeting.

    **b.** Four citizens spoke against the adoption of the Ordinance, and no citizens spoke in favor of the Ordinance.

    **c.** "On motion by Herzberg, seconded by Morris, the board moved to approve the ordinance and waiving the 1st and 2nd reading of the ordinance" prior to the final vote.

    **d.** The Board stated it was moving forward to adopt the ordinance at a single meeting, and waiving the usual three meeting process for ordinance approval, because it "felt it was necessary to approve the ordinance to protect the county infrastructure and residents."

    **e.** There is no indication in the minutes as to what threat existed to the county or to the residents and infrastructure requiring immediate, and minimally noticed, action rather than discussion of the ordinance over the course of three or more meetings as usually practiced by the Board in accordance with Iowa Code § 331.302(6).

**43.** Invenergy's representative's attendance at the October 29, 2019 meeting is evidence of Invenergy's prior communications with the Board.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**44.**  Invenergy's representative's attendance at the October 29, 2019 meeting indicates Invenergy was involved in the drafting of the ordinance proposed.

**45.**  Readings of an ordinance and preliminary votes at two meetings prior to the third, or later, final vote is generally required by Iowa Code § 331.302(6)(a).

**46.**  Waiving of prior readings and votes is (i) out of the normal course of business of the Board and (ii) generally reserved for emergency situations requiring prompt and swift action.

**47.**  No prompt or swift action was required for approving the wind ordinance.

**48.**  The Board's basis for rushing adoption without discuss is without a reasoned basis.

**49.**  As plead below, more than two years would pass from the County's adoption of the ordinance to its receipt of the first wind turbine system application under the ordinance.

**50.**  How the ordinance protected immediate threats to the infrastructure and residents of Page County at the time of adoption is never explained in any minutes of the Board.

**51.**  According to the October 29, 2019 Board minutes:

    **a.**  The Board purportedly lawfully adopted Page County Ordinance 2019-2 "An Ordinance Regulating the Placement of Wind Energy Conversion Systems (WECS) on Property Located in the Unincorporated Areas of Page County, Iowa." (the "Ordinance");

    **b.**  The Board did not discuss the substantive terms of the Ordinance;

    **c.**  The Board did not discuss the processes and procedures to implement the Ordinance;

    **d.**  At the time, "[The] board plans to further research this and potentially amend

the ordinance" and that the supervisors "plan to hold future meetings to discuss [the ordinance] again."

    **e.** The Board acted without knowledge, and without prior research or study on the matter, which is by definition capricious (i.e. without notion – meaning without knowledge).

**52.** The Ordinance became effective on November 8, 2019.

**53.** A copy of the Ordinance is attached hereto as Exhibit A to this Petition, and such exhibit is incorporated herein by this reference.

**54.** Upon information and belief, (i) the Ordinance, summarily published and adopted at one meeting, was not initially drafted at the initiative, or direction, of the Board, but rather (ii) the draft of what would become the Ordinance was provided to one or more of the Respondents, or their staffs, by persons or entities interested in developing commercial wind turbine systems in the Page County area.

**55.** There is no record of the Board discussing the terms of the Ordinance or discussing possible changes to the terms prior to adoption.

**56.** At the time the final vote of the Board approving the Ordinance was taken, no member of the Board of Supervisors disclosed a conflict of interest or abstained from voting.

**57.** The entire Ordinance had not been published for the public prior to the October 29, 2019 meeting.

**58.** At the November 12, 2019 Board meeting, the minutes reflect that when asked by a citizen how to place the wind ordinance on the agenda for future meetings, and how to propose amendments to the ordinance, Respondent Morris stated he would like to hold a public meeting in December.

**59.** Town hall meetings with Invenergy presenting were scheduled for December 16, 2019 in Clarinda and December 18, 2019 in Shenandoah.

**60.** The temporal proximity of Invenergy's quick involvement and organizing meetings in two towns just six weeks after adoption of the Ordinance is indicative of Invenergy, or those acting in Invenergy's interest, being involved in the drafting of the Ordinance and provision of the Ordinance to the Board.

**61.** No Board minutes in 2019 reflect open meetings between the Board, or a majority of its supervisors, with Invenergy or its representatives.

**62.** Any meetings between the Respondent supervisors and Invenergy in 2019 occurred in closed meetings for which there is no record of the meeting, or record of the basis for the closed meeting under Iowa law.

**63.** Each town hall meeting scheduled for December 2019 was attended by more than 50 citizens.

**64.** The minutes of the two December 2019 town hall meetings include dozens of individual public commenters.

**65.** At the December 18, 2019 town hall, the minutes reflect that when asked how quickly the Board will be looking to amend the Ordinance, Respondent Morris indicated the Board will look into amending at a meeting in mid-January 2020.

**66.** The Board never considered amendments to the Ordinance from the time of its adoption through today.

**67.** The Board minutes for meetings held in 2020 indicate the Ordinance, public comments and complaints regarding the Ordinance, and citizen requests and discussions of potential amendments to the Ordinance occurred on: February 11, and July 14, 2020

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**68.** At the February 11, 2020 Board meeting, the minutes reflect that the Ordinance was not on the agenda, but one citizen during open public comment raised the issue of inadequate setbacks in the Ordinance, and Respondent Holmes, not then a supervisor, met with the Board to discuss the wind turbines and requested the Board hold an open meeting to discuss the Ordinance with the public.

**69.** At the February 11, 2020 Board meeting, the minutes reflect that Respondent Holmes, not then a supervisor, "asked the Board not to have outside conversations with the wind turbine company except in open meeting."

**70.** Respondent Holmes's statement warning the Board of violating the Open Meetings Act indicates Respondent Holmes was concerned in early 2020 that unrecorded and undocumented closed meetings of the Board with Invenergy and other wind turbine companies were occurring.

**71.** At the July 14, 2020 Board meeting, the minutes reflect that:

    **a.** County Attorney Sonksen provided on the record advice on legal considerations before another open meeting regarding the Ordinance should be held.

    **b.** Sonksen indicated, the Ordinance can be "modified moving forward, but it cannot be retroactive. Any change in the ordinance that would affect landowners that have already signed contracts would likely result in legal action against the county."

**72.** On September 1, 2020, the minutes indicate:

    **a.** Citizens requested meetings and modifications to the Ordinance be discussed.

    **b.** Citizens requested that property takings of non-participating land-owners be discussed at public hearings.

   **c.**   Numerous citizens expressed concerns regarding the Ordinance.

   **d.**   Citizens advised the Board that despite its statements in October 2019 and December 2019 that further study and amendment would be forthcoming, no changes in the nearly one year since the Ordinance was adopted had occurred.

   **e.**   Respondent Morris stated that "moving setbacks a few hundred feet would be allowed, but shutting wind energy down in Page County could result in litigation."

**73.**  At the October 6, 2020 meeting, Respondent King, acknowledged that wind turbine companies transporting turbine equipment through the County to projects in other areas were damaging the roads, and that "if and when the wind farms stop tearing up the roads, [J55] will be returned to a hard surface road."

**74.**  From its interaction with wind companies transporting wind turbine components through Page County for other projects, the Page County engineer, Respondent King, and the Board knew of the damage caused to public roads by these excessively heavy trucks and cargo.

**75.**  The Board held a "wind forum" on October 13, 2020 with panelist comprised of the Executive Director of the Iowa Rural Development Council, Director of Iowa Energy Office Department of Iowa Economic Development Authority, Vice President of Development for Tenaska (a wind turbine developer), Manager of Renewable Development – Invenergy, LLC, Dean of Industrial Tech Programs – Iowa Western Community College, and a farmer in Adair County.

**76.**  All panelist invited by the Board to the October 13, 2020 "wind forum" spoke in favor of wind development.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

77.   Citizens were not allowed to question the October 13, 2020 "wind forum" panelists.

78.   The minutes of the Board do not reflect open meetings, or the basis for holding closed meetings, demonstrating the manner in which the Board organized the participants who appeared at the October 13, 2020 "wind forum"

79.   The October 13, 2020 "wind forum" was held shortly before the upcoming election in November, and the candidates for election had expressed differing views on wind energy development in Page County.

80.   The minutes reflect that at the October 20, 2020 meeting of the Board:

   a.   Citizens asked whether the Board would provide and organize a similar "wind forum" with a panel of individuals against wind turbines.

   b.   Respondent Morris indicated he would "consider" such a panel.

   c.   Respondent King presented the Board with two applications to build meteorological towers (MET Towers) – one from Invenergy and the other from Tenaska.

   d.   The Invenergy representative, Gabe Klooster, stated the proposed 195 foot tower would be temporary (two or three years) and then it would be removed.

   e.   The Board approved the Invenergy temporary MET tower application 3-0.

81.   The Board has never organized a public panel comprised only of wind turbine opponents.

82.   The November 10, 2020 Board minutes reflect:

   a.   The Board put to a vote the question of whether a non-participating land-owners' rights forum should be held.

   b.   The motion to hold such a forum was rejected on a 3-0 vote.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**83.**  Respondent Holmes was elected to the Board seat previously held by Herzberg. Holmes assumed the seat and attended his first Board of Supervisors meeting on January 4, 2021.

**84.**  The March 30, 2021 Board meeting minutes reflect the following:

    **a.**  Citizens again requested a public meeting regarding wind projects in the county.

    **b.**  Respondent Morris "stated that two companies are working to obtain land in the county but no projects have been presented to the board for approval at this time and that he feels that it would be more beneficial to have public meeting once a project is presented."

    **c.**  Respondent Holmes moved for a public meeting on wind projects in Page County. Holmes "stated he feels other people who are now seeing action around their property who didn't realize everything that was going on a couple of years ago, might be more interested in attending a public meeting now."

    **d.**  Respondent Holmes's proposal for a public meeting was rejected on a 2-1 vote (Respondents Armstrong and Morris in the majority).

    **e.**  Respondent Morris encouraged Respondent Holmes to meet with the County's legal counsel (Respondent Sonksen) the following week on the turbine issues.

    **f.**  Following the rejection of Respondent Holmes's motion, Respondent Armstrong moved that there be a public meeting once a project is submitted to the Board, and for the Board's legal counsel to be present at the meeting.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

    **g.**  Respondent Armstrong's motion for a public meeting upon receipt of a proposal was approved 3-0.

    **h.**  When further citizens voiced concerns of meeting after a project was proposed rather than amending the Ordinance prior to such a proposal, Respondent Morris "stated he would be willing to listen to anything new in regards to wind but if it has been previously discussed he is not interested."

    **i.**  One citizen inquired as to why the County's abstracts were being re-written and changed if no wind projects had been proposed.

**85.** The temporal proximity between abstracts being re-written, and Respondents Armstrong and Morris "road-blocking" discussions of amendments before the submission of a proposal, indicates closed meetings being held by a majority of its supervisors with wind industry interests.

**86.** The temporal proximity between abstracts being re-written, and Respondents Armstrong and Morris road blocking discussions of amendments before the submission of a proposal is further indication of conflicted interests of the supervisors.

**87.** Throughout the remainder of 2021, the minutes reflect repeated requests for information, meetings, clarifications, and amendments by citizens always being rejected by Respondent Morris and Respondent Armstrong.

**88.** The minutes reflect citizen requests for public discussions and Board provision of information to the public at Board meetings held on April 6, September 28, and October 5, 2021

**89.** The minutes of the Board reflect that the amount of work, and Board discussion and planning for other projects (such as the County's ATV ordinance and the County's

project to replace the windows in certain Page County buildings), was extensive when compared to the lack of work on the wind turbine ordinance reflected in the same minutes.

90.   This difference in treatment of projects, occurring at temporally proximate times, demonstrates the citizens were not receiving (i) full information as to the backroom, unrecorded closed meetings and/or (ii) full information as to the Board's cooperation with Invenergy in blocking proposed amendments to the Ordinance.

91.   The minutes reflect that the Board told the public in 2021 that amendments to the Ordinance would be addressed when a project proposal was submitted.

92.   The minutes reflect that the Board did not place the Ordinance or wind turbines on the agenda for any meetings in January and February 2022.

93.   The minutes reflect that the citizens requested information, requested amendments, and requested discussion on the Ordinance and wind turbine issues at Board meeting held on January 25, 2022.

94.   The 2021 minutes, and those from the first two months of 2022, show dearth of discussion of wind turbines by the Board in its meetings.

95.   When compared to the events of March 2022 to present, the lack of discussion of turbine issues in 2021 and early 2022 reflect the Board was:

    **a.**   Holding closed meetings with Invenergy during the entire period; and

    **b.**   Aware of the details of a project proposal to soon be submitted by Invenergy.

96.   The minutes of the Board's February 28, 2022 meeting reflect:

    **a.**   More than 90 citizens attended the meeting.

    **b.**   Nearly 20 citizens spoke against approval of wind turbine projects.

    **c.**   Invenergy's representative, Mark Cowl, was present at the meeting.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**d.**   Cowl indicated Invenergy would be submitting proposal and application within weeks.

**e.**   Respondent Holmes discussed safety and noise information.

**f.**   Respondent Holmes stated that it was his view that "the consensus seems to be that everyone is very concerned about the timeline of the submitted project." An interesting comment given no project proposal had been submitted. This comment and the discussions of a "proposal" not yet submitted are further indication of the Board holding closed meetings with Invenergy.

**g.**   Respondent Morris, in response to citizens, stated "the ship has already sailed" and that "he isn't going to change the ordinance because of the potential legal consequences."

**h.**   Respondent Holmes voiced concern as to allowing Invenergy to proceed with a project due to Invenergy lying regarding its breaking its road use agreement with the County.

**i.**   A citizen voiced concern that a tax incentive ordinance passed in 2008 is still in place and has not been repealed.

**j.**   A citizen read the minutes from the October 29, 2019 meeting approving the Ordinance at which Respondent Sonksen said details of the Ordinance can be amended before or after a plan is submitted.

**k.**   Citizens requested a hearing to amend the Ordinance before any proposal was submitted.

**l.**   Respondent Holmes expressed concerns on the Ordinance provisions on setbacks and decommissioning.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

### B.  Invenergy's Wind Turbine System Application

**97.** Section 3 of the Ordinance ("Section 3") established procedures and requirements for persons or entities applying for a permission to construct commercial wind energy conversion systems ("C-WECS") and for non-commercial wind energy conversion systems ("Non C-WECS").

**98.** On or about March 7, 2022, Shenandoah Hills Wind Project, LLC ("SHW"), an Invenergy affiliate, submitted an application under the Ordinance for a proposed C-WECS in Page County.

**99.** The application was entitled "Shenandoah Hills Wind Project WECS Application" (the "WECS Application").

**100.**  A copy of the WECS Application is attached hereto as Exhibit B and incorporated herein by reference.

**101.** The WECS Application by SHW was submitted on "Invenergy" letterhead.

**102.** The WECS Application disclosed that SHW was an "affiliate of Invenergy LLC."

**103.** The WECS Application did not describe or disclose the nature of the "affiliation" between SHW and Invenergy, LLC or any other Invenergy affiliates.

**104.** The WECS Application was not signed by any person or entity representing SHW or any Invenergy affiliate.

**105.** The WECS Application was not signed by anyone.

**106.** The WECS Application did not include any attestation as to the accuracy, truthfulness, or completeness of the information provided.

**107.** The WECS Application described the "Project" as including up to 64 wind turbines to be deployed, with 31 sites in Page County and 33 sites in Fremont County, with disclosed turbine heights of between 500 to nearly 600 feet, as well as up to two

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

permanent, non-guyed, meteorological (MET) towers of 344 feet in height.

108. Section 1.1 of the WECS Application stated that that the "application complies with and demonstrates that the Project meets all requirements for a Wind Energy Conversion System ("WECS") of the Page County Zoning Ordinance, as well as the additional sections of the Ordinance incorporated therein by reference. . ."

109. Invenergy's statement in Section 1.1. of the WECS Application quoted in the immediately preceding paragraph is without basis because:

   a.  No provision of the County Zoning Ordinance sets requirements specifically applicable to WECS.

   b.  No provision of the Ordinance states that the Ordinance's provision are incorporated into the Page County Zoning Ordinance.

   c.  No provision of the Ordinance states that it is part of the Page County Zoning Ordinance.

   d.  No provision of the Page County Zoning Ordinance states that it incorporates any provision of the Ordinance.

   e.  No provision of the Ordinance amends, modifies, repeals or otherwise changes specific provisions of the Zoning Ordinance.

   f.  The WECS Application was never submitted to, or reviewed by, the Page County Zoning Commission.

110. The WECS Application was submitted after 3:00 p.m. on March 7, 2022.

111. A meeting of the Board convened the following day, March 8, 2022, at 8:30 a.m.

112. The minutes of the March 8, 2022 Board meeting reflect:

   a.  The Board considered a resolution to impose a 180-day moratorium "on the submission, acceptance, or implementation of any [WECS] permit

application as well as any recording of easements while the ordinance is reopened for review and amending."

**b.** The moratorium proposal was rejected on a 2-1 vote (Armstrong and Morris in the majority).

**c.** In rejecting the moratorium, Respondent Armstrong "stated until he sees a specific project he isn't certain what needs amended in the ordinance."

**d.** Respondent Holmes requested an amendment to rescind Section 11.a of the Ordinance and amend Section 11.c of the Ordinance to provide for increased setback requirements.

**e.** Respondent Morris refused to vote for any amendments because he "is overloaded and needs to take time to look them over."

**f.** Respondent Armstrong stated he preferred to have amendments on the following week's schedule "so they can have adequate time to look into specific items in the ordinance."

**g.** Respondent King was tasked with looking at the road use agreement attached to the Ordinance.

**113.** Petitioners have no information as to why Respondent King, the County's Zoning Administrator and Engineer, had not looked at the road use agreement attached to the 2019 Ordinance prior to receiving the WECS Application in March 2022.

**114.** The minutes of the March 15, 2022 Board meeting reflect:

**a.** Public comments were taken, all against approval of the WECS Application.

**b.** No discussion of a moratorium or amendments to the Ordinance were raised by any of the supervisors.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**115.** The minutes of the March 22, 2022 meeting reflect:

    **a.** No on-the-record discussion of the Ordinance or WECS Application occurred.

    **b.** The Board conducted a closed meeting citing Iowa Code § 21.5 (1)(c)(conference with counsel regarding existing or threatened litigation).

**116.** The topic of conversation in the § 21.5 meeting on March 22, 2022 was threat of litigation received by the County and Board from Invenergy.

**117.** The minutes of the March 29, 2022 meeting reflect:

    **a.** A proposed 180-day moratorium was discussed with the County attorney present.

    **b.** The County Attorney, Respondent Sonksen, stated that "any ordinance can be amended and changed."

    **c.** Respondent Morris stated he would not support the moratorium based on the right of people to use their property as they see fit.

    **d.** Respondent Holmes stated there were still problems in the Ordinance (light, property rights issues, height, setbacks, and sound) that needed addressed.

    **e.** Respondent Armstrong stated the Board "worked hard to develop an ordinance that was beneficial to the citizens" citing tax revenue.

    **f.** The proposed 180-day moratorium was adopted on a 2-1 vote (Armstrong and Holmes in the majority).

**118.** The facts plead above (i) demonstrate the dearth of meetings prior to adoption the Ordinance in 2019, and (ii) the refusal of the Board to consider amendments in 2020 and 2021; all of which directly conflict with Respondent Armstrong's statement that the Board "had worked hard to develop an ordinance that was beneficial to the citizens."

**119.** The Board did not conduct any on-the-record work in open meetings to develop the Ordinance in 2019.

**120.** The Board always refused attempts to amend, or discuss amendments to, the Ordinance in 2020 and 2021.

**121.** The minutes of the Board from the two meetings prior to adoption of the Ordinance through March 29, 2022 only contain the following in connection with the wind turbine issue:

    **a.** The Board rejecting citizen requests to discuss amendments to the Ordinance.

    **b.** The Board stating it wanted to delay consideration of amendments until after a proposal was received.

**122.** Respondent Armstrong voted against a 180-day moratorium on March 8, 2022 (less than 24-hours after the WECS Application was submitted.)

**123.** Respondent Armstrong voted for a 180-day moratorium three-weeks later on March 29, 2022.

**124.** Respondent Armstrong's March 29, 2022 moratorium vote was a switch from his prior pro-wind votes with himself and Morris in the majority.

**125.** Respondent Armstrong's March 29, 2022 moratorium vote aligned himself with Respondent Holmes who was historically in the minority.

**126.** On March 29, 2022 Respondent Armstrong was facing stiff competition in the primary elections to retain his seat on the Board.

**127.** Respondent Armstrong did not change his vote on any other matters during the time period between March 8, 2022 and March 29, 2022.

**128.** Respondent Armstrong offered no reason for his change in vote on March 29, 2022.

**129.** The minutes do not reflect any discussion of the Ordinance or any applications

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

under the Ordinance at the Board meetings held on April 5, 12, 19, 26, or May 3, 10, 17, 24, 2022.

**130.** The minutes reflect the Board held closed sessions under Iowa Code § 21.5 (1)(c) (conference with counsel regarding existing or threatened litigation) on April 12 and 19, 2022.

**131.** The topic of conversation at the April 12 and 19, 2022 § 21.5 meetings was the threat of litigation by Invenergy against the County.

**132.** On or about May 30, 2022, Respondent King, solely in his capacity as Page County Zoning Administrator, delivered the Board the WECS Application with his singular conclusion that the WECS Application complied with the Ordinance.

**133.** Respondent King is not a lawyer.

**134.** Respondent King could not provide a legal opinion about the WECS Application.

**135.** Respondent King was not asked to provide a conclusion to the Board about the WECS Application in his capacity as Page County Engineer.

**136.** Respondent King did not provide a conclusion to the Board about the WECS Application in his capacity as an engineer.

**137.** The Board could have included in the Ordinance a required approval of the WECS Application from Respondent King in his capacity as an engineer.

**138.** The Board could have included in the Ordinance a required approval of the WECS Application from Respondent King as County Engineer

**139.** The Board could have included in the Ordinance a required approval of the WECS Application by the County Attorney.

**140.** The Board chose to request a conclusion from Respondent King solely in his capacity as Page County Zoning Administrator, and required no other approvals

prior to a Board vote.

141. The Board chose not to require in the Ordinance that the County Attorney find that the WECS Application complied with the Ordinance.

142. Respondent King was present at nearly every single Board meetings from 2019 to 2022.

143. Respondent King was aware of Respondent Armstrong's votes on the Ordinance and WECS Application.

144. Respondent King was aware of Respondent Morris's votes on the Ordinance and WECS Application.

145. Respondent King was aware of some of Respondents Armstrong's non-open meeting conversations with Invenergy.

146. Respondent King was aware of some of Respondents Morris's non-open meeting conversations with Invenergy.

147. Respondent King was aware that Respondent Armstrong wanted the WECS Application to be approved.

148. Respondent King was aware that Respondent Morris wanted the WECS Application to be approved.

149. Respondent King was aware that he can be terminated from his position by majority vote of the Board.

150. Respondent King was aware that Respondent Armstrong and Respondent Morris comprised a Board majority at the time that Respondent King delivered his WECS Application approval.

151. Respondent King was aware that his continued employment as Zoning Administrator was dependent on his ability to comply with the expressed wishes of

Respondent Armstrong that the WECS Application be approved.

152. Respondent King was aware that his continued employment as County Engineer was dependent on his ability to comply with the expressed wishes of Respondent Armstrong that the WECS Application be approved.

153. Respondent King was aware that his continued employment as Zoning Administrator was dependent on his ability to comply with the expressed wishes of Respondent Morris that the WECS Application be approved.

154. Respondent King was aware that his continued employment as County Engineer was dependent on his ability to comply with the expressed wishes of Respondent Morris that the WECS Application be approved.

155. Respondent King was aware that he was expected to "rubber stamp" the WECS Application.

156. Respondent King, with the above referenced knowledge, complied with the expressed wishes of Respondent Armstrong and approved the WECS Application.

157. Respondent King, with the above referenced knowledge, then complied with the expressed wishes of Respondent Morris and approved the WECS Application.

158. The minutes of the May 31, 2022 Board meeting reflect:

   a. Invenergy's representative advised the Board that Invenergy was requesting a vote on the WECS Application be taken at the Board's June 14, 2022 meeting.

   b. Respondent Holmes requested time to study the WECS Application's map and proposal.

   c. Respondent Holmes reiterated that the Board had previously indicated that once the plan was approved by King, the Board would take time to consider

the plan.

    **d.**     Respondent Armstrong, together with Respondent Morris, refused Respondent Holmes's and the citizens' requests for a public hearing on possible amendments in March 2021, and instead in March 2021 forced adoption of a resolution to hear public comments and concerns after an application was received.

    **e.**     Respondents Armstrong and Morris refused the citizens' request in contradiction of their March 2021 statements on the record.

    **f.**     Respondent Holmes asked whether the environmental study was done. Invenergy's representative stated he would email the study to Respondent Holmes.

**159.** The minutes of the June 7, 2022 Board meeting reflect:

    **a.**     Respondent Morris raised the question about the different number of turbines contained on the application compared to the number included in the digital plan submitted.

    **b.**     Invenergy stated several turbines had been removed from that in the WECS Application.

**160.** The Board never revealed a study or estimates of any tax revenue that would be generated for the County based on the WECS Application.

**161.** The Board never released a study of the estimated tax revenue impact of the reduction of the number of turbines in the proposal.

**162.** The primary elections for Page County Board of Supervisors was held in early June 2022.

**163.** Respondent Armstrong was defeated in the primary election, garnering only 31.41%

of the Republican vote.

**164.** The primary opponent defeating Respondent Armstrong received 68.45% of the vote.

**165.** The development of wind power in Page County was a significant issue in Respondent Armstrong's primary campaign.

**166.** The WECS Application was not addressed at the June 14, 2022 Board meeting following the primary election defeat of Respondent Armstrong.

**167.** The minutes of the June 21, 2022 Board meeting reflect:

    **a.** Mike Blazer (described as "special counsel for Invenergy") requested a date for a meeting to discuss and vote on the WECS Application.

    **b.** Blazer read a letter complaining about the contents and scope of a legal hold notice sent by counsel for the Petitioners to the Board of Supervisors.

**168.** Petitioners do not know how Invenergy came into receipt of a legal hold notice sent to the Board.

**169.** The only possible source of Invenergy's possession of the legal hold letter was one of the Page County Respondents.

**170.** At the June 30, 2022 Board meeting, citizens raised issues with approval of the WECS Application being contrary to the moratorium resolution adopted by the Board in March 2022.

**171.** The July 5, 2022 Board meeting minutes establish:

    **a.** A representative of Page County Horizons (a citizens group organized in opposition to wind turbines) presented to the Board, and commented upon Invenergy's conduct at the prior week's meeting in which Invenergy's representatives offered to make concessions on its plan if the Board would

approve the WECS Application at that time, such as Invenergy offering to remove four turbines from the Project (when such a change would have been material requiring re-application and the Ordinance did not prevent adding the turbines back, each as plead below).

b. Another citizen presented a letter for the supervisors to send to Invenergy inquiring about Invenergy's disclosures under Section 3.5 of the Application regarding environmental concerns for species.

c. Respondent Armstrong said he would "follow-up with Invenergy to request the information suggested in the letter."

172. Respondent Armstrong never provided the requested environmental information before approval of the WECS Application.

173. The July 12, 2022 Board meeting minutes establish:

a. A representative of Page County Horizons appeared at the Board meeting to discuss issues surrounding the Project's turbine interference with KYFR's radio signal, and the proposed placement of turbines too close to a public area (Wabash Trace Trail).

b. KYFR representatives appeared at the meeting indicating KYFR's engineers were still reviewing the proposal for impacts of three turbines causing distortion of the station's broadcast pattern.

174. The July 18, 2022 Board meeting minutes establish:

a. A member of Page County Horizons asked for clarification regarding the project line boundary in the WECS Application.

b. A member of Page County Horizons asked whether any future projects within the line would be grandfathered-in to any subsequent changes to the

Ordinance.

    **c.**    A member of Page County Horizons requested third-party legal and engineering opinions.

    **d.**    Representative Holmes stated he had requested environmental information from Invenergy but he only received a summary.

    **e.**    The meeting concluded with a closed session under Iowa Code § 21.5 (1)(c) (conference with counsel regarding existing or threatened litigation).

**175.** The topic of conversation at the July 18, 2022 § 21.5 meeting was the threat of litigation by Invenergy against the County.

**176.** The July 26, 2022 Board meeting minutes establish:

    **a.**    A citizen asked the Board who would be the County's point of contact for compliance with the Ordinance if there were violations.

    **b.**    A citizen asked whether any changes had been made to the Ordinance during the 120 days that had passed since passage of the moratorium.

    **c.**    Respondent Armstrong stated the Board had been working with legal counsel on the Invenergy WECS Application.

    **d.**    Respondent Armstrong stated that if legal counsel approves the WECS Application, the application would go to a vote, and then after the vote the Board would be able to concentrate on the Ordinance and future projects.

    **e.**    A citizen, in response to a challenge by Respondents Armstrong and Morris at a prior meeting for her to locate another county's ordinance measuring setbacks from property lines not structures, presented such an ordinance from Madison County.

    **f.**    The minutes indicate Respondents Armstrong and Morris rejected the

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Madison County example because Madison County did not have an active wind project.

177. The Petitioners cannot understand the logic of Respondents Armstrong and Morris regarding Madison County at the July 26th meeting because at the time Page County, just like Madison County, did not have an active wind project.

178. The only explanation of the July 26th statements is that Respondents Armstrong and Morris, as members of the Enterprise, considered an active wind project to be ongoing in Page County, even when such a project had not yet been approved.

179. The rejection of the presented Madison County ordinance demonstrates the lack of reason (unreasonableness) and arbitrariness of the Board in approving the WECS Application.

180. On July 29, 2022, the Board held another closed meeting pursuant to Iowa Code § 21.5 (1)(c) (conference with counsel regarding existing or threatened litigation).

181. The topic of conversation at the July 29, 2022 § 21.5 meeting was the threat of litigation by Invenergy against the County.

182. The Board's published agenda for the August 2, 2022 meeting (i) conflicted with the Board's prior promises and resolutions to consider Ordinance amendments after receiving a specific proposal, and (ii) pre-ordained a result, when the agenda item was "Discuss/Approve Shenandoah Hills Application" (emphasis added).

183. The evens of August 2, 2022 demonstrate three members of the Enterprise, Respondents Armstrong, Morris and Sonksen, had repeatedly lied to the public regarding the amendment process and planned proceedings to amend for more than two years.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**184.** The August 2, 2022 Board meeting minutes establish:

    **a.**    At least 100 people were present personally or by Zoom.

    **b.**    Only one citizen spoke in support of approving the WECS Application.

    **c.**    KYFR spoke against the approval of WECS Application on the grounds of Invenergy refusing to engage in good faith negotiations regarding radio interference.

    **d.**    Citizens raised the issue for the first time as to the danger of the project to the Buckeye petroleum product pipeline running through the Project area.

    **e.**    The Board had not been informed by anyone prior that a pipeline was in the area.

    **f.**    A citizen raised the issue of a television advertisement run for Respondent Armstrong's unsuccessful primary campaign touting his pro-wind position, and inquired as to the source of funding for the ad.

    **g.**    Respondent Armstrong stated "he was not sure who was running the ad and that he did not contact them and it was that company who endorsed Armstrong."

    **h.**    Citizen questioned Respondent Armstrong as to his conflicts of interest.

    **i.**    Respondent Armstrong denied any conflict on the Invenergy WECS Application.

    **j.**    Questions as to eminent domain were raised, but not addressed by the Board.

    **k.**    Citizens noted for the Board that there were errors and omissions in the WECS Application.

    **l.**    Citizens noted that information regarding the WECS Application's proposed placement of turbines inside of the required setbacks for public land had not

been addressed by the Board.

**m.** A citizen asked how it had only taken two meetings to pass a 26-page wind ordinance, but it had taken seven meetings to pass a 5-page ATV ordinance.

**n.** The Board was advised that Invenergy had not obtained a FCC permit.

**o.** Respondent Holmes suggested that a vote on the WECS Application be delayed until the FCC permit had been obtained.

**p.** Respondent Holmes's suggested delay on a vote to await FCC permitting was rejected by Respondents Armstrong and Morris.

**q.** The Board stated Invenergy would not provide more information on the environmental studies beyond that summary information already provided to the public.

**r.** The Board acknowledged that the Ordinance was confused as to whether the turbine placement near Wabash Trace trail, a public area, was permitted or not.

**s.** The Board indicated the Ordinance is weak, but the WECS Application met the requirements.

**t.** The WECS Application was approved on August 2, 2022 on a 2-1 vote (Armstrong and Morris in the majority).

**u.** Respondent Holmes stated he was not voting for the WECS Application because (i) Invenergy had breached its only prior contract with the County, (ii) representatives of Invenergy had lied to his face in the board room, and (iii) the application was full of problems.

**185.** Mere seconds after approving the WECS Application, the audio & video record of the Board meeting show Respondent Armstrong acknowledging that the Board

knows of deficiencies in the Ordinance and WECS Application materials.

**186.** Mere seconds after approving the WECS Application, the audio & video record of the Board meeting show Respondent Armstrong stating that the deficiencies in the Ordinance and WECS Application can be addressed later.

**187.** The August 9, 2022 Board meeting minutes establish the Board, only one week after "approving" the WECS Application, voted to extend the moratorium to March 2023.

**188.** Neither the Ordinance nor the WECS Application was discussed at the August 16, 2022.

**189.** The August 23, 2022 Board meeting minutes establish:

    **a.** The Board was asked how Invenergy communicated with the Board.

    **b.** Armstrong responded and "stated through emails and phone calls."

    **c.** A citizen stated that such communication from Invenergy should be public information.

    **d.** Armstrong indicated that updates would be provided at later meetings.

    **e.** Armstrong stated he had contacted outside counsel for assistance with preparing the road use agreement and decommissioning plan.

    **f.** Armstrong stated he was getting advice from outside counsel regarding the setback encroachment near Wabash Trail.

    **g.** The Board discussed whether it would be able to TIF (tax incremental financing) the Wind Turbine Project and the need for expert help to determine what the "costs and benefits would be."

**190.** The minutes and agenda for the August 30, 2022 meeting establish:

    **a.** Counsel had advised the Board that a resolution was needed to authorize supervisors or staff to work with outside counsel to prepare and negotiate along the final road use and turbine decommissioning agreements with Invenergy. The proposal was approved and a vote on the proposal was delayed at the request of Respondent Holmes.

    **b.** "Armstrong explained that legal counsel wanted one board member to be a point of contact that would work with outside counsel and King."

    **c.** "Brownell [outside counsel] felt that after reading through the minutes [of the August 2nd meeting] they needed to assign a board member to be in contact with legal counsel. Legal counsel would then contact Invenergy and go back and forth on the road use agreement and decommissioning agreement. This process will take approximately 30-45 days. Once an agreement has been met it would then be presented to the entire Board of Supervisors to vote on."

    **d.** Holmes questioned why Invenergy should have any say in the agreements and the agreements were to protect Page County resources.

    **e.** Holmes stated that he "prefers that all three board members have a say in both agreements and feels it should be discussed in public meetings."

    **f.** "Morris stated due to potential litigation and the fact that the Road Use Agreement is included in the Wind Ordinance he felt it was required to be in closed session if all three supervisors were present."

**191.** Prior to August 30, 2022, the Board had never considered or adopted a resolutions approving any Board supervisors or staff to negotiate with Invenergy or any other potential wind turbine system applicant.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

192. At the August 30, 2022, the Board discussed the assigning Armstrong to the negotiate one agreement and Holmes to negotiate the other.

193. At the September 6, 2022 meeting, on a 2-1 vote (Armstrong and Morris in the majority):

    a.    Respondent Armstrong was assigned to serve as contact and negotiator to work with outside counsel on the road use agreement;

    b.    Respondent Morris was assigned to serve as contact and negotiator to work with outside counsel on the decommissioning plan;

    c.    Respondent Holmes was not assigned to participate in the negotiations.

194. Respondent Holmes voted to deny the Invenergy WECS application on August 2, 2022 because Invenergy lied about its damage to Page County roads from its transports across the county for other projects.

195. Respondent Holmes received no assignment because he demanded Invenergy to comply with other road use agreements

196. In September 2022, Cass County now also learns road use agreements are ignored when a turbine crane took an unauthorized route and being over-weight demolished a bridge on an unauthorized route, with no care for the people of the county, and now the bridge to now be repaired and local transportation before harvest hampered.

[https://www.kjan.com/index.php/2022/09/cass-county-sheriffs-office-updates-crane-accident-info-1-other-accident/]

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT



**197.** Litigation is ongoing in Minnesota and other areas attempting to obtain wind turbine developers to pay after damaging roads even with road use agreements.

**198.** Respondent Armstrong and Respondent Morris intentionally, and with allegiance to Invenergy, blocked Respondent Holmes from negotiating the road use agreement.

**CLAIM 1:   <u>WRITS OF MANDAMUS & CERTIORARI</u>**

**199.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**A. <u>General Legal and Factual Allegations</u>**

**1. <u>Source, Scope and Limits of the County's and Board's Authority</u>**

**200.** Iowa Constitution, art. III, § 39A, grants Iowa counties home rule power and authority to determine and act in local affairs and government.

**201.** Iowa Constitution, art. III, § 39A prohibits an Iowa counties from acting inconsistent with the laws of the laws of the State of Iowa general assembly.

**202.** The Iowa general assembly is vested under Iowa Constitution art. III Legislative

Department § 1 with sole legislative authority for the State.

**203.** The Iowa legislature vested county boards of supervisors with legislative authority within those areas of police power specifically delineated by statute. Iowa Code § 33.301(2).

**204.** The Iowa legislature directed that all duties of a county must performed by, or under the direction of, the board of supervisors. Iowa Code § 33.301(2).

**205.** A county, and its board of supervisors, do not have power to take actions inconsistent with the Iowa Constitution or the laws adopted by the general assembly of Iowa. Iowa Const. art. III § 39A; Iowa Code § 331.301(1).

**206.** Neither the Iowa Constitution nor the statutory enactments of the Iowa general assembly provide authority for a county, or its board of supervisors, to sub-delegate the county's legislative powers to any other person or entity.

**207.** In exercising its delegated duties and legislative powers, the County and the Board must "substantially comply with procedures established by state law for exercising a county power." Iowa Code § 331.301(5).

**208.** An action of a board is illegal and unenforceable if "the board has not acted in accordance with a statute; if its decision was not supported by substantial evidence; or if its actions were unreasonable, arbitrary, or capricious." Perkins v. Bd. of Supervisors, 636 N.W.2d 58, 64 (Iowa 2001)(quoting Northland v. Worth County Compensation Bd., 323 N.W.2d 251, 253 (Iowa 1982)).

**209.** The County and Board are required to comply with, and not take action inconsistent with, the provisions of Iowa statutes, including without limitation Iowa Code Chapter 331 ("Home Rule Statute") and Iowa Code Chapter 21 ("Open Meetings Act").

210.    The Board is bound by its duly adopted ordinances and resolutions unless and until such ordinance or resolution is repealed or amended by the Board after complying with all statutory and county requirements for the adoption of an ordinance or resolution.

211.    Actions by the Board in contravention of Home Rule Statute, Open Meetings Act, or any other Iowa statute, are *ultra vires* and illegal under the provisions of Iowa Code § 331.301(1).

212.    Actions by the Board in conflict or contravention of the Board's prior acts, ordinances or resolutions, are *ultra vires* and illegal under the provisions of Iowa Code § 331.301(1).

213.    The Board is devoid of authority, power and jurisdiction to take any action, or adopt any ordinance or resolution, that does not substantially comply with the Iowa Constitution or the statutes adopted by the Iowa general assembly.

214.    In adopting the Ordinance the Board was required under the Home Rule Statute to provide Petitioners notice and opportunity to be heard.

215.    In and approving the WECS Application the Board was required under the Home Rule Statute to provide Petitioners notice and opportunity to be heard

216.    In adopting the Ordinance the Board was required to (i) determine the factual basis for its actions, (ii) apply Iowa Code § 331.301(1) to those facts, and (iii) make its determination whether those actions were within its jurisdiction and authority as delegated by the Home Rule Statute.

217.    In approving the WECS Application the Board was required to (i) determine the factual basis for its actions, (ii) apply Iowa Code § 331.301(1) to those facts, and (iii) make its determination whether those actions were within its jurisdiction and

authority as delegated by the Home Rule Statute.

218. Under Section 3 of the Ordinance, before approving the WECS Application, the Page County Zoning Administrator was required to determine that the WECS Application complied with the Ordinance.

219. Under Section 3 of the Ordinance, after certification of the WECS Application's compliance with the Ordinance from the County Zoning Administrator, the Board was required to determine that the WECS Application complied with the Ordinance.

220. In adopting the Ordinance each supervisor, and the entire Board, was required to determine if any member was acting with a conflict of interest as to the matter upon which action was being taken.

221. In approving the WECS Application, each supervisor, and the entire Board, was required to determine if any member was acting with a conflict of interest as to the matter upon which action was being taken.

222. Only the courts may adjudicate whether the Board acted consistent with its power, authority and procedures as delegated by statute.

223. Only the courts may adjudicate whether the Board has violated the rights of the citizens of Page County to be subject to only those laws and rules adopted in conformance with the Constitution and laws of the State of Iowa.

224. Only the courts may determine whether the Board complied with the statutory procedural requirements of the Iowa Code.

225. Only the courts may determine whether the Board and County officers and employees took actions outside of their authority granted by the State of Iowa.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

## 2. **General Factual and Remedies Allegations**

226.  The Petitioners are personally interested in the requests for relief contained within this entire Petition.

227.  The Petitioners, as residents of Page County, have interest in the following:

   a.  The lawful exercise of governmental power by their County elected officials;

   b.  The employees, officers and supervisors of the County exercising their powers in accordance with the law;

   c.  The health, safety and welfare of the residents of Page County;

   d.  The financial and infrastructure resources of Page County;

   e.  The habitats and species of Page County; and

   f.  The impact of the SHW proposed C-WECS system on their property, businesses, living conditions, health, safety, life, roadways, and standard of living.

228.  Invenergy is comprised of companies headquartered in downtown Chicago.

229.  Invenergy's employees and representatives have been deployed to Page County to effectively "carpet bag" ordinances and approvals to Invenergy's economic advantage over the wishes of the Page County citizens

230.  Invenergy does not share the same concerns as the Petitioner's identified above.

231.  The Page County Respondents each have a duty, arising out of their office, to comply with the Constitution and laws of the State of Iowa.

232.  The Page County Respondents each have a duty, arising out their office, to comply with the Board's previously adopted ordinances and resolution that have not been specifically repealed or amended.

233.  The Page County Respondents each had a duty to assure that Invenergy's WECS

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Application complied with the requirements of the Ordinance before approving the WECS Application.

234. The Petitioners have demanded that the Page County Respondents comply with their duties, verbally at numerous public meetings, and in writings to the Board by individuals and by their attorneys, and the Page County Respondents have refused and/or neglected to do so.

235. The record of the open meetings held regarding Invenergy's WECS Application approval demonstrates that any further demands to properly perform these duties would be futile.

### 3. **Standards for Mandamus & General Description of Requested Mandamus Relief**

236. An action of mandamus may be brought in equity to obtain an order commanding a county board of supervisors or person to do, or not to do, an act, the performance or omission of which the law enjoins as a duty arising from an office, trust or station. Iowa Code § 661.1.

237. Petitioners pray for all appropriate orders of mandamus be issued to the Page County Respondents, including appropriate orders to take actions to rectify and remove illegal acts from the laws of the County (including repealing the Ordinance, revoking Invenergy's WECS Application approval and authorization, revoking any other authorizations issued, prohibiting entry of any contract or agreement contemplated by the Ordinance, revoking any other tangential or related authorizations, exceptions, and permits granted under other ordinances, zoning exceptions, or zoning approvals), arising out of the breach of the duties of their offices to comply with the laws of the United States, the State of Iowa, and the laws

of the County

238. Petitioners further pray for an order of mandamus requiring the Board to initiate restraining order proceedings under Iowa Code § 335.23 to prevent Invenergy from the unlawful construction of a C-WECS, and to restrain and abate violations of the Page County Zoning Ordinance by Invenergy.

### 4. **Standards for Certiorari & General Description of Requested Certiorari Relief**

239. A writ of certiorari lies where a county board of supervisors acts in a quasi-judicial nature and exceeds its jurisdiction or otherwise acts illegally. *State Public Defender v. Iowa District Court*, 594 N.W.2d 34, 36 (Iowa 1999); *Hoefer v. Sioux City Cmty. Sch. Dist.*, 375 N.W.2d 222, 224 (Iowa 1985); Iowa R. Civ. P. 1.1401.

240. Petitioners pray for writs of certiorari be issued to the Page County Respondents acting in a quasi-judicial nature (i) outside of their statutory jurisdiction; (ii) illegally by exercising power in excess of that provided by the legislature; (iii) illegally and without jurisdiction by adopting the Ordinance in its entirety, and/or by adopting specific provisions within the Ordinance as plead below; and (iv) illegally and without jurisdiction in granting the WECS Application.

### B. **Section 9 of the Ordinance is an Illegal Act in Violation of the Specific Repeal Requirements in Iowa Code § 331.302(4)**

241. Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

242. Adoption and application of Section 9 of the Ordinance is an illegal act in violation of the specific repeal requirements of Iowa Code § 331.302(4).

243. The Home Rule Statute prohibits the County and Board from exercising powers "inconsistent with the law of the general assembly." Iowa Code § 331.301(1).

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**244.** Iowa Code § 331.302(4) establishes requirements for the Board to act specifically when amending or repealing ordinances previously adopted.

**245.** Iowa Code § 331.302(4) provides (emphasis added):

> An amendment to an ordinance or to a code of ordinances <u>shall</u> <u>specifically</u> <u>repeal</u> <u>the ordinance</u> or <u>code</u>, or the <u>section</u>, <u>subsection</u>, <u>paragraph</u>, or <u>subpart</u> to be amended, and <u>shall</u> <u>set forth</u> the <u>ordinance</u>, <u>code</u>, <u>section</u>, <u>subsection</u>, <u>paragraph</u> or <u>subpart</u> <u>as amended.</u>

**246.** Section 9 of the Ordinance ("<u>Section 9</u>") provides:

> All ordinance(s) in conflict with the provisions of this Ordinance are hereby repealed.

**247.** Section 9 does not "specifically" identify any ordinance, code, section, subsection, paragraph or subpart purportedly repealed by Section 9.

**248.** The County and Board have not set forth versions of any County ordinance, code, section, subsection, paragraph, or subpart as amended by the purported effect of Section 9.

**249.** By failing to identify specific ordinances, codes, sections, subsections, paragraphs or subparts repealed by Section 9, and by failing to publish amended versions of modified ordinances, codes, sections, subsections, paragraphs or subparts impacted by Section 9, the public has no notice of the existing laws of the County.

**250.** Because Section 9 did not identify the "specific" changes to existing ordinances, codes, sections, subsections, paragraphs or subparts purportedly repealed by its enactment:

    **a.** Section 9 was not adopted in substantial compliance with the procedures established by the general assembly under Iowa Code § 331.302(4);

    **b.** Section 9 is an act inconsistent with the laws imposed on the County by the

general assembly in violation of Iowa Code § 331.301(1); and

    **c.**    Section 9 is an illegal act outside of the delegated jurisdiction and powers of the Board.

**251.** Because no ordinance, code, section, subsection, paragraph or subpart purportedly repealed by Section 9 has been published as specifically amended, repealed or modified:

    **a.**    The County failed to substantially comply with the procedures established by the general assembly under Iowa Code § 331.302(4); and

    **b.**    Any purported amendment, repeal or modification to existing ordnances ordinance, codes, sections, subsections, paragraphs or subparts by Section 9 are invalid as illegal acts of the Board.

**252.** Because the Board acted illegally by:

    **a.**    adopting Section 9 as a general, rather than "specific," repeal, and

    **b.**    failing to republish any ordinances, codes, sections, subsections, paragraphs and subparts affected by Section 9;

the Petitioners seek Writs of Certiorari and Orders of Mandamus declaring, and ordering all actions by the Page County Respondents to effectuate remedies to, the following:

    (i)    Section 9 of the Ordinance is an illegal, unauthorized and *ultra vires* act by the Board as it is inconsistent with the laws adopted by the general assembly; and

    (ii)    The repeal, amendment or modification of any Page County ordinance, code, section, subsection, paragraph or subpart by Section 9 is ineffective, and other ordinances, codes, sections, subsections, paragraphs and subparts remain in effect, in full force, without repeal or amendment because the adoption of Section 9.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**253.** Petitioners also seek a declaratory judgment that Section 9 of the Ordinance (i) is of no legal force and effect, and (ii) does not lawfully repeal, amend or modify any pre-existing or future ordinance, code, subsection, paragraph or subpart lawfully adopted by the County.

### C. **The Board of Supervisors Illegally Abdicated and Sub-Delegated Legislative Power to Private Entities in Contravention of Iowa Code §§ 331.301 & 331.302**

**254.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**255.** The Ordinance and approval of the WECS Application constituted an illegal abdication and delegation of legislative power, and county power, to private entities in contravention of the Iowa Code as plead below.

**256.** The Home Rule Statute, Iowa Code Chapter 331, constitutes the Iowa general assembly's delegation of a portion of its sole constitutional legislative power to the County. Iowa Code § 331.301(1).

**257.** The legislature's delegation of constitutional legislative power is not unlimited because both the Iowa Constitution and the Home Rule Statute provide that the County is not vested with the power to take any action inconsistent with the Iowa Constitution or the laws of the general assembly.

**258.** The general assembly specified that "[A] power of a county is vested in the board, and a duty of a county shall be performed by or under the direction of the board." Iowa Code § 331.302(2).

**259.** The general assembly did not authorize any entity or person, other than the board or those acting under direction of the board, to exercise the powers delegated by the State to the County, or to exercise and fulfill the duties of the County.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

260. The general assembly did not authorize the Board to sub-delegate, assign or abdicate, its duties and powers to any other person or entity.

261. The Ordinance, and the approval of the WECS Application, unlawfully abdicate, sub-delegate, and assign the County's and Board's powers to a private entity in violation of the Home Rule Statute and the Iowa Constitution.

262. Section 4 of the Ordinance ("Section 4") sets forth the provisions applicable to the "siting, construction and operation" of a C-WECS after approval of a C-WECS application.

263. Section 4's restrictions are limited to requirements as to the following: color of the turbines; tower configuration, lighting and signage; feeder powerlines; waste disposal; signal interference; compliance with FAA standards; use of National Electric Codes; setbacks of towers from structures, property lines, public rights-of-way, radio communication paths and public areas; and safety measures for towers as to wiring, non-climbability, access, and markings.

264. Other than Section 4, no provision in the Ordinance limits or restricts an approved C-WECS owner's or operator's actions, decisions, or conduct in the "siting, construction or operation" of a Board approved C-WECS.

265. No provision of the Ordinance provides a mechanism for the County to inspect or enforce the provisions of Section 4 even if a Board approved C-WECS owner or operator acts in contravention of those requirements.

266. No provision of the Ordinance provides for the revocation of the C-WECS authorization and decommissioning of turbines installed if the Board approved C-WECS owner or operator violates the few listed Section 4 restrictions on the siting, construction, and operation of the turbines.

267. No provision of the Ordinance requires the information provided in a C-WECS application to be truthful or complete to the best of the applicant's knowledge.

268. No provision of the Ordinance requires the applicant to sign the application or attest to its contents.

269. No provision of the Ordinance provides a remedy or ability to revoke Board approval of an application to construct or operate a C-WECS when the application contained false or misleading information.

270. No provision of the Ordinance requires a Board approved C-WECS owner or operator to comply with the terms and conditions of the project as described in the submitted and approved application.

271. No provision of the Ordinance provides a remedy or ability to revoke a C-WECS approval based upon the owner's or operator's deviation from the project as described in the submitted and approved application.

272. No provision of the Ordinance authorizes the County to impose additional or modified limitations on the siting, construction or operation of turbines after application approval.

273. Section 3(10) of the Ordinance required the applicant to affirm a "sound study was completed showing expected maximum decibel levels produced" by the proposed turbines,

274. No provision of the Ordinance requires the turbines actually constructed to comply with the disclosed standards.

275. No provision of the Ordinance requires the turbines to comply with any noise standards at all.

276. No provision of the Ordinance provides a remedy if the fully constructed turbines

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

fail to meet the sound levels disclosed in the application.

277. Section 9 of the Ordinance purports to repeal any existing or future lawfully adopted ordinance that would impose sound limitations upon the operation of the turbines.

278. Section 3(12) of the Ordinance required the applicant to affirm the applicant had identified migratory flyways, nesting areas, and the species in the area

279. No provision of the Ordinance requires a C-WECS owner or operator to limit damage to these identified flyways, nesting areas or species in the area.

280. No provision of the Ordinance provides any remedy if the fully constructed turbines damage or impact any identified, threatened or protected flora or fauna.

281. Section 9 of the Ordinance purports to repeal any existing or future lawfully adopted ordinance that imposes regulation on, procedures to protect, or penalties to be assessed for harm to such flora or fauna.

282. Section 3(4) of the Ordinance required the applicant to disclose the height and rotor diameter of the wind turbines.

283. No provision of the Ordinance requires an approved C-WECS owner or operator to comply with the height or rotor diameter descriptions of the application in the final project.

284. No provision of the Ordinance provides any remedy if the fully constructed turbines exceed the height or dimensions included and disclosed in the application.

285. Section 9 of the Ordinance purports to repeal any existing or future lawfully adopted ordinance that imposes height or diameter limitations on structures or turbines.

286. Section 6 of the Ordinance, applicable to non-commercial wind turbines even after construction, specifically prohibits non-commercial turbines from exceeding one hundred feet in total height.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**287.** Unlike the provisions of Section 6 of the Ordinance applicable to non-commercial wind projects, no provisions of the Ordinance restrict the height of commercial turbines.

**288.** The difference in the Ordinance's treatment of height limitation between commercial and non-commercial turbines will be cited by Invenergy and other approved C-WECS developers for the proposition that the Board knew how to impose height restrictions on turbines, as they did for non-commercial turbines, and, therefore, the lack of height restrictions on commercial turbines within the Ordinance means no height restrictions, now or in the future, may be applied to commercial turbines.

**289.** Section 9 of the Ordinance as adopted, would serve to repeal any existing or future height restrictions on commercial turbines contained in any lawfully adopted ordinance.

**290.** The final paragraph of Section 3 of the Ordinance provides that if "there are any material changes to the information provided as part of the application" that occur "from the time of the application until the construction of the WECS, the applicant shall submit a new application . . . together with the updated information for each Wind Turbine, and any such change shall be in compliance with the Ordinance."

**291.** Nothing in the Ordinance requires disclosure or re-application in the event of material changes after construction is completed.

**292.** The Ordinance does not define "material change."

**293.** The Ordinances does not require resubmission of an application if a series of immaterial changes, in the aggregate, materially change the plan or information as submitted in the application.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**294.** The Ordinance does not provide any remedy or penalty, or the ability to revoke an approval of a C-WECS application, if the C-WECS developer fails to resubmit a revised application due to material changes in information.

**295.** The Ordinance does not provide that the original application approval, prior to changes in material information, is revoked and of no force and effect unless the revised application is approved.

**296.** The Ordinance does not provide that all construction and development must cease until the re-application disclosing material changes is approved.

**297.** The Ordinance does not provide that if the amended re-application is not approved, construction and operations must cease, and be dismantled or decommissioned.

**298.** As the Ordinance is drafted, there are no limitations on Invenergy's actions after the Board's approval of the WECS Application (with the exception of those areas identified in Section 4 of the Ordinance, and even then, no enforcement mechanism exists in the Ordinance to enforce violations of Section 4).

**299.** By operation of the Ordinance as adopted, upon approval of the WECS Application the Board has unlawfully delegated the power to repeal lawfully adopted ordinances of Page County to Invenergy.

**300.** Any subsequently approved C-WECS applicant would similarly be delegated such powers to repeal ordinances lawfully adopted by the Board.

**301.** If Invenergy, or any other Board approved applicant, takes an action in connection with the siting, construction or operation of a turbine system that (i) is not inconsistent with the Ordinance and (ii) is inconsistent or violates any existing County ordinance, then by operation of Section 9 of the Ordinance, the existing, inconsistent County ordinance is repealed by Invenergy's or other Board approved

applicant's actions.

302. The ability of an unelected, private enterprise, through merely taking physical acts in furtherance of a privately owned wind turbine system, to effectuate the repeal of lawfully adopted county ordinances, violates the Home Rule Statute vesting legislative power to adopt, amend and repeal county ordinances solely in the County and its Board.

303. The County has impermissibly, and illegally, abdicated and effectively delegated, the legislative powers vested by the general assembly solely in the Board to Invenergy, and possibly future approved applicants, in perpetuity, without the ability of Page County's residents to vote upon Invenergy's actions going forward, or to seek legal redress for Invenergy's acts that otherwise would be illegal under county ordinances but for Invenergy taking such an illegal act that then has the effect of repealing the lawfully adopted ordinance prohibiting that action in the first place.

304. The Ordinance divests the citizens of Page County of political control of their laws and representatives, and subjects the citizens of Page County to the unknown sensibilities, risk aversion or non-aversion, and risk analysis (which can never be known to the County or the public), of a private, for profit enterprise, which now is vested by the Ordinance with the power to repeal other lawfully adopted ordinances, with no political or legal recourse whatsoever provided.

305. The purpose of the home rule provisions of the Iowa Constitution and Home Rule Statute was to place political and policy control in the hands of the eligible electors in the counties.

306. The purposes of the home rule provisions are completely thwarted and overridden

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

when a company, based in Chicago, is vested with dictating the policy and legislative decisions rightfully belonging solely to the County and its citizens.

307. The Board's abdication and sub-delegation of its powers to a non-governmental entity is inconsistent with the Iowa Constitution and the acts of the Iowa general assembly.

308. No law of the State of Iowa vests Invenergy with the authority to take actions that repeal or amend lawful enactments of the County or Board.

309. Invenergy's pleadings in litigation already ongoing in other parts of the State of Iowa (Worth County as an example), and in threats of litigation already made by Invenergy against Page County while Invenergy was preparing its WECS Application, while Invenergy's WECS Application was being considered by Respondents King and Sonksen, and being considered and approved by the Board, demonstrate Invenergy's position, now judicially estopped from change, that county ordinances and their C-WECS approval processes, similar to those at issue in this case, simply by being adopted and Invenergy making preliminary investments in developing a plan and pursuing approval to construct a C-WECS, vest Invenergy nearly unfettered discretion to develop and construct wind systems without any interference or restraint by the county, and without ability of the county to change, modify, add, or modify any restrictions on Invenergy's siting, construction or operation of a turbine system.

310. Section 9 (repealing any contradictory ordinance), combined with the minimal regulation provided by Section 4, and Invenergy's litigation position that it has a vested interest based upon its actions in reliance on the ordinance and WECS Application approval that cannot be revoked, modified or regulated, means, as

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

examples:

**a.** Invenergy alone is now vested with the sole discretion to determine the height and diameter of wind turbines deployed in the approved area regardless of any existing or future ordinances to the contrary, and

**b.** Invenergy alone may determine the actual noise level of the turbines regardless of any existing or future ordinances to the contrary.

**311.** Height restrictions and noise levels are clear examples of the police powers vested by the Iowa legislature solely in the County and its Board.

**312.** Nothing in the Home Rule Statute authorizes the Board to abdicate, assign, or sub-delegate these powers to regulate height and noise to a private enterprise.

**313.** The Ordinance constitutes an illegal and *ultra vires* abdication and sub-delegation of powers belonging solely to the Board under Iowa Code §§ 331.301(1), (2) & 331.302(1) to private entities as to which Petitioners seek all necessary Orders of Mandamus and Writ of Certiorari:

(i)  declaring the Ordinance invalid;

(ii)  declaring the approval of the WECS Application invalid; and

(iii) directing the Page County Respondents to take all necessary actions to effectuate and document the invalidity of the Ordinance, WECS Application approval, and any other authorizations provided to Invenergy to site, construct, and operate a C-WECS in Page County.

**D. <u>The WECS Application Failed to Comply with the Ordinance and Approval of the WECS Application is Invalid</u>**

**314.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**315.** The WECS Application failed to comply with the requirements of the Ordinance, and the Board's approval of the WECS Application, therefore, is invalid for the reasons plead below.

**316.** Section 3 required Invenergy, as an applicant, to submit an application and application fee to Page County.

**317.** Section 3 of the Ordinance set forth 12 categories of information required to be included within Invenergy's application.

**318.** By specifically including these 12 categories of in the Ordinance, the Board determined that such information was material to their decision as to whether or not to approve an application.

**319.** By specifically including these 12 categories of information in the Ordinance, the Board determined that such information was material to the public's evaluation of any application under the Ordinance.

**320.** Invenergy failed to truthfully respond with all information within its knowledge, or that reasonably could be obtained, responsive to the material information required by Section 3.

**321.** The WECS Application contained omissions of material information.

**322.** The WECS Application contained material misstatements of fact.

**323.** The WECS Application's omissions and misstatements were knowing.

**324.** The WECS Application's omissions and misstatements were intentional.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**325.** Under Section 3, the Page County Zoning Administrator was to determine whether the WECS Application satisfied the requirements of the Ordinance, and if so, then the WECS Application was to be presented to the Board of Supervisors to review its compliance with the Ordinance and vote on whether to approve an application.

**326.** The Board of Supervisors was to evaluate the WECS Application compliance with the Ordinance and evaluate the WECS Application, if compliant, as to the best interest of the citizens of Page County.

**327.** The citizens in Page County were entitled to complete and truthful information from Invenergy with respect to all 12 material information categories required by Section 3, so they could evaluate their individual position regarding the proposed project, and so they could be informed to comment upon such proposal at required open meetings to consider the matter and to consider in voting in subsequent supervisor elections if the Board took action contrary to their position.

**328.** The WECS Application under the Ordinance was submitted to the County on March 7, 2022.

**329.** Under Section 3, if material changes to the information provided as part of the WECS Application occurred prior to construction of the C-WECS, the applicant was required to "submit a new application with updated information."

**330.** The Board and the citizens of Page County were entitled under the Ordinance for Invenergy to resubmit its application if material changes to the information contained in the original WECS Application was necessitated by changes of facts, the applicant learning of new information, or due to changes in the applicant's proposed plan and project.

**331.** As specifically plead below, while the WECS Application was pending, material

changes occurred and Invenergy did not submit a new re-application.

**332.** At the time the WECS Application was approved:

(i)   Invenergy knew the information contained within the WECS Application was incomplete, omitted material information, and failed to include all information responsive to Section 3 of the Ordinance within Invenergy's knowledge; and

(ii)  Invenergy knowingly failed to submit a new re-application to correct information to account for developments between the time of the original application's submission and the time of the original application's Board approval.

These intentional omissions, misstatements, and undisclosed material changes currently known to Petitioners, are set forth below.

1.   **Invenergy's Knowing and Intentional Omission of Information Regarding Threatened and Endangered Species Invalidates the WECS Application Approval**

**333.** Section 3(12) of the Ordinance requires an applicant to affirm "that the applicant has identified significant migratory flyways and nesting areas of federally listed birds, bats, and endangered species within one (1) mile of the proposed Wind Turbine."

**334.** When species have habitats and migratory patterns covering tens, hundreds, and thousands of miles, such as birds, bats and migratory butterflies, a one mile limitation is arbitrary and without reasoned basis, and has no scientific basis as a standard for disclosure.

**335.** When asked to provide complete scientific studies and raw data supporting its disclosures in response to Section 3(12) of the Ordinance, Invenergy only supplied summaries and refused requests for further information.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**336.** At the final August 2, 2022 meeting approving the WECS Application, the Board acknowledged that summary information is all that would be provided by Invenergy.

**337.** Invenergy knowingly and intentionally:

    **a.** Omitted information required by Section 3(12) of the Ordinance from its application;

    **b.** Failed to supply complete studies;

    **c.** Refused requests for additional information; and

    **d.** Failed to reapply with material changes to information, regarding several species.

**338.** Invenergy's knowing and intentional omission of required application information invalidates the WECS Application approval.

**339.** Invenergy omitted information from its WECS Application regarding the terms and conditions of any Incidental Take Permits, Conservation Agreements, or any similar agreements with governmental entities regarding conservation efforts which Invenergy, or any entity with whom Invenergy has contractually agreed to sell (or has an understanding or course of business dealings which indicating the potential to sell) the completed project, is required to comply.

**340.** Bald eagles are protected from any taking under The Bald and Golden Eagle Protection Act (16 U.S.C. § 668-668c) ("Protection Act").

**341.** Bats and pollinators perform important agricultural and horticultural functions (pest control and pollination).

**342.** Pollinators also perform the function of maintaining the aesthetics of Page County by performing essential functions to the reproduction of the natural flora within

Page County.

**343.** The Petitioners are involved in agriculture and horticulture and would be effected by the diminishment in the population of any species, including those discussed below, providing crucial elements of the ecosystem in Page County.

**344.** The Petitioners would be directly impacted, both economically as the entire area is agriculture dependent, and in the loss of aesthetics in which they live and recreate daily.

<u>**Bald Eagle**</u>

**345.** The Protection Act imposes criminal penalties for, among other things, killing, wounding, or disturbing bald eagles.

**346.** In April 2022, criminal penalties of $8 million were imposed on one wind farm operator for the taking of more than 150 eagles in Montana. All of the eagles killed were struck by moving turbine blades.

 [https://abcnews.go.com/Technology/wireStory/wind-energy-company-kills-150-eagles-us-pleads-83916292]

**347.** Bald eagles are listed by the federal government as a threatened species.

**348.** Active bald eagle nests are in Page County, near Northboro, within the Project boundaries and proposed turbines are within the expected range of nesting bald eagles.

**349.** Invenergy knew the bald eagle was a bird for which disclosure was required under Section 3 at the time of the WECS Application was submitted.

**350.** The WECS Application contained no information regarding the bald eagles in Page County for consideration by the Board or citizens of Page County.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

## Migratory Birds

**351.** The Migratory Bird Treaty Act ("MBTA") 16 U.S.C § 703 et seq. protects 1,093 species of birds and prohibits, among other things, killing such species excepted as authorized under a valid permit. 50 C.F.R. §21.11.

**352.** For MBTA protected birds allowed to be hunted in-season, baiting of those birds is prohibited.

**353.** The federal list of migratory birds contains numerous species common in Page County.

**354.** The WECS Application identified, vaguely, the Mississippi Flyway in a map that merely shades in the states east of the Missouri river.

**355.** In Section 3.5 of the WECS Application, SHW stated that their "environmental consulting firm" found that no federally listed birds, their habitat or nesting areas were confirmed present within one mile of any proposed turbine.

**356.** The above quoted Section 3.5 disclosure is a patently, and knowingly, false statement.

**357.** Those living in southwestern Iowa have seen protected migratory birds flying over-head.

**358.** On its face, Section 3.5 of the WECS Application is a lie.

**359.** The WECS Application failed to disclose any birds listed under the MBTA in Page County.

**360.** The WECS Application failed to disclose the potential impact of the Project on those MBTA protected bird species.

**361.** The WECS Application failed to disclose if SHW has obtained any permits from the Department of Interior permitting the taking of listed migratory birds.

**Indiana Bat**

**362.** The U.S. Fish and Wildlife Service ("USFWS") considers Page County as within the habitat range of the Indiana Bat.

**363.** The Indiana Bat is an endangered species.

**364.** [https://www.iowadot.gov/erl/archiveoct2013/CM/content/Appendix%206-1_b_1.pdf]

**365.** "One species that may be affected by wind energy generation is the endangered Indiana bat (Myotis sodalist), which is found in the eastern and Midwestern United States. In addition to mortality from wind energy generation, the species also faces range-wide threats from emerging infectious fungal disease, white-nose syndrome (WNS). . . Wind turbine mortality interacted with WNS and together these stressors had a larger impact than would be expected from either alone . . . " Effects of Wind Energy Generation and White-Nose Syndrome on the Viability of the Indiana Bat, Reickson, Thogmartin (US Geological Survey), Diffendorfer (US Geological Survey), Russell (USFWS), Szymanski (USFWS-Midwest Region), Dec. 2016

**366.** [https://www.researchgate.net/publication/311826151_Effects_of_wind_energy _generation_and_white-nose_syndrome_on_the_viability_of_the_Indiana_bat]

**367.** All projects authorized, carried-out or funded by the Iowa Natural Resources Conservation Service require consultation with USFWS to ensure actions do not jeopardize the Indiana bat or any other threatened species. [https://www.nrcs.usda.gov/wps/portal/nrcs/ia/newsroom/factsheets/nrcs142p2 _008516/]

**368.** Invenergy knew the Indiana Bat was a bat for which disclosure was required under Section 3 at the time of the WECS Application was submitted.

**369.** The WECS Application contained no information regarding the Indiana Bat in Page County for consideration by the Board or citizens of Page County.

**370.** Invenergy and its affiliates have been previously enjoined, and limits placed on its other projects, due to its failures to properly identify and protect the Indiana Bat. *Animal Welfare Inst. V. Beech Ridge Energy, LLC.,* 675 F.Supp.2d (D. Md. 2009).

## Northern Long-Eared Bat

**371.** Page County is within the habitat area of the Northern Long-Eared Bat.

**372.** The Northern Long-Eared Bat was a threatened species at the time the WECS Application was submitted.

**373.** Invenergy knew at the time of its submission on March 7, 2022, that the Northern Long-Eared Bat, federally listed as a threatened species, would soon be listed as an endangered species.

**374.** On March 22, 2022, fifteen days after the submission of the WECS Application, the USFWS proposed a final rule changing its listing of the Northern Long-Eared Bat from threatened to endangered.

**375.** [https://www.fws.gov/species/northern-long-eared-bat-myotis-septentrionalis]

**376.** The USFWS found that "wind energy-related mortality of the northern long-eared bat is a stressor at local and regional levels where the northern long-eared bat populations have been impacted by WNS [white nose syndrome]. In 2020 northern long-eared bats were at risk from wind mortality in approximately 49 percent of their range based on the areas where wind turbines were in place and operating. . . Most bat mortality at wind energy projects is caused by direct collisions with moving turbine blades." 87 F.R. 16442,16446 (Mar. 23, 2022).

**377.** Invenergy knowingly failed to include information regarding the Northern Long-

Eared Bat in its WECS Application as required by the Ordinance.

378. Invenergy knowingly failed to resubmit a new application upon the material change of information regarding the change of listing the Northern Long-Eared Bat as threatened to endangered on March 22, 2022.

379. Invenergy knew prior to its WECS Application on March 7, 2022, that USFWS would soon be proposing the change in listing of the Northern Long-Eared Bar, but chose not to include any information on the species as required.

380. Invenergy knowingly omitted required information regarding the Northern Long-Eared Bat from its WECS Application for consideration by the Board and citizens of Page County evaluating the application.

**<u>Monarch Butterfly</u>**

381. Page County is within the migratory path of the Monarch Butterfly.

382. The Iowa Department of Natural Resources has declared "increasing concern about the health of the population and migration of Monarch Butterflies. Their numbers have dropped significantly in the last 10-15 years."

[www.iowadnr.gov/Conservation/Iowa-Wildlife/Pollinators]

383. In 2017, the Iowa Renewable Fuels Association launched its Monarch Fueling Station Project to encourage biofuel producers in Iowa to add Monarch Butterfly habitat near production facilities. [https://monarch.ent.iastate.edu/iowa-renewable-fuels-association-launches-monarch-fueling-stations]

384. In 2018, the Iowa Monarch Conservation Consortium, whose members include the Iowa Department of Natural Resources, Iowa State University, a number of fuel and power energy produces (but not Invenergy), and other colleges, universities, and conservation groups, adopted its "Conservation Strategy for the Eastern Monarch

Butterfly in Iowa" to address the more than 80% decline in the monarch population over the last two decades.

385. In 2018, the Midwest Association of Fish and Wildlife Agencies, of which Iowa DNR is a member, adopted a Mid-America Monarch Conservation Strategy to address the more than 80% decline in the monarch population over the prior twenty years. [https://www.mafwa.org/?page_id=2347;https://www.mafwa.org/wp-content/uploads/2018/07/MAMCS_June2018_ Final.pdf]

386. On December 17, 2020, the USFWS found the Monarch Butterfly to be endangered, and found that changing the Monarch Butterfly's listing as threatened to endangered is warranted. 85 F.R. 81813, 81815 (Dec. 17, 2020).

387. At the time of Invenergy's WECS Application, the Monarch Butterfly was federally listed as a threatened species.

388. Invenergy's March 7, 2022 WECS Application contained no information regarding the presence of the Monarch Butterfly in the area of the proposed project and the application contained no information about the potential impact of the project on the Monarch Butterfly population.

389. On July 21, 2022, after Invenergy's initial application, but before Invenergy received the Board's approval, the International Union for Conservation of Nature ("IUCN") , comprised of more than 1,400 government and civil organizations, including the United States Department of State, Bureau of Oceans and International Environmental and Scientific Affairs, United States Department of the Interior Bureau of Ocean Energy Management, U.S. Agency for International Development, United States Department of Agriculture – Forest Service, and United States Department of the Interior (Fish and Wildlife Service & National Park

Service), listed the North American migratory monarch as an endangered species. [https://www.iucn.org/press-release/202207/migratory-monarch-butterfly-now-endangered-iucn-red-list].

390. In its July 21, 2022 press release, the IUCN noted that "monarch butterflies and their extraordinary migration teeter on the edge of collapse."

391. Contrary to the requirements of the Ordinance, Invenergy failed to resubmit its application to account for this change of status of the Monarch Butterfly.

392. In November 2021, four months before the submission of the WECS Application, the Green Plains ethanol plant in Page County announced it would begin planning and constructing a "monarch fueling station" on the plant's property near Shenandoah. These "monarch fueling stations" are designed to attract Monarch populations through planting and developing plants, including milkweed, for the Monarchs to use for reproduction and to pollinate.

393. [https://www.kmaland.com/news/green-plains-in-shenandoah-joins-monarch-habitat-project/article_d4f16c5a-5c23-11ec-8819-3769f3093070.html]

394. Organizations across the world, within the United States federal government, within the states of the Mid-West, within the State of Iowa, and within Page County are engaged in an effort to preserve the dwindling population of the endangered Monarch Butterfly.

395. At the same time "monarch fueling stations" are being developed in Page County to attract and assist the Monarch population, Invenergy and the Page County Board of Supervisors, without any study, seek to erect a series of wind turbines through which the Monarchs must fly twice each year during their migration. Page County cannot be permitted to bait endangered Monarchs to the area and then swat them

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

to death with large fans.

## **Invenergy's Failure to Comply with Ordinance Section 3(12) Requirements**

**396.** Bald Eagles, protected migratory birds, Indiana Bats, Northern-Long Eared Bats, and Monarch Butterflies are present in Page County, within 1 mile of proposed turbines, and have ranges that would bring them in contact with Invenergy's proposed wind turbines.

**397.** Invenergy failed identify any of these species in its WECS Application.

**398.** Invenergy knew of the information regarding these species at the time the WECS Application was submitted.

**399.** Invenergy intentionally omitted this species information from its WECS Application.

**400.** Invenergy failed to re-apply and update the WECS Application to reflect material changes in information regarding these species between the time of application and the time of application approval.

**401.** Evidence of Invenergy's knowledge and awareness of the status of these species, and the impact of wind turbines on their populations, is publically available.

**402.** Invenergy has prepared Habitat Conservation Plans for the Indiana Bar and Northern Long-Eared Bat in connection with its projects in other areas. For example, see the November 3, 2020 study by Invenergy's consultant prepared for Invenergy in connection with its High Prairie Wind Energy Facility in Missouri. [https://downloads.regulations.gov/FWS-R3-ES-2020-0136-0002/content.pdf]

**403.** Invenergy is well aware of issues regarding the Indiana Bat, has a pattern of ignoring the Indiana Bat, and has had wind turbine project construction enjoined under the Endangered Species Act in prior federal court orders and Invenergy

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

required to obtain necessary USFWS permits before continuing construction. *Animal Welfare Inst. v. Beech Ridge Energy, LLC.,* 675 F.Supp.2d (D. Md. 2009).

**404.** Invenergy participated in a draft Midwest Wind Energy Multi-Species Habitat Conservation Plan within an Eight-State Planning Area, including Iowa.  77 FR 52754 (Aug. 30, 2012)

**405.** The Invenergy statement in its application that birds, bats or endangered species, their habitat, or nesting areas were confirmed to not be present in or near the project area was false, and Invenergy knew the statement was false when made.

**406.** By failing to disclose material information regarding these species, Invenergy deprived the Board and the citizens of Page County of information that may have led to the imposition of conservation plans or other remedies as a condition to application approval, or may have led to the denial of the WECS Application all together.

**407.** Possible conditions to approval could have included those similar to requirements have imposed in Pennsylvania to prohibit operation of turbines at night from April to November while bats are feeding, but allowing turbine operations at night when bats are hibernating.

**408.** The Board and citizens were deprived of considering such conditions to approval of Invenergy's WECS Application because Invenergy hid information regarding the potential impact of the Project on the local species.

**409.** Neither equity nor the law condones false statements in an application submitted to a governmental entity charged with evaluating the application in relationship to the County's powers to protect the health, safety, and welfare of the public in Page County.

**410.** Invenergy's receipt of application approval under the Ordinance, based upon its submission of knowingly false information upon which it sought for the Board and the residents of Page County to rely, is akin to fraud in the inducement, and equity cannot uphold the Board's authorization granted to Invenergy under such circumstances.

**411.** Invenergy failed to amend its application following changes to the listing of the Northern-Long-Eared Bat and the Monarch Butterfly while its application was pending. Such material changes to the information required Invenergy to file a new and revised application and Invenergy failed to do so.

**412.** Board approval of a pending application, when a new application or re-application was required by the Ordinance, is an unlawful and illegal act in contravention of the terms of the Ordinance.

**413.** The Board's act of approving the WECS Application is inconsistent with the adopted Ordinance and therefore constitutes an illegal act of the Board, and is of no legal force or effect, and confers no, and has not conferred any, rights or privileges to Invenergy.

**2. <u>Invenergy's Knowing and Intentional Omission of Information Regarding a Shallowly Buried, Active Petroleum Product Pipeline in the Project Area Invalidates the WECS Application Approval</u>**

**414.** Invenergy failed to contact Buckeye Pipeline to assess its projects potential impact on petroleum pipelines in the project area.

**415.** The pipeline running through the area is merely one foot to three feet below ground in some places.

**416.** The pipeline running through the area was constructed in the 1930s.

**417.** Large, heavy machinery, trucks and cranes will be used in constructing the wind

turbines.

418.  The potential impact of these large pieces of equipment on an active petroleum product pipeline has not been studied or considered by the Board.

419.  The Page County Board of Supervisors, approved the WECS Application as being in compliance with the Ordinance knowing petroleum pipelines were in the area and a potential hazard for the proposed plan without requiring Invenergy to modify its application upon receiving material information regarding the location of those lines.

420.  Petitioners, in addition to the orders of mandamus and writs of certiorari, request a declaratory judgment that any change to the Project necessary or prudent to mitigate risks to the pipeline, or required by the pipeline owner, be declared "material changes" requiring resubmission of an C-WECS application and a "material change" revoking the existing approval without any liability to the County to Invenergy.

### 3.  **Invenergy's Knowing and Intentional Omission of Radio Interference Information   and Lack of FCC Authorization Invalidate the WECS Application Approval**

421.  Invenergy knows that wind turbines can interfere with and distort terrestrial radio communications.

422.  Radio station KYFR broadcasts in southwestern Iowa and appeared at meetings of the Board and identified four proposed turbine towers that would interfere with its radio signal.

423.  At the Board meeting at which the WECS Application was approved, KYFR appeared and voiced these concerns and voiced difficulty in dealing with Invenergy to modify the plan to avoid this interference.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**424.** Section 4(8) of the Ordinance prohibits C-WECS from interfering with licensed microwave communication paths, and requires the approved C-WECS developer or owner to minimize and mitigate any interference with electromagnetic communications such as radio, telephone or television signals.

**425.** The remedy for violations of Section 4(8) of the Ordinance are minimal.

**426.** Section 4(8) of the Ordinance only provides that "If after construction of the C-WECS, the owner receives a written complaint related to the above-mentioned interference, the owner shall take reasonable steps to respond to the complaint."

**427.** The Ordinance does not require that the radio signal interference be mitigated or minimized.

**428.** There is no provision of the Ordinance allowing the County to take action to require anything in the event the construction causes interference with radio signals.

**429.** Invenergy did not disclose the potential interference with the radio signals

**430.** Invenergy knows its Project will interfere with radio signals.

**431.** Section 3(11) of the Ordinance required Invenergy to affirm that it had applied "for necessary and appropriate Federal Communication Commission (FCC) applications. [sic]"

**432.** Section 3(11) of the Ordinance also required the same affirmation with respect to applications to the Federal Aviation Administration (FAA) no hazard determinations.

**433.** SHW provided an affirmation as to both the FCC and FAA, however SHW only provided a list of FAA Aeronautical Study Numbers.

**434.** SHW did not provide any proof of its FCC applications.

**435.** SHW did not affirm it had filed any FCC applications.

**436.** SHW only affirmed that it had applied for "necessary and appropriate FCC applications."

**437.** SHW's FCC affirmation leaves open the question of whether or not (i) SHW considered any FCC application to be necessary or appropriate, and (ii) SHW filed anything with the FCC at all.

**438.** The lack of FCC licensure or clearance of the Project was discussed at the meeting approving the WECS Application.

**439.** At that approval meeting, Respondent Holmes even requested a delay in approval until the FCC issues were resolved. This request was denied by Respondents Armstrong and Morris.

**440.** Invenergy and the Board knew the information in the WECS Application regarding radio interference was inaccurate and incomplete, and knew the Project would cause interference prohibited by Section 4.

**441.** Under the Ordinance, Invenergy was required to re-apply with updated information regarding interference and it did not so apply.

**442.** Invenergy did not re-apply, and the Board approved a knowingly inaccurate WECS Application.

**443.** The Board was required to reject the WECS Application as containing knowingly material misstatements regarding radio interference and FCC permitting.

**444.** The Board's action of approving a non-compliant WECS Application was illegal under the Ordinance and therefore an unlawful act of the Board.

4.  **Invenergy's Knowing and Intentional Omission of Information Regarding Planned Encroachments on Required Setbacks for Public Lands Invalidates the WECS Application Approval**

445.  Section 3(5) of the Ordinance required Invenergy "to provide a site layout, including the location of the wind turbines and those items to which a setback applies." The site layout was required to include distances and be drawn to scale, in order for the County to determine if the turbines meet the setback requirements of the Ordinance."

446.  Section 3(9) of the Ordinance required Invenergy to identify those public areas listed in Section 4(2)(f) of the Ordinance potentially impacted by the proposed turbines.

447.  At least one turbine contained in the Plan submitted with the WECS Application violates the public lands setback requirements contained in Section 4(2)(f) of the Ordinance.

448.  The Board was advised of this setback violation prior to its approval of the WECS Application.

449.  At the time the WECS Application was approved, both Invenergy and the Board knew that the WECS Application contained false statements of its compliance with Section 4(2)(f) of Ordinance.

450.  At the time the WECS Application was approved, Invenergy and the Board knew a revised plan to comply with the setbacks from public lands was required.

451.  Any revision of turbine location in the proposed Project would be a material change requiring re-application.

452.  Invenergy did not re-apply, and the Board did not require Invenergy to re-apply, with a new application containing a plan in compliance with the public lands

setback requirements.

**453.** Approval of the WECS Application with known violations of Section 4(2)(f) of the Ordinance was an illegal and invalid act of the Board.

**5.** **Requested Relief – Approval of an Application Containing Knowingly False Information Must be Revoked**

**454.** The WECS Application's known false statements and omissions as plead above, and Invenergy's failure to amend its application and re-apply as required by Section 3 of the Ordinance, constituted the failure of Invenergy's application to comply with the requirements of Section 3 of the Ordinance.

**455.** The Board's knowing failure to require complete disclosure and re-application brings them before this court with unclean hands and not entitled to appeals to equity.

**456.** The Page County Zoning Administrator's determination that the application complied with the requirements of Section 3 was incorrect, erroneous, unreasonable, illegal, arbitrary, capricious, and *ultra vires*.

**457.** The Page County Attorney's determination that the application complied with the requirements of Section 3 was incorrect, erroneous, unreasonable, illegal, arbitrary, capricious, and *ultra vires*.

**458.** The Board's approval of an application based upon a known non-compliant, deficient, and knowingly false application information was incorrect, erroneous, unreasonable, illegal, arbitrary, capricious, and *ultra vires* as to which Petitioners seek, in addition to certiorari and mandamus relief as set forth herein, a declaration of the invalidity of the Board's approval of Invenergy's WECS Application as it was illegally and invalidly obtained and such approval is of no legal force or effect.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

E. **Approval of the WECS Application was an Illegal Act of the Board in Violation of Page County Wind Moratorium Resolution.**

**459.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**460.** The WECS Application was submitted to Page County the afternoon of March 7, 2022.

**461.** At the Board meeting held the following morning, March 8, 2022, the Board rejected on a 2-1 vote (Armstrong and Morris in the majority) a 180-day moratorium on wind application and approvals under the Ordinance.

**462.** On March 29, 2022, the Board adopted a 180-day moratorium on a 2-1 vote (Armstrong and Holmes in the majority) with Armstrong changing his March 8th vote due to stiff primary competition for his seat, an election that Armstrong subsequently lost.

**463.** A copy of the approved moratorium resolution, Page County Resolution #26-2022 is attached as Exhibit C and incorporated herein by reference ("Moratorium Resolution").

**464.** The minutes reflect that the Board adopted the Moratorium Resolution based upon the County's interest in protecting its infrastructure, natural resources, property rights, the need for a robust road use agreement, addressing decommissioning issues, abating sound nuisances, addressing lighting system nuisances, and the Board's need for substantial time to gather information and coordinate with multiple agencies for purposes of reviewing, updating or creating ordinances related to C-WECS development.

**465.** The Board's declared bases for adopting the Moratorium Resolution without any changes to the Ordinance prior to approval of the WECS Application, demonstrates the unreasonableness, arbitrariness, and capriciousness of the WECS Application approval.

**466.** The precise wording of the Moratorium Resolution is important to analyzing whether the Board violated its own resolution in approving the WECS Application.

**467.** The effective portion of the Moratorium Resolution provides:

> NOW THEREFORE BE IT RESOLVED by the Board of Supervisors of Page County, Iowa, that Page County now imposes a <u>moratorium, effective immediately</u> and for a period of one-hundred eighty days, <u>on C-WECS permit applications</u> for the purposes of drafting and adopting any necessary and proper revisions to the existing C-WECS ordinance. This <u>moratorium shall not affect any construction permits already filed</u> with Page County as of the effective date of this resolution.

**468.** Iowa Code § 331.302 requires a board to exercise its powers by passage of "a motion, a resolution, an amendment, or an ordinance."

**469.** The Moratorium Resolution is an effective act of the Board under its § 331.302 authority and was an effective act on March 29, 2022.

**470.** The Moratorium Resolution was adopted before the Zoning Administrator certified his conclusion that the WECS Application complied with the Ordinance and submitted the WECS Application to the Board for approval.

**471.** At the time of adoption of the Moratorium Resolution, the prerequisites for Board consideration of the WECS Application had not been satisfied.

**472.** The WECS Application was an application to which the Moratorium Resolution applied.

**473.** Construction permits are routinely issued by the County under its zoning and construction codes.

**474.** The WECS Application was not a "construction permit already filed with Page County."

**475.** August 2, 2022 was less than 180 days after March 29, 2022.

**476.** The approval of the WECS Application on August 2, 2022 was a violation of the Moratorium Resolution and an illegal act of the Board.

F. **Adoption of the Ordinance was an Illegal Act in Violation of the Page County Zoning Ordinance.**

**477.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**478.** A copy of the Page County Zoning Ordinance is attached hereto as Exhibit D ("Zoning Ordinance") and is incorporated herein by this reference.

**479.** Section 15.2 of the Zoning Ordinance requires a properly completed application be submitted to the Zoning Administrator to initiate an amendment to the Zoning Ordinance.

**480.** No application was completed by any Respondent or any other citizen to amend the Zoning Ordinance for conflicts with the Ordinance or the WECS Application.

**481.** Section 15.3 of the Zoning Ordinance requires the Planning and Zoning Commission ("PZC"), upon receiving an application to amend the Zoning Ordinance, to make the application materials available to the public.

**482.** The PZC did not receive or make any materials available to the public in connection with the adoption of the Ordinance or the approval of the WECS Application.

**483.** Section 15.3 of the Zoning Ordinance requires the PZC secretary to set a date, time and place for a public hearing before the PZC on any proposed changes to the Zoning Ordinance.

**484.** The PZC secretary did not set a date, time and place for a public hearing before the PZC on any proposed changes to the Zoning Ordinance in connection with the Ordinance or WECS Application.

**485.** Section 15.3 of the Zoning Ordinance requires the PZC, after hearing, to make its determinations regarding the proposed amendment to the Zoning Ordinance and submit them and a proposed amendment to the Zoning Ordinance to the Board of Supervisors.

**486.** The PZC did not make any determinations or propose any amendments to the Zoning Ordinance in connection with the Ordinance or the WECS Application.

**487.** Under Section.4 of the Zoning Ordinance, after PZC recommendations and request for amendment, the Board must set a date, time and place for a hearing on the proposed changes or amendment to the Zoning and Ordinance and arrange for public notice of the meeting. The board is also required to gather public opinion at the hearing.

**488.** The Board never received a PZC recommendation, never scheduled a meeting, and never held hearings on proposed changes or amendments to the Zoning Ordinance in connection with the Ordinance or the WECS Application.

**489.** The Board's adoption of the Ordinance and approval of the WECS Application failed to comply with the requirements for amending the Zoning Ordinance.

**490.** To the extent the Ordinance or WECS Application purports to amend the Zoning Ordinance, the actions of the Board in approving the Ordinance and/or WECS

Application were illegal and unenforceable acts in violation of the Zoning Ordinance.

491. In addition to the remedies otherwise requested herein, the Petitioner's request a declaratory judgment that (i) the Ordinance and WECS Application approval are ineffective to change, modify or amend the Zoning Ordinance and the Agricultural District permitted uses in Section 5.1 of the Zoning Ordinance and the height restrictions contained in Section 5.4, and that (ii) the Agricultural District permitted uses and height restriction set forth in the Zoning Ordinance are unamend and unchanged by the Ordinance and WECS Application approval.

492. As with the requirements for amending the Zoning Ordinance plead above, the County failed to comply with the Special Exception procedures established in Chapter X of the Zoning Ordinance.

493. In connection with the Ordinance adoption and WECS Application approval the Special Exception Procedures were not followed for the following reasons:

   a. No application for a special exception use was submitted on the prescribed application to the Zoning Administrator; and

   b. The Board of Adjustment was not involved in any manner in arranging a public hearing to consider a special exception to the Zoning Ordinance or making a decision as to a proposed special exception;

494. In addition to the remedies otherwise requested herein, the Petitioners request a declaratory judgment that the adoption of the Ordinance and the WECS Application approval did not constitute the granting of a special exception to the Zoning Ordinance in conformance with Chapter X of the Zoning Ordinance.

**G. <u>Adoption of Section 9 of Ordinance, Adoption of the Ordinance as a Whole, and Approval of the WECS Application, were Each Illegal as Unreasonable and Capricious Acts of the Board.</u>**

**495.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**496.** Unreasonable and capricious acts of the Board are illegal, unenforceable, and of no legal effect.

**497.** The Petitioners seek Writs of Certiorari and Orders of Mandamus declaring adoption of Section 9 of the Ordinance, the Ordinance as a whole, and the Board's approval of the WECS Application, were illegal, invalid, and of no legal force or effect because they were unreasonable, arbitrary and capricious as plead below.

**498.** "Unreasonable" means "without reason." Reason requires logic applied to facts.

**499.** "Capricious" means governed or characterized by caprice.

**500.** "Caprice" means sudden, impulsive, or unmotivated by notion.

**501.** "Notion" means a conception or impression of something known (i.e. knowledge).

**502.** Capricious means actions taken suddenly, impulsively, and without knowledge.

**503.** All of the Board's acts as plead above were taken without reason and taken impulsively without knowledge in violation of the law. By definition, these acts were unreasonable and capricious.

**1. <u>The Adoption of Section 9 of the Ordinance was Unreasonable and Capricious</u>**

**504.** The idiomatic expression "Don't throw the baby out with the bathwater" is a description of the act of discarding the essential with excessive zeal when unnecessary. In other words, the expression describes an unreasoned and impulsive act.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**505.** Section 9 purports to repeal entire ordinances, when amendments, exceptions or variances would suffice.

**506.** Section 9 is an unreasoned and impulsive act of the Board, discarding the good with the bad, and is illegal and unenforceable.

**507.** Examples of the Board's lack of logic and reasoning in adopting Section 9 are as follows:

    **a.** Section 5.1 and 5.2 of the Page County Zoning Ordinance list permissible uses of land within an Agricultural District. Construction and operation of C-WECS systems are not included in those permitted uses.

    **b.** Section 5.4 of the Zoning Ordinance provides height limitations in Agricultural Districts of 2.5 stories for principal structures and 15 feet for accessory structures. The structures proposed to be built in the Agricultural Districts of Page County in the WECS Application will be between 344 and 600 feet in height, well in excess of these limitations.

    **c.** The Ordinance and the WECS Application approval authorizes Invenergy's (i) construction of C-WECS systems, which are not included in the Zoning Ordinance permissible uses and (ii) construction of turbines and towers more than 400 times greater in height than the existing height restrictions in the Zoning Ordinance.

    **d.** Section 9 provides that "All ordinance(s) in conflict with the provisions of this Ordinance are hereby repealed."

    **e.** By its terms, Section 9 repeals the entire Zoning Ordinance, including all provisions unrelated to the Project. The effect of Section 9, applying the plain meaning of its terms, is that Page County is now without any zoning ordinance

whatsoever. Such an act by the Board is certainly unreasonable and capricious, and a direct violation of Iowa Code Chapter 335.

**f.**  Being unjustifiably lenient, and applying a strained, but more narrow, reading, Section 9 repeals the Agricultural District use and height limitations in Zoning Ordinance sections 5.1, 5.2 and 5.4, and possibly other sections and subsections of all of Page County's ordinances. Such an act is certainly unreasonable and capricious, especially when Section 9 of the Ordinance repeals the height limitation for all structures in an Agricultural District, but then in Section 6 the Ordinance independently imposes a 100 foot limitation on Non C-WECS. Under this more narrow reading of Section 9 of the Ordinance, the only structures subject to a height limitation in Page County now are Non C-WECS. This result is unreasonable and capricious, and also arbitrary in singling out non C-WECS as the only structure with a height limitation.

**g.**  Any attempt to read Section 9's language of "repeal" to mean "exception to" or "variance from" is contrary to plain English. "Repeal" means the "abrogation or destruction of a law by legislative act." Section 9 "repeals" conflicting "ordinances," it does not amend, create exceptions or grant variances. Any argument by Respondents that "repeal" has any other meaning will only demonstrate the unconstitutionality of the Ordinance's for vagueness as plead below, and is evidence of the Enterprise's collusion and intent.

**h.**  Section 9 throws the baby out with the bathwater by repealing entire ordinances. This result, from failure to specifically identify amendments, repeals and modifications to an ordinance is exactly why compliance with Iowa Code §331.302(4), as plead above, is essential to reasoned and non-capricious

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

ordinance promulgation.

**508.** The limitation on Non C-WECS to 100 feet in height compared to C-WECS with an unlimited height (currently proposed heights up to 600 feet) is designed by the Enterprise, in part, to create electric customers and eliminate excess Non C-WECS generation from entering the grid.

**509.** The Non C-WECS regulations and provisions within the Ordinance are designed, by the wind energy industry, in part to stifle competition, reduce non-industrial grid contributions, and maintain customer demand in rural areas for industrial energy providers.

**510.** The Petitioners request that the Court: (i) declare Section 9 to be unreasonable and capricious and therefore illegal and unenforceable; (ii) declare the Page County Zoning Ordinance to be in full force an effect, without any changes, modification or repeal by effect of Section 9; (iii) declare the WECS Application approval authorizing Invenergy to construct C-WECS structures in contravention of the Zoning Ordinance limitations to be an illegal act; and (iv) enjoin Invenergy from continuing or furthering any illegal use of property interests it may have in violation of the Zoning Ordinance.

**511.** If the Board wishes to proceed, it must do so in a reasoned, intentional and non-impulsive manner, and draft a new Ordinance, reasoned and narrowly tailored, without sweeping repeals of unidentified ordinances, and proceed through the required public open meeting process to specifically amend those existing ordinances that it intends to amend.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

### 2. __The Adoption of the Ordinance and Approval of the WECS Application were Unreasonable and Capricious__

**512.** The above and subsequent allegations are incorporated as if fully set forth in full herein.

**513.** As plead above, the Ordinance is devoid or all normal and usual markers of a well-reasoned and considered legislative act.

**514.** The unreasonableness of the Ordinance is evident from, among others, the following:

    **a.** Failures to include enforcement provisions of any kind;

    **b.** Failure to require attestation to facts in applications;

    **c.** Failure to require compliance with project proposals;

    **d.** Unreasoned differences in treatment between C-WECS and Non C-WECS;

    **e.** Failure to consider the impact of a Project on existing near surface petroleum pipelines;

    **f.** Failure to consider the impact of the Project on indigenous species;

    **g.** Contradictions between the Ordinance provisions and road use agreement to assure road repairs at no cost to the County;

    **h.** Approving the WECS Application containing knowingly false information;

    **i.** Invoking the procedure of waiving the first two readings of the proposed Ordinance when no need to act quickly was present and such procedure had been used sparingly before;

    **j.** Approving the 26-page Ordinance in two meetings within 8-days when seven meetings were necessary to approve a 5-page ATV ordinance;

    **k.** The Board's acknowledgement that the Ordinance was weak and with gaps to

be filled at the time the WECS Application was approved;

**l.**   The Board's approval of the WECS Application knowing of a threatened pipeline and no study or information requested prior to approval; and

**m.**   The Board's approval of the WECS Application knowing of a radio interference with no study or information requested prior to approval.

**515.** The "one mile" distance from turbines for purposes of species reporting in the WECS Application is without any reasoned basis.

   **a.**   The range of an Indiana Bat or Northern Long-Eared Bat from its hibernacula is five miles.

   **b.**   While nesting bald eagles may fly 10-20 miles per day, and a hundred miles a day when migrating.

   **c.**   Monarchs migrate from Canada to Mexico.

   **d.**   The range of migratory birds subject of the MBTA is thousands of miles.

**516.** The Moratorium Resolution was adopted on March 29, 2022 to provide time for the Board to address known deficiencies in the Ordinance.

**517.** The Board has yet to consider amendments to the Ordinance.

**518.** Respondent Armstrong acknowledged just after voting for the approval of the WECS Application that the Ordinance was weak.

**519.** The Board repeatedly acknowledged the need for amendments to the Ordinance, but approved the WECS Application before addressing the any amendments.

**520.** From 2019 to 2022, the Board repeatedly rejected requests to amend known Ordinance deficiencies.

**521.** Approving the WECS Application knowing the Ordinance is inadequate and weak is unreasoned, capricious and arbitrary, and is without logic or reason.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**522.** It is unreasonable for the Board to have approved the WECS Application when there were never studies of the financial benefit to the county and the possibility of TIF financing was not even considered or discussed until one month after the approval of the WECS Application.

**523.** The Invenergy employee safety manuals require employees to remain more than 3,000 feet away from a tower during storms and for an hour after lightening has not appeared in the area, but the setbacks from residences and other inhabited structures in the Ordinance are 1,500 feet. Such an Ordinance, exposing citizens to risks Invenergy by policy does not expose its employees is unreasoned, arbitrary and capricious.

**524.** These glaring deficiencies in the Ordinance reveal the lack of reason and thought in approving the Ordinance and granting the WECS Application, and therefore such acts of the Board are illegal, and of no force, effect or legal meaning.

**525.** The Board acted impulsively, by improper influence, grift, graft, strong-arm tactics, and other undue influence, to adopt an Ordinance (drafted and prepared by Invenergy or other wind energy interests). It is no surprise that every vagary or omission in the Ordinance is to the advantage of Invenergy.

**526.** The interstate enterprise composed of members of the Respondents coordinated outside of the law to obtain the adoption of an ordinance and application approval to their economic advantage.

**527.** The Ordinance contains no provision providing increased revenue to the County.

**528.** The Ordinance and WECS Application approval allow Invenergy to destroy county roads and drainage systems without enforceable recourse.

**529.** The Ordinance and WECS Application approval allow Invenergy to operate in the

County with complete disregard for existing ordinances.

530. While the WECS Application was pending, Invenergy threatened the County with litigation if the application was not approved.

531. The Board refused to implement proposed moratoriums on C-WECS applications and approvals under threat from Invenergy.

532. The Board approved the WECS Application the same night it learned of concerns that the Project's plan could impact existing petroleum pipelines without the Board asking for further information, study, or seeking assurances or conditions on the approval to address these valid safety concerns.

533. The actions of the Board, under these influences and threats of litigation, are not reasoned decisions.

534. The actions of the Board are impulsive to kowtow to the big-wind companies and to avoid the confrontation needed to protect the interests of the citizens of Page County.

535. Invenergy's legal position, expressed in their current litigation in Iowa and in threats to Page County, is without merit.

536. Invenergy, its affiliates, its contract partners, its investment structures, etc. may have obtained real estate interests throughout Page County.

537. The Board's use of alleged "threats of litigation" to cloak backroom meetings to avoid amendments, approve a deficient plan, and hide negotiations of the road and decommissioning agreement, is an arbitrary, capricious and unreasonable (without legal basis).

538. At the time Invenergy was making real estate investments and signing real estate contracts acquiring interests in real estate in Page County, the use of the land for C-

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

WECS was not permitted, and even after adoption of the Ordinance, no approval of the construction, siting, or operation of a C-WECS in Page County had been granted by the Board to Invenergy.

539. Invenergy's Page County real estate transactions were purely speculative as to the possibility of potential future use for a C-WECS system.

540. The acquisition of interests in real estate in this manner is based upon speculation as to future changes in the law.

541. A land speculator's belief that a change in the law in the future is likely does not vest that speculator with any enforceable interest to require the legislative change at speculation.

542. The lack of the legislative change, or denial of an application, contrary to the speculation of an investor does not provide a cause of action for the speculator's loss on any investment entered knowing the law may or may not change, or an application may be denied.

543. It would not be "speculation" if the purchase came with the right to force a change that was at the time of investment "speculative."

544. Speculation by definition involves risk that the investor's foresight is in error.

545. The courts, and the threat of costly litigation, as Invenergy has demonstrated as its pattern, are not to be utilized to force changes to laws to eliminate the risk Invenergy assumed in speculating on whether or not the change could or would occur in the first place.

546. Invenergy is a sophisticated party.

547. Invenergy's purchase or acquisition of real property interests, at the time unusable for under then current law of Invenergy's intended purpose, does not give Invenergy

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

the legal right to threaten litigation that could break counties if the law is not changed.

548. Invenergy's urgency to move forward, without appropriate study and without any interference, is based solely upon its need to treat the Project as under-construction for it to receive production tax credits that expired on December 31, 2021.

549. Absent Invenergy's qualification for these credits, the Project is economically unviable, and Invenergy's costs in speculative investments is a loss.

550. Any such loss is the risk of speculation, and that risk belongs to Invenergy, and not to the Petitioners or the citizens of Page County at the expense of illegal, unreasoned, and capricious Board action.

551. Without the Ordinance, provided to the Board by Invenergy and wind interests, there would have been no arguable standing of Invenergy to even threaten the Board with litigation.

552. Invenergy's influence on the Board, created by it providing a deficient ordinance proposal, boot-strapped Invenergy into its position of threatening the Board with litigation. The Home Rule Statue does not provide Invenergy with this authority.

553. The Board has been subjected to undue influence and threats by Invenergy, leading to the adoption of an unreasoned and capricious Ordinance and WECS Application approval, solely for the benefit Invenergy, and its affiliates and contract parties, and the Enterprise to take advantage of the production tax credit.

### H. **Adoption of the Ordinance and WECS Application Approval are Abuses of Zoning Discretion in Violation of Iowa Law**

**554.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**555.** Adoption of the Ordinance and approval of the WECS Application constituted an abuse of the Board's zoning discretion, and was inconsistent with, and in violation of, Iowa law as plead below.

**556.** The Ordinance, the WECS Application, and the approval granted to Invenergy, conflict with the Page County Zoning Ordinance and comprehensive plan referred to in that ordinance, as well as with other County ordinances.

**557.** In approving the WECS Application, the Board failed its duty to consider the County's comprehensive zoning structure and plan in violation of Iowa Code §§ 351.1, 352.5, & 414.3.

**558.** These failures constituted the Board's abuse of discretion as to which Petitioners seek this Writ of Certiorari declaring the Ordinance invalid and correspondingly declaring the WECS Application approval thereunder invalid.

### I. **The WECS Application Approval was an Illegal Act Under Iowa Code § 331.302(14) Because the Decisive Vote was Cast by a Conflicted Supervisor**

**559.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**560.** The Board's WECS Application approval was an illegal act because the approval was granted on a 2-1 vote, with the decisive vote cast by a supervisor with a conflict of interest as plead below.

**561.** Iowa Code § 331.302(14) provides that an action of the Board of Supervisors is

invalid if a supervisor voting on the measure has a conflict of interest and that supervisor's vote was decisive to the passage of the ordinance.

562. At the time of approving Invenergy's WECS Application, supervisor Armstrong had a conflict of interest.

563. Between the time of the adoption of the Ordinance and approval of the WECS Application, Respondent Armstrong was a member of the Board of Supervisors and during this time invested in, and owned, equity securities in a Nebraska based mineral exploration company supplying minerals necessary for the development of wind turbines.

564. At the time of approving Invenergy's WECS Application, supervisor Armstrong cast the decisive vote.

565. The adoption of the Ordinance and approval of the WECS Application were illegal and invalid under Iowa Code § 331.302(14) because a conflicted supervisor cast the decisive votes.

566. The temporal proximity of events, and out of the ordinary conduct of the Board from 2019 through approval of the WECS Application, are indicative of members of the Board of Supervisors and/or the County Attorney, all Respondents, having undisclosed interests in seeing the approval of Invenergy's application in the face of substantial public oppositions.

567. The indicia of interestedness at the time of adoption of the Ordinance, and at the time of approval of the WECS Application include:

   a. Accepting a draft of the Ordinance from a wind energy interest;

   b. Waiving the normal first and second reading of an ordinance prior to adoption at the third meeting;

**c.** The Board's statement on October 29, 2019 that it would study and research the implications of the Ordinance after, not before, the Ordinance was adopted;

**d.** Town hall meetings were convened by the Board after, not before, the Ordinance was adopted.

**e.** The Board minutes reflect no on-the-record discussion of the terms of the Ordinance during the meeting immediately prior to adoption of the Ordinance or at the meeting at which the Ordinance was adopted;

**f.** The Board's holding of a public forum for panelists to provide pro-wind information to the public one year after adoption of the Ordinance;

**g.** The Board holding pro-wind public panel presentations and then refusing to hold anti-wind panels;

**h.** Refusing to delay approval until complete information regarding radio interference and FCC application information was received;

**i.** Citing potential land-owner litigation against the County as a reason for not repealing or amending unacceptable and admittedly weak portions of the Ordinance, when the legal basis for such claims is shaky at best and the only reason landowners would have such claims is because the Ordinance was adopted without consideration of the issues;

**j.** Failing to follow the usual, customary and required procedures under the Zoning Ordinance;

**k.** The Board of Supervisor minutes show repeated closed meetings allegedly to discuss potential litigation matters;

**l.** The County Attorney's repeated advice not to interfere with the project out of fear of litigation from Invenergy;

**m.** Invenergy coming into possession of a legal hold notice sent by Petitioner's counsel only to members of the Board of Supervisors and not Invenergy (i.e. the Board was cooperating with Invenergy and sharing litigation demands and threat with Invenergy);

**n.** The County Engineer was tasked with looking at the road use agreement in March 2022 when the road use agreement was attached to the Ordinance adopted in 2019 (this means the Board received no input from the County Engineer prior to voting on the Ordinance);

**o.** The failure of the Board to ever provide the citizens an economic impact study showing anticipated County revenue from the complete project;

**p.** The failure to consider the possibility of tax incremental financing possibilities until a month after approving the WECS Application;

**q.** The refusal to consider or implement a moratorium until after the Invenergy WECS Application had been submitted;

**r.** Armstrong switching his vote from anti-moratorium to pro-moratorium after the Invenergy WECS Application had been submitted;

**s.** Respondent Armstrong believing the moratorium grand-fathered Invenergy;

**t.** The stark difference between procedures used, consideration of issues, and minutes of wind related actions compared to non-wind related actions taken by the Board;

**u.** The repeated delays of considering amendments or changes to the standards of the Ordinance until a proposal was submitted, and then when the proposal was submitted stating changes could not be made without risk of litigation;

**v.** The Board's refusal to delay approval until the radio disruption issues and

Wabash Trail setback issues were decided;

**w.** The Board's continual placation of opposed citizens by promising to evaluate potential amendments after the next significant event, and then not doing so;

**x.** Television advertisements supporting Armstrong in the primary election paid for by private parties (Armstrong claiming to not know who was behind the ads) touting his support of wind energy running during the time the WECS Application had been submitted;

**y.** The Board voting to approve the WECS Application after Armstrong had lost his primary election 68% to 41% on the basis of the candidates wind development platforms;

**z.** The assignment of Armstrong and Morris, and the exclusion of Holmes, as points of contact and negotiators with outside counsel on the road agreement and decommissioning plan;

**aa.** The position of Armstrong and Morris after the WECS Application was approved that (i) the entire Board need not be involved in the negotiations of the road use and decommissioning plan, and (ii) if the entire Board was involved in the negotiations those sessions would have to be closed due to "threats of litigation;"

**bb.** The temporal proximity of (i) the Board's adoption of a moratorium immediately after submission of Invenergy's application, (ii) an extension of the moratorium after the approval of Invenergy's WECS Application; (iii) exclusion of Respondent Holmes from negotiations regarding road use and decommissioning; and (iv) attempting to cloak negotiations of the road and decommissioning documents from public view or public meeting because of

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

"alleged threats of litigation," all individually, and in the aggregate, show nothing other than Respondents Armstrong's and Morris's protection of Invenergy and the Enterprise.

568. In combination, these factors demonstrate the Board was motivated by personal interests in seeing Invenergy succeed in approval of its project (i) under the terms of a weak Ordinance drafted by Invenergy, an affiliate of Invenergy, or an entity with similar economic interests as Invenergy, and (ii) under road and decommissioning agreements only Armstrong and Morris would be involved in negotiating..

569. The adoption of the Ordinance and WECS Application approval each constituted an illegal and *ultra vires* act by the Board under Iowa Code § 331.302(14) as to which Petitioners seek this remedies declaring the Ordinance invalid and correspondingly declaring the WECS Application approval thereunder invalid, and/or declaring the WECS Application approval alone invalid.

### J. **The Adoption of the Ordinance, the WECS Application Approval, and the Board's Negotiating Process for Road Use Agreement and Decommissioning Plan are Each Illegal Acts Arising from Violations of the Open Meetings Act**

570. Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

571. All of the indicia of interestedness set forth above are also indicia that closed meetings involving a majority of the Board or their agents occurred to conduct County business, including closed meetings with Invenergy and its representatives off-the-record.

572. It is not possible for the Board to have not met in closed meetings with wind

interests in receiving a draft Ordinance and then passing the Ordinance is a matter of eight days, and with no on the record discussion or public comment as to the terms of the Ordinance and options considered.

573. It is not possible for the Board to have evaluated the WECS Application without hiring independent experts, implies the Board or its representatives met with Invenergy and its experts.

574. Numerous closed meetings were held during relevant times citing legal privilege for ongoing or threatened litigation without the Board ever discussing the particular threats on the record.

575. The Board's proposal in the August 30, 2022 agenda to authorize Board members or staff to negotiation, along with Respondent Sonksen, with Invenergy demonstrates that The Board knows prior Board approval is necessary before supervisors and staff hold meeting with Invenergy.

576. No Board approval to negotiate with Invenergy was adopted by the Board in 2019, 2020, 2021, or 2022.

577. The Board's August 20, 2022 proposal affirms that any prior discussions by Board members' or the staff prior to August 30, 2022 were *ultra vires* and illegal actions in violation of the Board's authority.

578. Invenergy came into possession of a legal hold letter sent to the Board.

579. In adopting the Ordinance, the Board failed to comply with the requirements of Iowa Code § 21.1(1) requiring "open sessions" absent an applicable exception to such requirement and with that exception stated on the record.

580. In adopting the Ordinance, closed sessions were held and the records and recordings required by Iowa Code § 21.5(5) were not created or maintained.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**581.** The adoption of the Ordinance in violation of the Open Meetings Act in Iowa Code Chapter 21 constituted an illegal and *ultra vires* act by the Board as to which Petitioners seek this Writ of Certiorari declaring the Ordinance invalid and correspondingly declaring the WECS Application approval invalid.

**582.** In considering and voting to approve the WECS Application, the Board failed to comply with the requirements of Iowa Code § 21.1(1) requiring "open sessions" absent an applicable exception to such requirement and with that exception stated on the record.

**583.** In considering and voting to approve the WECS Application, closed sessions were held and the records and recordings required by Iowa Code § 21.5(5) were not created or maintained.

**584.** In considering and voting to approve the WECS Application in violation of the Open Meetings Act in Iowa Code Chapter 21 constituted an illegal and *ultra vires* act by the Board as to which Petitioners seek this Writ of Certiorari declaring the approval of the WECS Application, and all authorizations and permissions granted therewith or in relation thereto, invalid.

**585.** The process adopted for negotiating the  road use agreement and decommissioning plan is a ruse to permit Armstrong and Morris to conduct unrecorded closed meetings with their Enterprise partner Invenergy in violation of the Open Meetings Act as evident from the following:

   **a.** The cloaking of road use and decommissioning plan negotiations from public scrutiny and public meetings

   **b.** Armstrong and Morris sing vague and unsubstantiated threats of litigation by Invenergy as the basis for keeping negotiations private between Invenergy and

Armstrong and Morris

**c.**  Armstrong and Morris voted to limit the involvement of the sole dissenter, Respondent Holmes, from participating in those negotiations for the purposes of:

**d.**  Creating a process to eliminate Holmes's access to information;

**e.**  Prevent Holmes from discovering information as to prior communications between Armstrong, Morris, Sonksen, and Invenergy;

**f.**  Avoiding the requirements of recording closed sessions that would reveal the Enterprise; and

**g.**  Advance the interests of Invenergy without public scrutiny or that of the dissenter on the Board.

**h.**  Appointing Armstrong and Morris to each communicate with the same outside counsel separately for each agreement, in an attempt to cloak their unrecorded closed meetings with outside counsel in privilege.

**i.**  None of the § 21.5 exceptions to the Open Meetings Act apply to the negotiation of road use agreements or turbine decommissioning plans.

**j.**  None of the § 21.5 exceptions to the Open Meetings Act form a basis for depriving the public information and communications regarding negotiations of road use and decommissioning plans.

**586.**  Respondent Armstrong meeting with Maria and then Morris meeting with Maria each to discuss agreements with Invenergy is a "meeting," formal or informal, of a majority of the Board to deliberate action on matters within the scope of the Board's policy-making duties" under Iowa Code § 21.1(2).

**587.** The road use agreement and decommission plan are inter-related documents being drafted as part of a single transaction.

**588.** The structure of separate meetings with Maria to discuss related agreements with Invenergy is intended to avoid the purposes of the Open Meetings Act.

**589.** The process adopted by the Board for conducting negotiations with Invenergy regarding the road use agreement and the decommissioning plan violates the Open Meetings Act and must be enjoined before any agreements are entered.

**590.** In addition to granting Petitioners requested writ, Petitioner requests that the court assess damages against each member of the board participating in the violation of the Open Meetings Act, grant Petitioners recovery of all costs and reasonable attorney fees and issue an injunction prohibiting future violations as provided in Iowa Code § 21.6(a), (b), and (e)

## K.  Requested Orders of Mandamus and Writs of Certiorari

**591.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**592.** Equity will not suffer a wrong without a remedy.

**593.** Equity looks on that as done which ought to have been done.

**594.** Equity imputes an intention to fulfill an obligation.

**595.** Remedies at equity are unavailable to those who approach the court with unclean hands.

**596.** Equity will not reward dishonesty, misrepresentation, illegality or unfairness.

**597.** For the reasons set forth above, Petitioners request Orders of Mandamus (and permitted injunctions, temporary orders, and stays permitted under Iowa Code Ch. 661) and Writs of Certiorari (and stays necessary to effect the same as permitted

under Iowa R. Civ. P. 1.1405) declaring Section 9 of Ordinance (generally repealing conflicting existing ordinances) (i) to be an illegal act in contravention of Iowa Code § 331.302(4), and (ii) to be unenforceable to invalidate any ordinance (including without limitation the Page County Zoning Ordinance) duly passed and of legal effect prior to the adoption of the Ordinance, and ordering the Page County Respondents to take all actions necessary to document the removal of Section 9 from the Ordinances and laws of the County

598.  For the reasons set forth above, Petitioners request Orders of Mandamus (and permitted injunctions, temporary orders, and stays permitted under Iowa Code Ch. 661) and Writs of Certiorari (and stays necessary to effect the same as permitted under Iowa R. Civ. P. 1.1405) declaring the Ordinance (i) to be an illegal act in contravention of Iowa Code Ch. 331, and (ii) to be unenforceable, and ordering the Page County Respondents to take all actions necessary to document the removal of the Ordinance from the ordinances and laws of the County as it had never been passed.

599.  For the reasons set forth above, Petitioners request Orders of Mandamus (and permitted injunctions, temporary orders, and stays permitted under Iowa Code Ch. 661) and Writs of Certiorari (and stays necessary to effect the same as permitted under Iowa R. Civ. P. 1.1405) (a) declaring the approval of the WECS Application (i) to be an illegal act in contravention of Iowa Code Ch. 331, and (ii) to be unenforceable and of no legal effect, and (b) ordering the Page County Respondents to take all necessary actions to revoke Invenergy's WECS Application approval, including all authorizations, permits, or authorities granted to Invenergy thereby, and to take all actions necessary to cease activity being taken by Invenergy in

connection with the Project, including seeking injunctive relief against SHW and its affiliates for violations of the Zoning Ordinance if necessary to effectuate such order.

**600.** As part of any injunction, Respondents request that the County be enjoined from entering any road use agreement or decommissioning agreement with SHW, the County be ordered to revoke any permit, authorization, or exception issued for ancillary project items such as substations and switching stations.

**601.** Petitioners further request all other remedies as plead herein.

**602.** Any statute of limitations, or limitation on remedies, is equitably tolled based on the Board's continued promises of addressing the weaknesses and to consider amendments throughout the process and then the Board failing to do so. The public relied on these promises of the Board to address the issues without need for initiating litigation. The Board cannot be permitted to lie and placate the public and then renege and claim advantage of a limitation on time.

## CLAIM 2:   THE ORDINANCE IS VOID FOR VAGUENESS

**603.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**604.** The Due Process Clause of the United States Constitution as well as article I, section 9 of the Iowa Constitution prohibit enforcement of vague statutes and ordinances. *Formaro v. Polk County*, 773 N.W.2d 834, 840 (Iowa 2009); *State v. Nail*, 743 N.W.2d 535, 539 (Iowa 2007).

**605.** In conjunction with, or as an alternative to, the Writs of Certiorari and Orders of Mandamus set forth above, the Ordinance is illegal and fails to meet the requirements of the Due Process Clause because it is so vague and standardless that

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

it leaves the public uncertain is to what conduct it permits and what conduct it prohibits. *Helmers v. City of Des Moines*, 918 N.W.2d 501 (Iowa Ct. App. 2018)(quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1996))

606. As examples, a citizen of Page County cannot determine whether or not the height, noise, impact on birds, bats, and endangered species, or the exact, specific location of a turbine are regulated by the Ordinance or not. The Ordinance required information as to each of these items in the application, but the Ordinance does not otherwise require compliance with the disclosures contained in the application.

607. The enforcement provisions of the Ordinance are non-existent.

608. Wind farm construction projects of the type proposed by Invenergy cause millions of dollars in damages to roadways and attached drainage systems.

609. Section 5(1) of the Ordinance provides "Roadways of any surface type will be restored to preconstruction condition by the Developer at no cost to the County."

610. Section 5(1) of the Ordinance requires an approved C-WECS developer to enter into a "road use agreement substantially in the form attached to [the] Ordinance, prior to the start of construction."

611. Section 2 of the "road use agreement" attached to the Ordinance, in contrast to the terms of Section 5(1) of the Ordinance, only commits the approved C-WECS developer to responsibility for "maintaining the unpaved roads within the Wind Farm project boundaries."

612. The conflict between the terms of Section 5 of the Ordinance requiring restoration of roadways of all surface types anywhere in Page County at no cost to the County and the provisions of the "road use agreement" committing the C-WECS developer only to repair "unpaved roads" "within the project boundaries" (which does not

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

cover the entire county) are in direct conflict, and that conflict is irreconcilable.

613. This irreconcilability will become even more pronounced down-the-road when Invenergy fails to repair paved roads within the project boundaries and/or fails to repair any roads outside of the project boundaries citing no enforcement provisions in the Ordinance, but a vested contractual rights to only repair unpaved roads in the project area with specific remedy provision in the road use agreement approved by the Board and constituting the contractual agreement and commitment of the County when signed.

614. As Invenergy has done in litigation already in the State of Iowa, Invenergy will assert a contract right to which it is entitled, and that, notwithstanding Section 5(1) of the Ordinance, it may only be required to repair unpaved roads in the project boundaries and has no obligation to repair paved roads anywhere or unpaved roads outside of the project area. Invenergy will argue the road use agreement is a contractual waiver of any obligation to comply with the Ordinance road repair requirements.

615. Transportation of wind turbine equipment to site locations will require the use of paved and unpaved roads in Page County both within and outside of the project area.

616. No mechanism exists for enforcing the C-WECS developer's obligation under the Ordinance to repair damaged paved or unpaved roads in the County outside of the "project area" at no cost to the County, and no provisions provide for enforcing the C-WECS developer's obligation under the Ordinance to repair paved roads within the project area.

**617.** The road repair provisions, which includes incorporation of the "road use agreement" attached to the Ordinance, are unconstitutionally vague as to the obligations of the C-WECS developer's and the definition of their required conduct is vague.

**618.** Invenergy should not be permitted to latch on to this vagueness down-the-road to shirk its responsibilities to repair damage to the County's roads. The vagueness and contradiction within the Ordinance renders it unconstitutional under the Due Process clauses of the United States and State of Iowa Constitutions.

**619.** Further Ordinance vagueness arises from the requirement in Section 3 for a commercial wind system applicant to disclose turbine heights in the WECS Application, but then not be obligated under Section 4 of the Ordinance to comply with any height requirements or to limit the height to those included in the application.  In stark contrast, the height limitation for a non-commercial turbine is limited to 100 feet in Section 6 of the Ordinance.

**620.** These contradictions and inconsistencies related to height limitations create vagueness as to what is permitted and prohibited by the Ordinance and therefore the Ordinance is unconstitutionally vague, especially when the heights proposed by Invenergy are also inconsistent with the Page County Zoning Ordinance.

**621.** A law is vague if it impermissibly delegates basic policy matters to those entrusted with enforcing it. *Helmers v. City of Des Moines*, 918 N.W.2d 501 (Iowa Ct. App. 2018) 918 N.W.2d 501 (Iowa Ct. App. 2018)(quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

**622.** The void-for-vagueness doctrine is designed to prevent the vesting of virtually unlimited discretion in governmental officials. Id.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**623.** Therefore, even more so, an ordinance, such as the Ordinance in this case, vesting virtually unlimited discretion for policy-making in an unelected person is certainly vague in its definition of permitted and prohibited conduct.

**624.** If a law is void for vagueness if it delegates policy-making to government law enforcement officials, a law that delegates policy-making to a purportedly regulated non-governmental entity is certainly void on vagueness grounds.

**625.** The Ordinance fails to delegate enforcement at all to any law enforcement or governmental entity and instead policy making matters are delegated to Invenergy. This structure violates the Due Process Clause.

**626.** The Ordinance unconstitutionally vests the non-governmental proverbial fox with the authority to guard the hen house as it sees fit.

**627.** The vagueness of the Ordinance further deprived the citizens of Page County of the opportunity to understand the meaning of the ordinance while being considered by the Board.

**628.** Petitioners seek a declaration, whether as certiorari, mandamus, or declaratory judgment under Iowa R. Civ. P. 1.1101, that the Ordinance as adopted by the Board of Supervisors is unconstitutionally vague and void, and violates the Due Process Clause.

**629.** Petitioners further seek an injunction against the County prohibiting it from entering the "road use agreement" appended to the Ordinance with Invenergy while this litigation is pending.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**CLAIM 3:    TEMPORARY AND PERMANENT INJUNCTION AGAINST COUNTY**

**630.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**631.** As an auxiliary or alternative remedy to the Writs of Certiorari and Orders of Mandamus set forth above and below, Petitioners seek a temporary and permanent injunction at equity and pursuant to Iowa R. Civ. P. 1.1501& 1.1502 to the same effect and on the same terms as Petitioners requests under its pleadings herein regarding the declaratory judgments, writs, and orders sought as to the unenforceability and invalidity of the Ordinance and/or WECS Application approval as plead above and below in support of the Writs of Certiorari, Orders of Mandamus, declarations of invalidity and unconstitutionality, and other equitable relief.

**632.** The Petitioners request a temporary injunction pursuant to Iowa Code § 661.16 permitting the court to make temporary orders for purposes of preventing damage or injury to the Petitioners until the action is decided.

**633.** The County's continued operation of under an illegal Ordinance with no enforcement provisions, and allowing Invenergy to proceed with development under an illegal application approval based on an application containing knowing material misstatements and omissions, would cause great, or irreparable injury to the Petitioners' rights to have their government conduct itself within the bounds of the law. Money damages are insufficient to compensate the Petitioners' for Page County's violations of the laws governing its authority and ability to act.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**634.** Page County, by allowing Invenergy to continue development of the C-WECS project, while litigation as to the legality of the Ordinance and legality of the WECS Application approval are ongoing, exposes Page County, and correspondingly the Petitioners as residents and taxpayers in Page County, to potential further cost and expense arising out of Invenergy's possible, although unjustified, claims based upon reliance, imputed contract, or similar types of claims. Invenergy has already demonstrated its claims unfettered entitlement to pursue such projects in its litigation Tama County, Worth County, and in demands to Page County. Temporary and permanent injunctive relief prohibiting Invenergy from unilaterally expanding its entitlement claims is necessary to limit future harm to all involved.

**CLAIM 4:   DECLARATORY JUDGMENT**

**635.** Petitioners incorporate the foregoing and subsequent paragraphs as if fully set forth herein.

**636.** For all of the reasons set forth herein, Pursuant to Iowa R. Civ. P. 1.1101, Petitioners seek declaratory judgment against all Respondents declaring (i) the invalidity, illegality, unconstitutionality, and unenforceability of the Ordinance, and (ii) the invalidity, illegality, and unenforceability of Invenergy's WECS Application purportedly granted pursuant to the Ordinance.

## V.     **REMEDIES AND REQUESTS FOR RELIEF**

Petitioners pray for the relief as plead in each of the Claims set forth above, and that this Court, whether by Writ of Certiorari, Order of Mandamus, Declaratory Judgment, by Injunction, at law or equity, or by any other remedy available at law or equity, enter an order that:

(i)     invalidates the Ordinance as an illegal, unconstitutional, and unenforceable act of the Board of Supervisors;

(ii)    invalidates the approval of the WECS Application under the Ordinance as an illegal and unenforceable action of the Board of Supervisors;

(iii)   invalidates Invenergy's WECS Application approval to construct a wind turbine system in Page County and declares Invenergy has never had a right to do so;

(iv)    directs Page County and its Board of Supervisors, individual members of the Board of Supervisors, officers, and employees to take all actions necessary to reflect the illegality and repeal of the Ordinance and revocation of the WECS Application approval so as if the Ordinance were never adopted and the WECS Application never approved;

(v)     enjoins the County from authorizing any person to negotiate a road use agreement or decommissioning agreement with Invenergy;

(vi)    enjoins the County from entering a road use agreement or decommissioning agreement with Invenergy;

(vii)   enjoins the Board of Supervisors from any violations of the Open Meetings Act for a period of 12-months;

(viii)  grants all penalties and fines available at law against each Respondent;

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

(ix)   grants such further relief, remedy or damages to which the Petitioners

may be entitled; and

(x)   to the full extent permitted by law or equity, award Petitioners such amounts as to fees, costs, and expenses, including attorney's fees, court costs, and related litigation expenses.

Dated: September 16, 2022

ATTORNEYS FOR THE PETITIONERS

/s/ Theodore Sporer (AT0007453)
108 Third Street, Suite 302
Des Moines, Iowa 50309-4758
Telephone (515) 989-6080
Facsimile (515) 414-7679
Email teddy@sporerlaw.com

/s/ Shawn Shearer (AT0014824)
The Shearer Law Office, P.C.
108 Third Street, Suite 302
Des Moines, Iowa 50309-4758
Telephone (214) 717-1828
Email shawn@shearerlaw.pro

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Document 20192338
Pages 26
Date 11/08/2019  Time  9:46 AM
Rec Amt $.00

BRENDA ESAIAS, RECORDER
PAGE COUNTY, IOWA

# PAGE COUNTY

## ORDINANCE #2019-2

Preparer Information:  Melissa Wellhausen, Page County Auditor, 112 E Main St., Clarinda, IA 51632
(712)542-3219

Return Document To:  Melissa Wellhausen, Page County Auditor, 112 E Main St., Clarinda, IA 51632
(712)542-3219

Grantors:  Page County Board of Supervisors

Grantees:  Page County, Iowa

Prepared by & Return to: Melissa Wellhausen, Page County Auditor, 112 E. Main St., Clarinda, IA 51632, (712) 542-3219

# PAGE COUNTY ORDINANCE #2019-2

# AN ORDINANCE REGULATING THE PLACEMENT OF WIND ENERGY CONVERSION SYSTEMS (WECS) ON PROPERTY LOCATED IN THE UNINCORPORATED AREAS OF PAGE COUNTY, IOWA

## BE IT ENACTED BY THE PAGE COUNTY BOARD OF SUPERVISORS

SECTION 1. <u>PURPOSE</u>

The purpose of this Ordinance shall be to promote the public health, safety, comfort and general welfare, while facilitating economic opportunities, for rural residents and promoting a goal of increased energy production from renewable energy sources. In addition, this Ordinance will serve to establish guidelines for the siting, construction and operation of Wind Energy Conversion Systems (WECS) which generate electricity. The requirements of this Ordinance shall apply to all WECS constructed after the effective date of this Ordinance. No modification or alteration to an existing WECS shall be allowed without full compliance with this Ordinance.

SECTION 2. <u>DEFINITIONS</u>

For use in this Ordinance, certain words used herein shall be defined as follows:

<u>Applicant:</u> The person or entity submitting the application under this Ordinance, which is normally expected to be the owner or operator of a WECS, or the owner of the WECS development.

<u>Commercial Wind Energy Conversion System (or C-WECS):</u> A WECS which has a generating nameplate capacity of 100 kW or greater.

<u>Feeder Line:</u> Any power line that carries electrical power from one or more wind turbines or individual transformers associated with individual wind turbines to the point of interconnection with the electrical power grid. In the case of interconnection with the high voltage transmission systems, the point of interconnection shall be the substation serving the WECS.

<u>Meteorological Tower:</u> For the purpose of this Ordinance, meteorological towers are those towers which are erected primarily to measure wind speed and directions plus other data relevant to siting and/or operating WECS.

<u>Non-Commercial WECS (or Non C-WECS):</u> A WECS which has a generating nameplate capacity of not more than 100 kW and which is intended to primarily reduce on-site consumption of utility

power.

**Operator:** The entity responsible for the day-to-day operation and maintenance of the WECS.

**Owner:** The entity or entities with an equity interest in the WECS, including their respective successors and assigns. Owner does not mean (i) the property owner from whom a lease, easement or other property rights are acquired for locating the WECS (unless the property owner has an equity interest in the WECS); or (ii) any person holding a security interest in the WECS solely to secure an extension of credit, or a person foreclosing on such security interest provided that after foreclosure, such person seeks to sell the WECS at the earliest practical date.

**Participating landowner:** A landowner under lease, easement or other property agreements with the owner or operator of the WECS.

**Non-participating landowner:** Any landowner not under agreement with the owner or operator of the WECS.

**Professional Engineer:** A qualified individual who is licensed in the State of Iowa as a professional engineer.

**Residence:** A house, apartment or other shelter that is the abode of a person, family, or household and regularly occupied.

**Rotor Diameter:** The diameter of the circle described by the moving rotor blades of a WECS.

**Setback:** The minimum required distance from a certain object, structure or point to the center point of the foundation of the Wind Turbine at the natural ground level.

**Structure:** Anything constructed or erected on the ground or attached to the ground, including but not limited to, antenna(s), buildings, sheds, cabins, residences, signs, storage tanks, towers, Wind Turbines and other similar objects.

**Substation:** The apparatus that connects the electrical connection system of the WECS and increases the voltage for connection with the utility's, transmission owner's or WECs owner's transmission lines.

**Total Height:** The total height of the Wind Turbine inclusive of rotor blades, as measured from the ground to the tip of the blade when fully extended.

**Tower:** The vertical structure that supports the electrical generator, nacelle, rotor blades, or meteorological equipment.

**Transmission Line:** Those electrical power lines that carry voltages of at least 69,000 volts (69 kV) and are primarily used to carry electrical energy over medium to long distances rather than directly interconnecting and supplying electrical energy to customers.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**Wind Energy Conversion System (WECS):** All necessary devices that together convert wind energy into electricity, including Wind Turbines, electrical components, transformers, feeder lines, substation and meteorological towers.

**Wind Turbine:** A Wind Turbine is any piece of electrical generating equipment that converts the kinetic energy of blowing wind into electrical energy, primarily made up of a foundation, tower, nacelle and rotors.

## SECTION 3. WECS PERMIT APPLICATION REQUIREMENTS.

The applicant for the siting and construction of a WECS shall file an application with the County Zoning Administrator or his designee, accompanied by a fee of Two Hundred Fifty Dollars ($250.00) per Wind Turbine that is a part of the application and payable to Page County, Iowa.

A.   All applications for WECS must include the following information (as applicable).

1. A WECS project summary, including, to the extent possible: (1) a general description of the project, including its approximate nameplate generating capacity; the equipment manufacturer and a general description of the Wind Turbines, and (2) a description of the applicant, owner and operator, including their respective business structures.
2. The names of project applicant and project owner, including contact information.
3. The general description of the location of the WECS.
4. Total height and rotor diameter of the Wind Turbines.
5. Site layout, including the location of the Wind Turbines and those items to which a setback applies. The site layout shall include distances and be drawn to scale, in order for the County to determine if the Wind Turbines meet the setback requirements of this Ordinance.
6. Engineer's certification(s) of the Wind Turbines. This includes as a minimum: standard drawings of the wind turbine structure, including the tower, base, and footings. An engineering analysis of the tower showing compliance with the applicable regulations and certified by an Iowa licensed professional engineer shall also be submitted. This analysis is frequently supplied by the manufacturer.
7. Documentation of land ownership or legal control of the property.
8. The latitude and longitude of individual Wind Turbines.
9. Location of the public areas listed in the table in Section 4.12.f. which are potentially affected by the proposed Wind Turbines.
10. Affirmation that a sound study was completed showing expected maximum decibel levels produced by the Wind Turbines as measured at non-participating residences should not exceed fifty-five (55) decibels (dBA) for any period of time during normal operating conditions.

11. Affirmation that the applicant has applied for necessary and appropriate Federal Communication Commission (FCC) applications and Federal Aviation Administration (FAA) no hazard determinations (including FAA determinations of no hazard, if received).

12. Affirmation that the applicant has identified significant migratory flyways and nesting areas for federally listed birds, bats and endangered species within one (1) mile of the proposed Wind Turbine.

The WECS application shall contain the above information and be submitted to the Page County Zoning Administrator or his designee. Upon determination by the Page County Zoning Administrator that the requirements of this Ordinance have been satisfied, the completed WECS Application and any/all necessary supporting documentation shall be presented to the Page County Board of Supervisors for approval. The Page County Board of Supervisors, upon approval of an application, shall authorize the Zoning Administrator to provide any necessary building permits for each Wind Turbine. If there are any material changes to the information provided as part of the application in Section 3 that occur from the time of the application until the construction of the WECS, the applicant shall submit a new application (along with an application fee per Wind Turbine with changed information) together with the updated information for each Wind Turbine (with changes to the information required to be provided in Section 3) and any such change shall be in compliance with this Ordinance. The Page County Zoning Administrator shall present the amended and completed WECS Application and any/all necessary supporting documentation to the Page County Board of Supervisors using the process described above. Upon the issuance of any necessary FAA and FCC permits identified in this section, the applicant shall provide the Page County Zoning Administrator with documentation that the applications were approved.

## SECTION 4. GENERAL REQUIREMENTS FOR C-WECS AND METEOROLOGICAL TOWERS.

As part of the siting, construction and operation of the C-WECS, the C-WECS owner must comply with following requirements:

1. **Color and finish.** Wind Turbines shall be painted a non-reflective color. Blades may be black in order to facilitate de-icing. Finishes shall be matte or non-reflective.

2. **Tower Configuration.** All Wind Turbines, which are part of a C-WECS, shall be installed with a tubular, monopole type tower. Meteorological towers may be guyed.

3. **Lighting.** Wind Turbines shall not be artificially lighted, except to the extent required by the FAA or other applicable authority or for night time repairs/maintenance. Lighting, including lighting intensity and frequency of strobe, shall adhere to, but not exceed, requirements established by FAA regulations.

4. **Signage.** Upon completion of the Wind Turbines, the C-WECs owner's name and/or logo and the phone number to contact in case of emergency shall be placed upon the base of the WECS Tower or the entrance to any enclosure fence. Wind Turbines shall not be used for displaying any advertising except for reasonable identification of the manufacturer, owner or operator of the

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

WECS.

5. **Feeder Lines.** All communications and feeder lines, equal to or less than 34.5 kV, installed as part of a WECS shall be buried not less than forty-eight (48) inches deep.

6. **Waste Disposal.** Solid and hazardous wastes, including but not limited to crates, packaging materials, damaged or worn parts, as well as used oils and lubricants, shall be removed from the site in a time period as established by local, state and federal regulations.

7. **Minimum Ground Clearance.** The blade tip of any Wind Turbine shall, at its lowest point, have ground clearance of no less than fifty (50) feet.

8. **Signal Interference.** The C-WECs shall not interfere with licensed microwave communication paths or those microwave paths planned to be used by Page County at the time of the application. The C-WECs owner shall minimize and mitigate any interference with electromagnetic communications, such as radio, telephone or television signals caused by any Wind Turbines. If, after construction of the C-WECS, the owner or operator receives a written complaint related to the above-mentioned interference, the owner or operator shall take reasonable steps to respond to the complaint.

9. **Federal Aviation Administration.** All Wind Turbines shall comply with FAA standards and regulations.

10. **Electrical Codes and Standards.** All WECS shall comply with the National Electrical Code and other applicable standards.

11. **Setbacks.** The following setbacks and separation requirements shall apply to all Wind Turbines and meteorological towers, as measured from the center of the object or structure or closest point of items below marked by lines (as applicable) to the center point of the foundation of the Wind Turbine at the natural ground level:

a)    **Inhabited Structures (non-participating landowners).** Each Wind Turbine and meteorological tower shall be set back from the nearest residence, which  is  able to be occupied, school, hospital, church or public library (which such residence, school, hospital, church or public library exist as of the date the WECS application is submitted to the County Zoning Administrator or their designee), a distance no less than (i) one point one (1.1) times the total height or (ii) fifteen hundred (1500) feet, whichever is  greater.  An affected property owner may waive this setback requirement by executing a written waiver or agreement.

b)    **Inhabited Structures (participating landowners).** Each Wind Turbine and meteorological tower shall be set back from the nearest residence, which is able to be occupied, school, hospital, church or public library (which such residence, school, hospital, church or public library exist as of the date the WECS application is submitted to the County Zoning Administrator or their designee), a distance no less than (i) one point one (1.1) times the total  height  or  (ii) twelve  hundred fifty (1250) feet, whichever is greater. An affected property owner may waive this setback requirement by executing a written waiver or agreement.

c)    **Property Lines.** Each Wind Turbine and meteorological tower shall be set back a distance

of no less than one point one (1.1) times the total height without securing an appropriate agreement from the adjoining property owners. An affected property owner may waive this setback requirement by executing a written waiver or agreement.

**d)** **Public Right-of-Way.** Each Wind Turbine and meteorological tower shall be set back from the public right-of-way a distance no less than one point one (1.1) times the total height.

**e)** **Radio Communication Pathways.** Each Wind Turbine and meteorological tower shall be set back from licensed microwave radio communication paths, or those paths planned to be used by Page County at, the time of the application, so that no part of the Wind Turbine interferes with the path's Fresnel zone.

**f)** **Public Areas and Areas under PCCB management.** Each Wind Turbine and meteorological tower shall be set back from the property line of designated public areas/publicly owned conservation areas and other publicly owned areas managed by the Page County Conservation Board as shown in the table below the minimum distances identified in the table below.

| Designated Public Area | Setback Distance |
|---|---|
| State & Federal Parks | 1.0 mile |
| Specially designated protected areas:<br>a.) Pioneer Park<br>b.) Nodaway Valley Park<br>c.) Pierce Creek<br>d.) Rapp Park & Recreation<br>e.) Ross Park<br>f.) Page County Conservation Center<br>g.) Stephens Tract Wetlands | 1.0 mile |
| All other parks or areas | 0.5 mile |

**g)** **Municipalities.** Each Wind Turbine and meteorological tower shall be set back from the city limits of any incorporated municipality a distance no less than one (1) mile. An affected municipality may waive this setback requirement by executing a written waiver or agreement.

**12. Safety.**

a) All wiring between Wind Turbines and the substation shall be underground. If the applicant can demonstrate the need for an overhead line and the acceptance of landowners for this line, such option may be approved conditionally by the Page County Board of Supervisors.

b) Wind Turbines and meteorological towers shall not be climbable on their exterior up to fifteen (15) feet above ground level, except for stairs used to reach the access door used for entry into the Wind Turbines.

c) All access doors to Wind Turbines and meteorological towers and electrical equipment

shall be locked when not being serviced.

d) Appropriate visible warning signage shall be placed on Wind Turbines, electrical equipment, and substation entrances.

e)For all guyed meteorological towers, visible and reflective objects, such as plastic sleeves, balls, reflectors or tape, shall be placed on the guy wire anchor points and along the outer and innermost guy wires up to a height of twelve (12) feet above the ground.

## SECTION 5. AVOIDANCE AND MITIGATION OF DAMAGES TO PUBLIC INFRASTRUCTURE AND DECOMMISSIONING

1. **Roads.** The applicant or the C-WEC's owner shall enter into a road use agreement, substantially in the form attached to this Ordinance, with Page County prior to the start of construction of the WECS. Page County's approval and execution of the agreement shall not be unreasonably withheld. Roadways of any surface type will be restored to preconstruction condition by the Developer at no cost to the County.

2. **Drainage System.** The applicant or C-WEC's owner shall be responsible for prompt repair for damage to public drainage systems stemming from construction, operation or maintenance of the WECS. All bridge crossings must be preapproved by the Page County Engineer.

3. **Decommissioning.** The C-WEC's owner shall enter into a decommissioning agreement, substantially in the form attached to this Ordinance, with Page County prior to the start of construction of the C-WECS. Page County's approval and execution of the agreement shall not be unreasonably withheld.

## SECTION 6. GENERAL REQUIREMENTS FOR NON-COMMERCIAL WECS (Non C-WECS).

1. **Non C-WECS are subject to the following standards.** In addition to satisfactorily addressing all other applicable requirements of this Ordinance, the applicant must provide documentation that the following requirements have also been met.

   a) **Tower Height:** Non C-WECS Wind Turbines shall not exceed onehundred
   (100) feet in total height. Non C-WECS shall be subject to all height limitations as necessary to comply with other sections of this Ordinance and those imposed by FAA regulations.

   b) **Setback:** No part of the Non C-WECs wind system structure, including guy wire anchors, may extend closer than twenty five (25) feet to the property boundaries of the installation site. The distance of the base of the tower from any property line shall be a minimum of 115% of the total height of the tower. An affected property owner may petition the Board of Adjustment for a written waiver of this setback requirement.

   c) **Noise:** Non C-WECS shall not exceed 55 dBA, as measured at the closest neighboring inhabited dwelling that exists as of the time of the application. The level, however, may be exceeded during short-term events such as utility outages and/or severe wind storms.

d)      **Engineer Certification:** Applications for Non C-WECS shall be accompanied by standard drawings of the wind turbine structure, including the tower, base, and footings. An engineering analysis of the tower showing compliance with the applicable regulations and certified by an Iowa licensed professional engineer shall also be submitted. This analysis is frequently supplied by the manufacturer.

e)      **Compliance with Federal Regulations:** Non C-WECS must comply with applicable Federal Communication Commission (FCC) applications and Federal Aviation Administration (FAA) applications, including but not limited to, necessary approvals for installations near airports.

f)      **Compliance with National Electric Code:** Applications for Non C-WECS shall be accompanied by a line drawing of the electrical components in sufficient detail to allow for a determination that the manner of installation conforms to the National Electric Code. This information is frequently supplied by the manufacturer.

g)      **Utility Notification:** No Non C-WECS shall be installed until evidence has been given that the utility company has been informed of the customer's intent to install an interconnected customer-owned generator. Off-grid systems shall be exempt from this requirement.

h)      **Insurance:** The owner seeking a permit to erect a Non C-WECS shall provide evidence, in the form of a certificate of insurance satisfactory to Page County, showing general liability coverage for the installation and operation of the Non C-WECs system under a standard homeowner's or standard business owner's insurance policy, separate and distinct from any insurance requirements of a public utility.

## SECTION 7. TRANSFER

Building permits and the associated decommissioning and road use agreements granted under this Ordinance may be transferred to another party subject to Page County Board of Supervisors approval, said approval shall not be unreasonably withheld. Any assignee of the building permits and associated decommissioning and road use agreements shall be subject to all the requirements in this Ordinance and the agreements.

## SECTION 8. LIABILITY INSURANCE.

The owner or operator of any C-WECS subject to this Ordinance shall maintain a current general liability policy covering bodily injury and property damage with limits of at least Three Million Dollars ($3,000,000) per occurrence and Six Million Dollars ($6,000,000) in the aggregate.

## SECTION 9. REPEALER.

All ordinance(s) in conflict with the provisions of this Ordinance are hereby repealed.

## SECTION 10. SEVERABILITY.

Should any section or provisions of this Ordinance be declared by the courts to be invalid or unconstitutional, such decision shall not affect the validity of the Ordinance as a whole, or any part thereof other than the part so declared to be invalid or unconstitutional.

## SECTION 11. PENALTY

Any person, persons, firms, partnerships or corporations, whether acting alone or in concert with any other, who violates this Ordinance, shall be guilty of a simple misdemeanor as authorized by Iowa Code Section 331.302.

## SECTION 12. EFFECTIVE DATE.

This Ordinance shall be in effect after its final passage, approval and publication as provided by law.

Passed and Approved this 10-29, 2019

Alan Armstrong, Chairperson
Page County Board of Supervisors

Attest:

Melissa Wellhausen
County Auditor

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# ROAD USE AGREEMENT RELATING TO THE DEVELOPMENT OF
# (WIND FARM NAME) WIND FARM

THIS ROAD USE AGREEMENT (this **"Agreement"**), dated this ___ day of _____, 2019, between the BOARD OF COUNTY SUPERVISORS OF PAGE COUNTY, IOWA, (hereinafter sometimes referred to as **"County"**) and (_____) (hereinafter sometimes referred to as **"Developer"**).

## WITNESSETH:

WHEREAS, Developer intends the construction of wind turbine generators in Page County as part of one or more wind projects (including without limitation, the project known as the _____ (a **"Wind Farm"**); and

WHEREAS, Developer and County wish to formally document the expectations for road maintenance and restoration during and following construction of each Wind Farm in Page County; and

WHEREAS, County has fully considered the proposed development and improvement of the land and the requirements to be imposed upon other adjoining or neighboring properties by reason of the proposed development and improvement of the land; and

WHEREAS, County and Developer mutually acknowledge that the matters hereinafter described will be subject to all the requirements, terms and conditions of Page County, now in effect and other laws, rules, and regulations, as those are promulgated by statutes, resolutions, or otherwise; and

WHEREAS, County and Developer mutually acknowledge and agree that the matters hereinafter set forth are reasonable conditions and requirements to be imposed by Page County, and that such matters are necessary to protect, promote, and enhance the public welfare; and

WHEREAS, it is further mutually acknowledged that Page County is entitled to other assurance that the matters hereinafter agreed to will be performed as agreed by Developer, and in that regard, Developer has made available to County it's most recent publicly filed financial statements indicating it to be of investment grade, assuring County that there are available funds to cover the estimated costs of performance of the matters hereinafter agreed to. Should Developer fail to maintain such investment grade, it may be required to post security to cover the estimated cost of performance. At no time will security in excess of $500,000 per each Wind Farm be required.

NOW, THEREFORE, in consideration of the premises, the mutual covenants herein contained it is agreed as follows:

## PROJECT BOUNDARIES SUBJECT TO THIS AGREEMENT

1. The Wind Farm project boundaries subject to this Agreement are outlined in Exhibit A for the Wind Farm (and Exhibit A may be supplemented in the event any further Wind Farms are to be developed by Developer and approved by Page County or the boundaries attached to this Agreement in Exhibit A are modified in the future).

## ROAD MAINTENANCE TO BE PERFORMED

2. During the period of Wind Farm construction, Developer and its contractors and sub-contractors will be responsible for maintaining the unpaved roads within the Wind Farm project boundaries. Maintenance of the unpaved roads during construction will consist of the following:

  • Blading roads on a weekly or more frequent basis as needed due to construction traffic or weather.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

- Placement of granular surfacing on road soft spots on a weekly or more frequent basis as needed due to construction traffic or weather.
- Shaping roads as necessary for drainage and safety on a weekly or more frequent basis as needed due to construction traffic or weather.
- Utilization of dust mitigation and control measures on road surfaces to provide adequate site distance for vehicles and users of the unpaved road.

County may inspect the roads at any time and offer suggestions for maintenance to improve safety.

Developer's obligation to maintain specific unpaved roads within the Wind Farm project boundaries will cease at such time as the specific sections of unpaved roads are no longer required for transportation of wind turbine components for the initial construction of the Wind Farm and such specific road sections have been restored in accordance with this Agreement  and
have received probationary acceptance. For the purposes of this Agreement, County road sections will be defined as encompassing the entire distance between road intersections.

## ROAD RESTORATION TO BE COMPLETED

3. All road restoration contemplated by this Agreement shall be performed by Developer in a good and workmanlike manner and in accordance with applicable County standards, rules, and regulations governing such construction as reasonably determined by the Page County Secondary Roads Department. AASHTO Publications and Iowa DOT Standard Specifications shall be utilized as primary guidelines.  A template of the typical unpaved road profile is attached to this Agreement as Exhibit B.

## TIME OF COMPLETION

4. Except where a lesser time period is prescribed, all improvements herein described  and  all matters herein agreed to be performed shall be restored, constructed, or performed by Developer within one (1) year from the date of final wind turbine generator component delivery for the applicable Wind Farm project, provided however, that labor disputes, fire, unusual delays in transportation, unavoidable casualties, causes beyond the Developer's control or by any other cause which County may reasonably determine justifies the delay shall extend  the said  time period for performance of this Agreement as mutually agreed between the County and the Developer.

## OWNERSHIP OF IMPROVEMENTS

5. Subject to the County's reasonable acceptance of road improvements for maintenance purposes, upon completion of road restoration work located in County right-of-way, all such completed road restoration work shall become the sole property of Page County, free and clear of all liens, encumbrances, and restrictions. Developer's underground collector lines, communications lines, or other Wind Farm facilities constructed in the right-of-way are expressly excluded from the definition of completed road restoration work.  Developer shall furnish to County lien waivers and/or satisfactory proof that all claims and payments to be made in connection with construction of said road improvements have been satisfied. All other improvements referenced in this Agreement shall be owned and maintained by Developer and their successors and assigns.

## FAILURE TO COMPLETE THE RESTORATION

6.  In the event that any portion of road restoration work has not been made, installed, or performed within said one (1) year period, except as provided for in paragraph 4 above, then, and in that event, County may have such remaining road restoration work completed  within a  reasonable time by such means and in such manner, by contract with or without public letting, or otherwise, as it may deem advisable, at Developer's expense. County shall be entitled to reimbursement from Developer upon demand for any such documented reasonable costs incurred by County, plus 1.5% interest per month on unpaid balance.

## PARTIAL RELEASE

7.  In the event security has been provided in accordance with this Agreement, as road restoration work is completed, Developer may request in writing that County inspect such work and upon probationary acceptance corresponding reductions of such security will be granted.  The procedures for completion of road improvements and work by County and payment to County therefore shall apply whether there be one or more defaults on the part of Developer in performing the terms, conditions, and covenants contained in this Agreement.

## RELEASE

8.  The County shall not release the Developer from its obligations with respect to a particular Wind Farm project until all road restoration work with respect to such Wind Farm project has been completed and the probationary period(s) has expired or when all deficiencies identified prior to the expiration of the probationary period have been corrected. Following expiration of the probationary period the County will provide Developer with an acknowledgement that the probationary period has expired.

## PRESERVATION OF OTHER REMEDIES

9.  The rights and remedies of the County provided in this Agreement shall not be exclusive and are in addition to any other rights or remedies provided by law. Developer, in developing the applicable Wind Farm project shall fully comply with all applicable rules, regulations, standards, and laws of the County and other governmental agencies and bodies having jurisdiction.

## STANDARDS FOR ACCEPTANCE

10. County shall accept the road restoration in County right-of-way as public improvements which are constructed under this Agreement for full maintenance in accordance with its regulations once probationary acceptance has been granted for a road section under the following terms and conditions:

a.  As soon as all of the restoration in a road section which is covered by this Agreement has been completed in accordance with the terms of this Agreement, Developer shall send a letter to the County Engineer requesting probationary acceptance with the following statement included: "I hereby state that to the best of my knowledge, information and belief, the road section has been restored in substantial compliance with the Road Use Agreement Relating to the Development of (Wind Farm Name) Wind Farm." When improvements are determined to be constructed to the County's reasonable satisfaction, the County will send a letter to the Developer granting probationary acceptance of public improvements. The probationary period will terminate one year from the date of probationary acceptance unless one or more deficiencies is identified by the County prior to such termination.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

b. Prior to termination of the probationary period the County may identify and provide a written list of deficiencies based on a physical inspection of the road sections subject to this Agreement. The Developer shall correct all of said deficiencies to the County's reasonable satisfaction within six (6) months from the date said deficiency list is issued. When all of said deficiencies on a specific road section have been corrected to the County's reasonable satisfaction, the road section will be deemed accepted and Developer will have no further obligations for restoration on said road section.

## PLAN EXECUTION BY PAGE COUNTY

11. The execution of this Agreement by the Board of County Supervisors of Page County in no way represents that the County will accept the public road restoration contemplated by this Agreement for title or maintenance purposes until said road restorations have been completed in compliance with this Agreement and with applicable Page County standards, rules and regulations.

## RESPONSIBILITY FOR INSTALLING UTILITIES AND FOR THE PERMITTING OF THEIR INSTALLATION

12. Developer agrees to be responsible for contracting for installation of any or all utilities where required, including, but not limited to water, sewer, natural gas, and electricity. Page County, as the owner of public right-of-way and public easements in this Agreement, retains the right to issue utility permits to utility companies or to other persons, companies, corporations or organizations prior to the final acceptance of public road restorations, herein described.

## STIPULATIONS

13. This Agreement in addition to the consideration of the premises, the mutual covenants herein contained, and the approval and execution of this Agreement by Page County shall be and is subject to the following stipulations(s) and Developer agrees to the following:

a. Developer shall be responsible for maintenance of unpaved roads within the Wind Farm project boundaries as described in this Agreement. This will include, but is not limited to blading, placing of granular surfacing, shaping, and dust control. Coordination with Page County will be necessary, including response to citizen concerns.

b. Developer shall be responsible for an inspection of all County roadways within the Wind Farm project boundaries and subject to the Agreement prior to any major road improvement work being performed, as burden of proof of repairs and deficiencies is the responsibility of the Developer. Developer shall provide Page County with a video survey of all the roads in the Wind Farm project boundaries prior to start of construction of the Wind Farm. Developer shall be responsible for obtaining any and all permits, permissions, or compliances not covered in the provisions of this Agreement or those permitted by Page County.

c. Developer shall provide and maintain all traffic control as required for the safe and efficient movement of traffic as a result of its construction activities.

d. Should construction operations necessitate the crossing of an existing county roadway with a crawler crane, Developer shall adhere to the following requirements for each such crossing:

   i. Developer shall provide the County with a map identifying the total number of crossings along with coordinates of each crossing.

   ii. Developer shall supply a traffic control plan for the crane crossing, traffic control, the

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

time frame for all road closures, and how the closure will be handled with the County Engineer and County Law Enforcement. No roadway shall be closed without giving 24 hours' notice to the County Engineer and County Law Enforcement.

iii.    Developer shall provide a detail of how the weight of the crane will be bridged over the roadway for approval by the County Engineer. Developer will repair any damages to the roadway to the extent caused by such crane crossing over the roadway.

iv.    Developer must obtain the approval of the County Engineer to such crossing, such approval not to be unreasonably withheld if Developer complies with the requirements in this part d).

e.    The following shall apply with respect to Level B roads:

i.    Surfacing will be allowed on Level B roads; however, if Developer proposes to place granular surfacing on Level B roads, the Level B roads will need to be improved to meet or exceed the typical section as depicted in Exhibit B.

ii.    If Developer requests that the Board consider upgrading a Level B road to a Level A service road and the Board so approves, then Developer will be required to meet the minimum requirements as set forth in Exhibit B. There is no obligation on the part of the Board of Supervisors or in this Agreement that requires that the Board of Supervisors accept the improved road into the County's Level A system.

iii.    In certain locations, existing right-of-way width for such Level B roads may not be adequate to accommodate the proposed cross section as depicted in Exhibit B; and in such locations the Page County Engineer will review each such location on a case by case basis and upgrade work will not be permitted in such locations until and unless a construction plan for such location is mutually agreed upon by the Page County Engineer and the Developer.

f.    The following provisions shall also apply:

i.    Entrances needed by the Developer for construction work or permanent access to the site will follow Page County Entrance policy available at the Engineer's Office.

ii.    Seeding and erosion control of all disturbed areas is to be performed by Developer.

iii.    Developer will provide maintenance to the Level B roads where Developer has added granular surfacing.

iv.    Developer will be required to obtain applicable permits for all oversized loads on all county roads from the County (the issuance of such permits not be unreasonably withheld by the County).

v.    Developer agrees to retain and provide for the benefit of the County, an individual (not an employee of the Developer and as agreed upon by the County) on a temporary part-time basis as needed, to assist the County in overseeing the administration of this Agreement for the Wind Farms.

vi.    Developer agrees to hire an outside engineering firm to review the potentially affected bridges and culverts within each Wind Park's project boundaries to verify the load capacities in respect to the expected loads from Developer's construction and delivery activities, with same outside engineering firm conducting a post-construction structural review of the same bridges and culverts to verify that load capacities remain the same as the initial review.

## SECTION HEADINGS

14. The section headings are inserted herein only for convenience of reference and in no way shall

they define, limit or describe the scope or intent of any provisions of this Agreement.

## ASSIGNMENT CLAUSE

15. Upon written notification to Developer by County, County may assign this Agreement in whole or in part, to any person or third party **("Assignee")** that is a government entity that becomes responsible for the County roads. Notwithstanding the above, County may hire or retain an Assignee to perform remedial work on the county roads in the event Developer does not comply with its obligations under this Agreement. County's notification to Developer shall state the date of the assignment, the name of the Assignee, the percentage and or limits of the project being assigned, and if applicable work not completed to the County's reasonable satisfaction in accordance with this Agreement. Upon assignment, County shall be relieved of any liability or obligation under this Agreement. Upon written notification to the County by Developer, Developer may assign this Agreement in whole or in part to another party subject to the Page County Board of Supervisors' approval, which approval shall not be unreasonably withheld, conditioned or delayed.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year first above written.

**For the Board of County Supervisors Page County**

By:_____

    Name:

    Title:

**(COMPANY NAME)**

By:_____

    Name:

    Title:

    Attest:

    _____

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**EXHIBIT** A

Wind Farm Project Boundaries

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**EXHIBIT B**

Typical Section Rural Granular Road

# DECOMMISSIONING PLAN

For [insert name of wind project] Wind Project in Page County, Iowa

[Month Day, Year]

Submitted by: [Insert Applicants name]

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

## 1. DEFINITIONS

**Commercial Operation Date** shall mean the first day of the Project Term.

**County** shall mean Page County, Iowa.

**Decommissioning Plan** shall mean the plan to decommission the WECS as set out in this document as such plan may be revised from time to time as provided herein.

**Discontinued Use** shall mean with respect to an individual WECS that the use of such WECS has been discontinued for a period of [180] consecutive days, unless a plan is developed and submitted to the Page County Engineer or his designee outlining the steps and schedule for returning the WECS to service as outlined in such plan.

**Easement Agreement** shall mean an agreement between a Participating Landowner and the Facility Owner granting the Facility Owner an easement or other real estate rights for the right to use the Participating Landowner's property to construct, maintain, operate, repair, repower, and remove the WECS.

**Facility Owner** (or **Owner**) shall mean the entity or entities having controlling or majority equity interest in the Wind Energy Conversion System, including their respective successors and assigns. As of the date of this Decommissioning Plan, the Owner is [insert Applicant name].

**Project** shall mean the [insert project name] as located in Page County, Iowa.

**Participating Landowner** shall mean any landowner under easement, lease or other agreement with the Facility Owner or operator pertaining to the WECS.

**Project Term** shall mean the period commencing on the date Owner notifies Page County in writing that the entire Project has commenced commercial operation and expiring on the date [insert number of years] years after the date specified in such notice, unless sooner terminated or extended as provided herein.

**Property** shall mean the real property for which real property rights have been provided to Owner by a Participating Landowner under an Easement Agreement.

**Wind Energy Conversion System (WECS)** shall mean an electrical generating facility comprised of one or more wind turbines (made up of a foundation, tower, nacelle and rotor) and accessory facilities, including but not limited to: power lines, access roads, communication lines, transformers, substations, and meteorological towers that operate by converting the kinetic energy of wind into electrical energy. The energy may be used on-site or distributed into the electrical grid.

**WECS Ordinance** shall mean the Page County, Iowa Wind Energy Conversion Systems (WECS) Ordinance adopted_____, 2019.

**Wind Turbines** shall have the meaning in Section 5.

## 2. PURPOSE

The purpose of this Decommissioning Plan is to set out Owner's written agreement (as required in the WECS Ordinance) to dismantle and remove the Wind Turbine within 180 days after cessation of use, as further provided herein.

This Decommissioning Plan (a) outlines the anticipated means and cost of decommissioning the WECS upon a WECS becoming a Discontinued Use and (b) identifies the financial resources that will be

available to pay for decommissioning and removal of the WECS and other accessory structures.

## 3. PROJECT DESCRIPTION

Owner is planning to construct a [___] wind project which is located in Page County, Iowa. The Project involves constructing wind turbines, associated access roads, underground electrical collection system, underground communication system and other facilities.

## 4. PROJECT LIFE

Owner intends to install [insert wind turbine type(s)] wind turbine generators **("Wind Turbines")** for the Project which such Wind Turbines are expected to have a useful life of at
least [___] years. The term of the operating period as provided in the Easement Agreements
is [_] years. Beyond the end of its useful life, or at any other time, if a Wind Turbine needs to be replaced for any reason, a new Wind Turbine could potentially be installed as a part of the Project. It is expected that during the life of the Project that parts and components of the WECS will be repaired and/or replaced from time to time in order to continue to operate the WECS.

## 5. DECOMMISSIONING

In the event the use of any Wind Turbine has been discontinued for a period of 180 consecutive days, it shall be deemed to be abandoned (except as otherwise provided herein). Determination of the date of abandonment shall be made by the Page County Engineer or his designee and the County will notify Owner of such determination and the date of such abandonment. Upon such notice of abandonment, the Owner shall have an additional 180 days within which to reactivate the use of the Wind Turbine or dismantle and remove the Wind Turbine. As an alternative, the Owner may prepare and submit a plan for the "banking" of the Wind Turbine for future reactivation and use. Said plan must be submitted to the Page County Engineer or his designee within 180 days of the discontinuation of use of the Wind Turbine, and shall be updated and submitted every 180 days thereafter for a maximum of two years, at which time the wind turbine must be reactivated or dismantled.

Decommissioning is a procedural process which involves the removal of the WECS and associated facilities and infrastructure as further described herein. The process of decommissioning a WECS will involve evaluating and categorizing all components and materials based on their anticipated post-project use. The categories will include recondition and reuse, salvage, recycle, and disposal. In order to reduce impacts from the transport of components to and from the county, materials will likely be stored onsite at one or more locations until the bulk of similar components or materials are ready for transport. The components and material will be transported to the appropriate facilities for reconditioning and reuse, salvage, recycling, or disposal.

This Decommissioning Plan requires that each wind turbine foundation and gravel ring will be excavated and removed to a depth of forty-eight (48) inches below ground level. If, however, the landowner has entered into an Easement Agreement which provides for more stringent requirements than this Decommissioning Plan, the wind turbine foundation and gravel ring will be excavated and removed in accordance with the applicable provisions of the Easement Agreement.

The following is a general description of the anticipated decommissioning process (and the decommissioning is also generally described in Appendix AI):

## 5.1 WIND TURBINES

Wind Turbines are generally comprised of the tower, nacelle and rotor with blades which are modular items that can be disassembled. With some exceptions, Wind Turbine components are dismantled in the reverse order of their assembly using large crawler cranes. These turbine components are typically stored in temporary laydown areas before being hauled off-site to be

20

resold or taken to a scrap metal facility or offsite disposal facility. It is common for blades to be cut-up into smaller pieces at the location of such Wind Turbine and then transported to an offsite disposal facility.

## 5.2 UNDERGROUND COLLECTION LINES

Underground electrical and communication collection lines are typically installed at least forty-eight (48) inches below grade. As a result, the collection lines are typically rendered inert and left in the ground after decommissioning; however, at Owner's option, these lines may be removed and hauled off-site for scrap value.

## 5.3 FOUNDATIONS

Turbine foundations and gravel rings will be excavated around the concrete pedestal to a depth of forty-eight (48) inches below grade. Turbine footings and foundations below forty-eight (48) inches of the ground level will remain after decommissioning.

## 5.4 ACCESS ROADS

Once all of the Project components have been removed from the site, not including those parts of the WECS located more than forty-eight (48) inches below grade, the access roads will be removed, unless requested otherwise by the Participating Landowner and agreed to by Owner. The road material will be removed, soil will be ripped and topsoil will be used to fill these areas.

## 5.5 SITE RESTORATION

Upon completion of the dismantling and removal of all WECS (not including that part of a WECS that is more than forty-eight (48) inches below ground level) the land will be returned to a condition reasonably comparable to the immediate surrounding property. Restoration of the land includes backfilling all excavated areas with clean sub-grade material and topsoil, both as to quality and depth, as the immediate surrounding area.

## 5.6 WASTE DISPOSAL

Solid and hazardous wastes, including but not limited to crates, packing materials, decommissioned WECS, as well as used oils and lubricants shall be removed from the site promptly and disposed of in accordance with all applicable local, state and federal regulations.

## 5.7 ROAD AND DRAINAGE SYSTEM

Prior to any decommissioning work involving a substantial portion of the whole WECS Project, Owner will enter into a Road Use Agreement in a form similar to that Road Use Agreement that is attached to the WECS Ordinance.

## 5.8 COMPLIANCE WITH LAWS

Solid waste and hazardous material will be disposed of offsite in accordance with applicable state and federal laws and regulations. Decommissioned gearboxes, transformers, and hydraulic systems will be drained of fluids, put into appropriate containers before dismantling, and then transported and disposed of off-site in accordance with state and federal laws and regulations.

## 5.9 FORCE MAJEURE

Notwithstanding any other provision in this Decommissioning Plan to the contrary, if

21

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

performance of any act required to be performed by Owner under this Decommissioning Plan is in whole or in part prevented or delayed by reason of any fire, earthquake, flood, tornado, act of God or natural disaster, strike, lock-out, labor disputes or trouble, war, civil strife or other violence, inability to secure materials, any law, order, proclamation, regulation, ordinance, action, demand or requirement of any government agency, or any other cause, event or circumstance not the fault of Owner, including without limitation the invocation of a force majeure provision by any third party to excuse such third party's performance of any obligations related to the decommissioning of the WECS, then Owner, upon giving notice to County, shall be excused from such performance to the extent of and for the duration of such prevention, restriction or delay.

## 6. SUMMARY OF DECOMMISSIONING COST ESTIMATE

The estimated cost to decommission and remove the Project, including the estimated Project salvage value, is attached hereto as Appendix AI. The estimated cost is based on [insert year] dollars. This Decommissioning Plan and all appendices will be reviewed and updated by the Owner every five (5) years from the Commercial Operation Date upon written request of the County in the manner provided in Section 8. If there are items upon which the Owner and County disagree with respect to assumed decommissioning costs, Owner and County shall meet to attempt to reach agreement on all such items. If agreement cannot be reached within a reasonable time, Owner shall engage and pay for an independent engineer acceptable to County to review the items and this Decommissioning Plan and determine whether the items in dispute should be re-evaluated. The determination of the independent engineer shall be final until the next time the Decommissioning Plan and appendices are updated as provided herein.

Based on Appendix AI, the following costs were estimated:

| Decommissioning Cost Estimate (costs less salvage/scrap values) | Project | Per Wind Turbine |
|---|---|---|
| Estimated Cost for Wind Turbine Decommissioning | | |
| Estimated Cost for Balance of Plant Decommissioning | | |
| Totals | | |

## 7. FINANCIAL RESOURCES TO PAY FOR DECOMMISSIONING AND REMOVAL OF WECS

The Owner will be responsible for all costs to decommission the WECS in accordance with this Decommissioning Plan and the Easement Agreements. The decommissioning activities will be funded by the proceeds from one or more of the following:

1. Proceeds from the salvage and scrap value of certain components and raw materials included as part of the WECS as further described in Appendix AI.

ii. Other Owner funding.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

The County will have the right to request that Owner provide financial assurance in the form of (a) a cash escrow or deposit, bond, or letter of credit (as selected by Owner) in the amount of the total estimated costs of decommissioning the WECS located in the County (as such amount is set out in the most recent Decommissioning Plan (including appendices) provided by Owner to County in accordance herewith) or (b) a guarantee or such other form of security that is acceptable to the County. The County may waive the financial assurance requirement if the Owner is a public utility regulated by the Iowa Utilities Board in the State of Iowa with the financial wherewithal to pay for the estimated decommissioning costs. However, in the event of a material change to the public utility status and financial status of Owner that would reasonably be expected to impair Owner's ability to fund the total estimated costs to decommission the WECS in Page County (as such expected costs are set out in this Decommissioning Plan (or any future plan provided in accordance herewith), the County will have the right to require Owner to provide financial assurance as described above.

This Decommissioning Plan may be transferred to another party subject to the approval of the Page County Board of Supervisors, which approval shall not unreasonably be withheld. The County will have the right to request financial assurance from the new Owner and the new Owner will be subject to the requirements in this Decommissioning Plan.

## 8. NOTICES

Any notice, demand, or other communication **("Notice")** given under this Decommissioning Plan shall be in writing and given personally or by registered or certified mail (return receipt requested). A courtesy copy of the Notice may be sent by facsimile or email transmission.

Notices shall be given to the Parties at their addresses set forth below.

**If to County:**

Page County Board of Supervisors
112 E Main, Clarinda, IA 51632
E-mail: Supervisors@co.page.ia.us
FAX: 712-542-5019

**If to Owner:**

[Applicant Name] [Applicant
Address]
[Applicant Contact Information]

By Notice to the other, either Owner or the County may at any time designate a different address or person to which such Notice or communication shall be given.

In Witness Whereof, [insert County Official] has executed this Decommissioning Plan for Page County, Iowa as the date set out above on the cover page.

Page County, Iowa


By:_____


Name Printed:_____


Title:_____

In Witness Whereof, [insert Applicant name] has executed this Decommissioning Plan for [insert applicant name] as the date set out above on the cover page.

[insert Applicant name]

By:_____

Name Printed:_____


Title:_____

END PAGE

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Appendix A1
[insert year] Decommissioning Estimate

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022

Invenergy

**Table of Contents**

**1.0     INTRODUCTION**
1.1     PROJECT INTRODUCTION
1.2     COMPANY OVERVIEW
1.3     PROJECT STRUCTURE & CONTACT INFORMATION
1.4     APPLICATION FEE

**2.0     PROJECT INFORMATION**
2.1     PROJECT SUMMARY
2.2     PROJECT LOCATION & LOCATION OF WECS
2.4     PUBLIC AREAS

**3.0     ENGINEERING, ENVIRONMENTAL & AFFIRMATIONS**
3.1     WIND TURBINE DIMENSIONS
3.2     ENGINEER CERTIFICATIONS
3.3     SOUND STUDY AFFIRMATION
3.4     FAA & FCC AFFIRMATIONS
3.5     ENVIRONMENTAL FLYWAYS

**4.0     ORDINANCE REQUIREMENTS**
4.1     ADHERENCE TO ORDINANCE SETBACK REQUIREMENTS
4.2     ADHERENCE TO ADDITIONAL ORDINANCE REQUIREENTS

**5.0     ADDITONAL REQUIREMENTS**
5.1     ROADS
5.2     DRAINAGE SYSTEMS
5.3     DECOMMISSIONING
5.4     TRANSFER
5.5     INSURANCE
5.6     LEGAL CONTROL DOCUMENTATION

**6.0     CONCLUSION**


**LIST OF APPENDICIES**

**APPENDIX A – SITE LAYOUT**
**APPENDIX B – PUBLIC AREAS MAP**
**APPENDIX C – INDICATIVE TURBINE SPECIFICATIONS**
**APPENDIX D – SOUND STUDY**
**APPENDIX E – ENVIRONMENTAL FLYWAYS MAP**
**APPENDIX F – SETBACK MAP**
**APPENDIX G – LEGAL CONTROL DOCUMENTATION**
**APPENDIX H – COMMUNICATIONS REPORT**
**APPENDIX I – SHADOW FLICKER REPORT**
**APPENDIX J – HEALTH COMPENDIUM**
**APPENDIX K – MARKET IMPACT ANALYSIS**
**APPENDIX L – AERONAUTICAL STUDY NUMBERS**

# 1.0 INTRODUCTION

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022

**Invenergy**

## 1.1 PROJECT OVERVIEW

Shenandoah Hills Wind Project, LLC ("**SHW**") submits this application ("**Application**") for a Wind Energy Conversion System ("**WECS**") to construct and operate the proposed Shenandoah Hills Wind Project (the "**Project**") in Page County, Iowa. The Project is to be located in the townships of Morton, Lincoln, Washington, and Colfax in Page County, Iowa and Locust Grove, Riverton, Madison and Fisher townships in Fremont County, Iowa. SHW will construct the Project with a nameplate capacity of up to approximately 246 megawatts ("**MW**") across both counties. In addition to the wind turbine generators, SHW includes a project substation, an electric switching station, and an operations and maintenance (O&M) building. SHW was granted an exception to the height limit in the agriculture-zoned area for the switching station in December 2021, making that component of the project fully-permitted in Page County at the time of this Application. SHW will commence construction in the near future. Associated facilities are included in both Page and Fremont counites and include graveled roads to access each turbine, above ground ancillary electrical structures, and below ground electrical and communication cables to collect and transmit the power generated from each turbine (known as "collection lines," "gathering lines" or "feeder lines") to the Project substation. Each gathering line will serve turbines with less than 25 MW in aggregate nameplate capacity.

This Application complies with and demonstrates that the Project meets all requirements for Wind Energy Conversion Systems **("WECS")** of the Page County, Iowa Zoning Ordinance ("**Ordinance**"), as well as the additional sections of the Ordinance incorporated therein by reference, and that the Project is eligible for WECS and associated building permits.

The Iowa Legislature has provided that it is the policy of the state of Iowa "to encourage the development of alternative energy production facilities" – like wind – "in order to conserve our finite and expensive energy resources and to provide for their most efficient use." *See* Iowa Code §§ 476.41-.43, .53, .53A and § 18B.1(3). The Project not only will support state policy, but it will also provide extensive local benefits: up to $121 million in new property tax revenue to the County over the estimated forty-year operating life of the Project; approximately $122 million in payments to Page and Fremont County landowners over the life of the Project; and approximately 200 construction-period and up to 7-10 new permanent operations and maintenance jobs. Over 270 landowners have signed on to participate in the Project with the acreage signed for the Project totaling more than 45,000 acres.

Based on SHW's compliance with all applicable provisions of the Ordinance, and the benefits it will provide Page County and the state of Iowa, SHW respectfully requests that Page County approve the Application and grant the WECS approval and associated building permits for the Project as described below.

## 1.2 COMPANY OVERVIEW

SHW is an affiliate of Invenergy LLC, a leading developer of renewable and other clean energy generation and cutting-edge energy storage solutions. Invenergy, North America's largest independent, privately-held renewable energy company, and its affiliated companies have developed over 30,000 MW of projects that are in operation, construction or contracted, including wind, solar, and natural gas-fueled power generation and energy storage projects. Invenergy has developed or is developing over 18,000 MW of wind projects alone, and 3,600 MW in the state of Iowa that are now operational, including the Contrail Wind Project in Page and Taylor Counties. Invenergy has successfully completed 15 wind energy projects in Iowa. SHW and Invenergy LLC and their affiliated entities are collectively referred to as "**Invenergy**."

Founded in 2001, Invenergy has an excellent track record in the energy industry and a highly experienced management team. The members of Invenergy's senior management team have extensive experience in diverse areas of the energy market, including development, engineering, construction, finance, operations, asset management and energy trading and contracting.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022



Invenergy is headquartered in Chicago, Illinois and has North American regional offices located in Denver, Colorado, Ithaca, New York and Toronto, Ontario, Canada.

## 1.3    PROJECT STRUCTURE AND CONTACT INFORMATION

SHW, a special-purpose limited liability company, was created in order to develop, permit, finance, construct, own and operate the Project. Contact information for each company (collectively, "**Applicant**") is as follows:

| | |
|---|---|
| **Invenergy LLC** | **Shenandoah Hills Wind Project, LLC** |
| One South Wacker Drive | One South Wacker Drive |
| Suite 1800 | Suite 1800 |
| Chicago, IL 60606 | Chicago, IL 60606 |
| Phone: (312) 224-1400 | Phone: (312) 224-1400 |
| Fax: (312) 224-1444 | Fax: (312) 224-1444 |

The Project's contacts are:

| | |
|---|---|
| **Isaac Lamppa** | **Mark D. Crowl** |
| Senior Analyst, Renewable Development | Manager, Renewable Development |
| Invenergy LLC | Invenergy LLC |
| One South Wacker Drive | 1401 17th St. |
| Suite 1800 | Suite 1100 |
| Chicago, IL 60606 | Denver, CO 80202 |
| Phone: (312) 429-2519 | Phone: (918) 237-6417 |
| ilamppa@invenergy.com | Mcrowl@invenergy.com |

While these are the relevant entities at this time, it is common in the industry for wind projects to be sold in whole or in part or otherwise transferred at various stages of project development. SHW requests that the application and resulting permits and any rights thereunder be expressly made transferrable.

## 1.4    APPLICATION FEE

With this application SHW provides a check that includes payment of $250 per wind turbine for a total of $7,750 as required by the Ordinance.

# 2.0 PROJECT INFORMATION

## 2.1    PROJECT SUMMARY

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022

**Invenergy**

The Project, as currently proposed, will consist of up to 64 turbines in total depending on the final turbine technology selected, with 31 turbine sites in Page County and 33 turbine sites in Fremont County. The final "as-built" turbine locations ultimately selected will be comprised of the locations depicted in **Appendix A**. The Project is anticipated to utilize either the GE Sierra platform of 2.8 or 3.4 MW turbines– or the Vestas V136-3.45 MW or V150-4.5 MW turbines to achieve a total nameplate generating capacity of up to approximately 246 MW of power.

The Project may also include up to two permanent, non-guyed, meteorological ("MET") towers each with a height anticipated at approximately 344 feet. SHW anticipates that the Project could begin construction in the fourth quarter of 2022 and achieve commercial operations for all or part of the Project as early as the fourth quarter of 2023 pending completion of permitting, agency approvals, and other development and construction activities.

**2.2    PROJECT LOCATION & LOCATION OF WECS**

The latitude and longitude of all WECS Wind Turbines can be found in the table below:

| Turbine Number | Latitude | Longitude |
|---|---|---|
| 11 | 40.673213 | -95.362045 |
| 12 | 40.674162 | -95.351246 |
| 13 | 40.667356 | -95.346908 |
| 14 | 40.667691 | -95.342301 |
| 15 | 40.658429 | -95.32508 |
| 31 | 40.650158 | -95.370424 |
| 32 | 40.653149 | -95.363094 |
| 40 | 40.637092 | -95.367699 |
| 41 | 40.615385 | -95.367417 |
| 42 | 40.620907 | -95.360368 |
| 43 | 40.605958 | -95.362854 |
| 44 | 40.607333 | -95.357541 |
| 45 | 40.652216 | -95.328647 |
| 47 | 40.674791 | -95.283301 |
| 48 | 40.660145 | -95.280963 |
| 49 | 40.62165 | -95.312606 |
| 50 | 40.6287 | -95.306531 |
| 51 | 40.634278 | -95.294081 |
| 52 | 40.630789 | -95.289689 |
| 53 | 40.63478 | -95.284695 |
| 54 | 40.642164 | -95.262453 |
| 56 | 40.62124 | -95.264583 |
| 57 | 40.629852 | -95.251579 |
| 59 | 40.584248 | -95.291462 |
| 60 | 40.588858 | -95.284345 |
| 62 | 40.588042 | -95.269303 |
| 63 | 40.600626 | -95.268265 |

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022



| 64 | 40.603169 | -95.244639 |
| 65 | 40.600303 | -95.235919 |
| 76 | 40.673152 | -95.298303 |
| 77 | 40.6922 | -95.271024 |

SHW requests that all WECS Wind Turbine locations identified in the table above maintain the ability to move and adjust their final, constructed location by up to 300 feet in any direction in order to accommodate unforeseen circumstances and potential refinements and optimization of the layout. All final, constructed turbine locations shall either meet or exceed all setback and siting standards described in the Ordinance.

The Project is located in the southwestern portion of Page County and will encompass an area within the unincorporated areas of 4 townships. Approximately 30,080 acres of land are currently under contract with landowners to host Project facilities. The Project area was selected based on a number of factors, including, but not limited to, the wind resource, land use, proximity to existing transmission infrastructure, the public interest and the natural environment. A Site Layout depicting all of the Wind Turbine locations along with participating property adhering to applicable setbacks can be found in **Appendix F** attached to the Application. Figure 2.1 below depicts the general location of the Project and Table 2.1 further describes the project Footprint.

**Figure 2.1**



**Invenergy**

**Table 2.1**

| COUNTY | TOTAL AREA | POLITICAL TOWNSHIP | SECTION(S) |
|---|---|---|---|
| Page County | Approx. 30,080 Acres | Morton | Section 7 – 36 |
| | | Lincoln | All sections 1 – 36 |
| | | Washington | All sections 1 - 36 |
| | | Colfax | Sections 1 - 12 |
| Fremont County | Approx. 15,800 Acres | Locust | Section 1-17, 19-36 |
| | | Fisher | 13, 15, 20-21, 23-29, 32, 34-36 |
| | | Riverton | Sections 25 – 27, 34 -35 |
| | | Madison | Sections 1, 10, 12-13, 23, 24, 26, 28, 33, 35 |

## 2.4     PUBLIC AREAS

The Project maintains a setback greater than one mile from Public Areas and Areas under PCCB management such as Pioneer Park, Nodaway Valley Park, Pierce Creek, Rapp Park & Recreation, Ross Park, Page County Conservation Center, and Stephens Tract Wetlands as required by §4(11)f of the Ordinance. The Project maintains a $1/2$ mile setback from all other identified Public Areas in the County

**Appendix B** attached to this application depicts the Project's adherence to setbacks from identified Public Areas.

# 3.0 ENGINEERING, ENVIRONMENTAL & AFFIRMATIONS

## 3.1    WIND TURBINE DIMENSIONS

Dimensions for the four potential turbine types are described in Table 3.1 below:

**Table 3.1**

| Turbine Type | Hub Height (feet/meters) | Rotor Diameter (feet/meters) | Tip Height (feet/meters) |
|---|---|---|---|
| Vestas V150 | 344.5 ft / 105m | 492.1 ft / 150m | 590.6 ft / 180m |
| Vestas V136 | 344.5 ft / 105m | 446.2 ft / 136m | 567. 6 ft / 173m |
| GE 2.8-127 | 290.7 ft / 88.6m | 416.7 ft / 127m | 500.3 ft / 152.5m |
| GE 3.4-140 | 321.5 ft / 98m | 459.3 ft / 140m | 551.2 ft / 168m |

SHW will evaluate turbine performance characteristics, factors of the site and economic considerations to arrive at a final turbine model decision. The Application has been prepared with a set of turbine locations that can accommodate all four of these models, meaning that each location is compatible with setback requirements based on the tallest turbine. Likewise, the noise analysis and shadow flicker analysis have been prepared with the highest possible impacts and demonstrate compliance with the Page County Ordinance. So regardless of which of these four turbine models is ultimately chosen for construction, the project will comply with applicable requirements. SHW reserves the right to utilize a combination of these turbines across the Project to achieve the most efficient project design.

## 3.2    ENGINEER CERTIFICATIONS

Standard drawings reflective of the potential turbine types and structures, including the tower, base, and footings can be found in **Appendix C** included with this Application. Following approval of this Application and prior to the commencement of construction, SHW will provide the Page County Engineer with an engineering analysis certified by an Iowa Professional Engineer affirming compliance with applicable regulations.

## 3.3    SOUND STUDY

SHW affirms that a sound study has been completed showing the maximum decibel levels produced by Wind Turbines as measured at non-participating residences will not exceed 55 decibels (dBA) under normal operating conditions.

A copy of the SHW sound study is attached to this Application as **Appendix D**.

## 3.4    FAA & FCC APPLICATIONS

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022



SHW affirms that the Project has filed for the necessary and appropriate Federal Communication Commission (FCC) applications & Federal Aviation Administration (FAA) no hazard determinations. **Appendix L** includes a list of FAA Aeronautical Study Numbers (ASN).

## 3.5    ENVIRONMENTAL FLYWAYS

SHW affirms that the Project has identified any significant migratory flyways and nesting areas for federally listed birds, bats, and endangered species within one mile of a proposed wind turbine as required by §3(12) of the ordinance. The Project area falls within the greater Mississippi River Flyway which starts in central Canada and follows the Mississippi River to the Gulf of Mexico. The Project retained a third-party environmental consulting firm to assess the habitat and potential presence of federally listed species within one mile of proposed turbine locations, and no federally listed birds, bats or endangered species, their habitat, or nesting areas were confirmed present.

A depiction of these findings in relation to the Project's Wind Turbines can be found in **Appendix E.**

# 4.0    ORDINANCE REQUIREMENTS

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022



## 4.1      ADHERANCE TO ORDINANCE SETBACKS

In addition to the Ordinance requirements addressed in the previous sections of this Application, Section 4 of the Ordinance provides the General Requirements C-WECS and Meteorological Towers. SHW addresses below its compliance with each requirement.

### §4(11) – Setbacks

SHW has worked extensively with local landowners and other affected parties to develop a Project design that adheres to Page County setback requirements. In addition to required Page County setbacks, final wind turbine siting also considers internal best practices, industry standards, topography of the site, wind resource assessment and the selected turbine technology. For example, SHW has taken pains to minimize grading and impacts to the extensive network of terraces that have been installed by landowners over time.

In compliance with the Ordinance, the location of each turbine in the Project will comply with the following minimum turbine setback requirements, measured from the center of the foundation of the Wind Turbine to the closest point of items marked below, as shown in Appendix F.

**§4(11)a -Inhabited Structures (non-participating landowners).** Each Wind Turbine and meteorological tower will be set back from the nearest residence which is able to be occupied, school, hospital, church or public library (which such residence, school, hospital, church or public library exist as of the date the WECS application is submitted to the County Zoning Administrator or their designee), a distance no less than (i) one point one (1.1) times the total height or (ii) fifteen hundred (1500) feet, whichever is greater.

**§4(11)b - Inhabited Structures (participating landowners).** Each Wind Turbine and meteorological tower will be set back from the nearest residence which is able to be occupied, school, hospital, church or public library (which such residence, school, hospital, church or public library exist as of the date the WECS application is submitted to the County Zoning Administrator or their designee), a distance no less than (i) one point one (1.1) times the total height or (ii) twelve hundred fifty (1250) feet, whichever is greater. An affected property owner may waive this setback requirement by executing a written waiver or agreement.

**§4(11)c - Property Lines.** Each Wind Turbine and meteorological tower will be set back no less than one point one (1.1) times the total height of the structure. For Wind Turbines closer to non-participating property lines than one point one (1.1) times the total structure height, appropriate agreements were secured with affected property owners that waive this setback requirement.

**§4(11)c - Public Right-of-Way.** Each Wind Turbine and meteorological tower will be set back from the public right-of-way a distance no less than one point one (1.1) times the total height.

**§4(11)d - Radio Communication Pathways.** Each Wind Turbine and meteorological tower will be set back from licensed microwave radio communication paths, or those paths planned to be used by Page County at, the time of the application, so that no part of the Wind Turbine interferes with the path's Fresnel zone.

**§4(11)e - Public Areas and Areas under PCCB management.** Each Wind Turbine and meteorological tower will be set back from the property line of designated public areas/publicly owned conservation areas and other publicly owned areas managed by the Page County Conservation Board as described in Section 2.4 of this Application.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022



§4(11)f - Municipalities. Each Wind Turbine and meteorological tower will be set back from the city limits of any incorporated municipality a distance no less than one (1) mile.


## 4.2     ADHERANCE TO ADDITIONAL ORDINANCE REQUIREMENTS

In addition to the Page County Ordinance Requirements covered in §4(11), the remainder of Section 4 of the Ordinance sets forth additional requirements for WECS. SHW agrees to adhere to the requirements described below:

**§4(1) - Color and finish.** Wind Turbines shall be painted a non-reflective color. Blades may be black in order to facilitate de-icing. Finishes shall be matte or non-reflective.

**§4(2) - Tower Configuration.** All Wind Turbines, which are part of a C-WECS, shall be installed with a tubular, monopole type tower. Meteorological towers may be guyed.

**§4(3) - Lighting.** Wind Turbines shall not be artificially lighted, except to the extent required by the FAA or other applicable authority or for night time repairs/maintenance. Lighting, including lighting intensity and frequency of strobe, shall adhere to, but not exceed, requirements established by FAA regulations.

**§4(4) - Signage.** Upon completion of Wind Turbine construction, the Project's name and/or logo and the phone number to contact in case of emergency shall be placed upon the base of the WECS Tower or the entrance to any enclosure fence. Wind Turbines shall not be used for displaying any advertising except for reasonable identification of the manufacturer, owner or operator of the WECS.

**§4(5) - Feeder Lines.** All communications and feeder lines, equal to or less than 34.5 kV, installed as part of a WECS shall be buried not less than forty-eight (48) inches deep.

**§4(6) - Waste Disposal.** Solid and hazardous wastes, including but not limited to crates, packaging materials, damaged or worn parts, as well as used oils and lubricants, shall be removed from the site in a time period as established by local, state and federal regulations.

**§4(7) - Minimum Ground Clearance.** The blade tip of any Wind Turbine shall, at its lowest point, have ground clearance of no less than fifty (50) feet.

**§4(8) - Signal Interference.** The C-WECs shall not interfere with licensed microwave communication paths or those microwave paths planned to be used by Page County at the time of the application. The C-WECs owner shall minimize and mitigate any interference with electromagnetic communications, such as radio, telephone or television signals caused by any Wind Turbines. If, after construction of the C-WECS, the owner or operator receives a written complaint related to the above-mentioned interference, the owner or operator shall take reasonable steps to respond to the complaint. Please see the attached communication report included with this application as **Appendix H**. Per Appendix H, SHW was advised to stay three (3) kilometers (km) from the AM towers for Station KYFR, licensed out of Shenandoah, IA. SHW has communicated with Station KYFR to discuss mitigation options for potential interference due to the potential construction of turbines 54, 56, 57, 64, and 65 located within three (3) km from the tower location. SHW agrees that prior to construction of these turbines, a mutual agreement with the station must be achieved, to demonstrate compliance with the Ordinance directive.

**§4(9) - Federal Aviation Administration.** All Wind Turbines shall comply with FAA standards and regulations. **Appendix L** includes a list of FAA Aeronautical Study Numbers (ASN).

**§4(10) - Electrical Codes and Standards.** All WECS shall comply with the National Electrical Code and other applicable standards.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022

# Invenergy

**§4(12) -  Safety.**

**§4(12)a** - All wiring between Wind Turbines and the substation shall be underground.

**§4(12)b -** Wind Turbines and meteorological towers shall not be climbable on their exterior up to fifteen (15) feet above ground level, except for stairs used to reach the access door used for entry into the Wind Turbines.

**§4(12)c -** All access doors to Wind Turbines and meteorological towers and electrical equipment shall be locked when not being serviced.

**§4(12)d -** Appropriate visible warning signage shall be placed on Wind Turbines, electrical equipment, and substation entrances.

**§4(12)e -** Appropriate visible warning signage shall be placed on Wind Turbines, electrical equipment, and substation entrances. For all guyed meteorological towers, visible and reflective objects, such as plastic sleeves, balls, reflectors or tape, shall be placed on the guy wire anchor points and along the outer and innermost guy wires up to a height of twelve (12) feet above the ground.

SHW confirms that the construction and operation of the Project will be performed in compliance with all applicable state and federal laws and regulations. A map depicting the location of the Project's in compliance with the required setbacks can be found in **Appendix F** attached to this Application.

# 5.0    ADDITIONAL REQUIREMENTS

## 5.1    ROADS

SHW will enter into a road use agreement with Page County, substantially in the form attached to the Ordinance, prior to the start of construction of the WECS, and roadways of any surface type will be restored to preconstruction condition at no cost to the County. All bridge crossings will be preapproved by the Page County Engineer before such crossings takes place.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022



## 5.2 DRAINAGE SYSTEM

SHW will promptly repair damage to public drainage systems stemming from construction, operation or maintenance of the WECS.

## 5.3 DECOMMISSIONING

SHW will enter into a decommissioning agreement with Page County, substantially in the form attached to the Ordinance, prior to the start of construction of the WECS.

## 5.4 TRANSFER

SHW reserves the right to transfer Project approvals, building permits, decommissioning agreements, and road use agreements granted following approval of this Application to another party, subject to Page County Board of Supervisors approval. Any assignee of the building permits and associated decommissioning and road use agreements shall be subject to all the requirements in the Ordinance and the applicable negotiated agreements as described in Section 7 of the Ordinance. If the transferee is a rate-regulated utility in the State of Iowa, SHW requests that Page County pre-approve such transfer at the time of Project approval pursuant to this Application.

## 5.5    INSURANCE

SHW will maintain general liability policy covering bodily injury and property damage with limits of at least Three Million Dollars ($3,000,000) per occurrence and Six Million Dollars ($6,000,000) in the aggregate.

## 5.6 LEGAL CONTROL DOCUMENTATION

A spreadsheet of participating landowners and copies of the memoranda of easements reflecting SHW's rights and legal control in the participating properties is attached as **Appendix G.**

## 5.7 ADDITIONAL ANALYSES

Through its interactions with community members, SHW understands that there are some concerns about shadow flicker, potential health impacts, estimated tax distribution, and property values as a result of construction of the Project. Thus, SHW has performed additional analyses not required under the Page County Ordinance as a demonstration of its good faith and interest in responsible siting.

5.7.1    To address concerns about shadow flicker, SHW has retained experienced engineering consultant Stantec, which has prepared **APPENDIX I – SHADOW FLICKER REPORT.** The result of this analysis is that non-participating residences are predicted to experience no more than 30 hours per year of shadow flicker. Within the wind industry, 30 hours per year has been recognized as a responsible standard for minimal impacts. An alternative way of phrasing this amount is that 99.7% of the year, or 8,730 hours, neighboring residences will not experience shadow flicker.

5.7.2    To address concerns about health, SHW retained Michael Hankard, Dr. Mark Roberts and Dr. Jeffrey Ellenbogen, who have authored **APPENDIX J – HEALTH**

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022

# Invenergy

**COMPENDIUM.**  These experienced professionals have called upon their expertise, real world interactions with wind projects and extensive medical and scientific literature and studies to provide this thorough overview of frequently asked questions and facts to help answer them. With respect to the question of: do wind turbines impact human health? The report concludes that "modern wind turbines with reasonable limits in place (i.e., those currently in use) – achieved principally through noise standards — do not cause harm to humans."

**5.7.3**   To address concerns about property values, SHW retained Michael & Joey MaRous, of MaRous & Company who have prepared **APPENDIX K – MARKET IMPACT ANALYSIS.** MaRous & Company has over 40 years of experience in real estate market assessment and conducted this in-depth analysis to review the potential impact of the Project on local property values. MaRous & Company concluded that "there is no market data indicating the wind farm will have a negative impact on either rural residential or agricultural property values in the surrounding area. Further, market data from Iowa, as well as from other states, supports the conclusion that the project will not have a negative impact on rural residential or agricultural property values in the surrounding area. Finally, for agricultural properties that host turbines, the additional income from the wind lease may increase the value and marketability of those properties."

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**SHENANDOAH HILLS WIND PROJECT**
WECS APPLICATION
3/7/2022

**Invenergy**

# 6.0 CONCLUSION

By this Application and the attached appendices, SHW has demonstrated compliance with all permit requirements in the Page County Ordinance. A certified check for the required fee is presented with this Application. All requirements for SHW to obtain a WECS approval and associated building permits have been met, and significant efforts beyond those required in the Ordinance have been made as the layout was designed to minimize Project impacts on agricultural operations including terraces and private drain tiles, environmental resources, and other sensitive features. Granting a WECS permit for the Project will bring investment, jobs, tax revenues and revenues for landowners in Page County, while supporting the express policy of the state of Iowa to promote additional wind energy development.

Accordingly, SHW respectfully requests that Page County timely grant the requested WECS approval as described in this Application as efficiently and expediently as possible.

## RESOLUTION #26-2022

## MORATORIUM ON C-WECS CONSTRUCTION PERMITS

**WHEREAS,** Page County Iowa has an existing C-WECS ordinance, ordinance #2019-2 that provides rules governing the siting, construction, and operation of C-WECS systems in unincorporated areas of Page County, Iowa, AND

**WHEREAS,** the County has an interest in protecting the County's infrastructure, natural resources and property rights through adequate setback provisions, AND

**WHEREAS,** the County has an interest in protecting the County's road infrastructure, through more robust road use agreements during construction of C-WECS, AND

**WHEREAS,** the County has an interest in preventing and abating any resulting nuisance from decommissioned commercial wind turbines through more robust decommissioning requirements, AND

**WHEREAS,** the County has an interest in preventing and abating any resulting nuisance from sound emissions related to C-WECS operation, AND

**WHEREAS,** the County has an interest in preventing and abating any resulting nuisance from lighting systems associated with and used in the operation of C-WECS, AND

**WHEREAS,** the Board of Supervisors will require substantial time to gather information and coordinate with multiple agencies for the purpose of reviewing, updating or creating ordinances, policies and procedures relative to C-WECS development, AND

**NOW THEREFORE BE IT RESOLVED** by the Board of Supervisors of Page County Iowa, that Page County now imposes a moratorium, effective immediately and for a period of one-hundred eighty days, on C-WECS permit applications for the purpose of drafting and adopting any necessary and proper revisions to the existing C-WECS ordinance.  This moratorium shall not affect any construction permits already filed with Page County as of the effective date of this resolution.

Dated this 29th day of March, 2022.

_____AYE

**ORIGINAL PETITION**               **EXHIBIT C**                         **Page 1 of 1**

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# TABLE OF CONTENTS

Chapter I       Purpose and Jurisdiction ............................................................1

Chapter II      General Provisions ..................................................................... 3

Chapter III     Districts, Boundaries, and Map.................................................. 7

Chapter IV      General Provisions ..................................................................... 9

Chapter V       Agriculture District .................................................................. 11

Chapter VI      Residential District................................................................... 14

Chapter VII     Commercial District ..................................................................16

Chapter VIII    Industrial District..................................................................... 19

Chapter IX      Highway Business District ....................................................... 21

Chapter X       Special Provisions ................................................................... 23

Chapter XI      Off-Street Parking and Loading Regulations ......................... 27

Chapter XII     Non-Conformities ..................................................................... 29

Chapter XIII    Administration and Enforcement ............................................ 30

Chapter XIV     Board of Adjustment ............................................................... 32

Chapter XV      Changes and Amendments .................................................... 34

i

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

ii

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER I

## PURPOSE AND JURISDICTION

**1.1    PURPOSE.**  This ordinance is written in accordance with a Comprehensive Plan and the objectives of Chapter 335 of the Iowa Code and is adopted for the following purposes:

- To promote the orderly growth of the County;

- To conserve the natural resources and beauty of the County;

- To consider the protection of soil from wind and water erosion;

- To regulate the density of the population;

- To regulate the location and use of buildings, structures, and land for trade, industry, residence, or other purposes, all in accordance with Chapter 335 of the Iowa Code.

**1.2    TITLE.**  This ordinance shall be known and may be cited as the "Page County, Iowa Zoning Ordinance", and shall be referred to herein as "This Ordinance".

**1.3  JURISDICTION.**  This provisions of this ordinance shall apply to all the unincorporated territory of Page County, Iowa; except to the extent required to implement the Agricultural

1

ORIGINAL PETITION                              EXHIBIT D                              Page 3 of 62

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Land Preservation Ordinance contained in Chapter 352 of the Iowa Code as amended, no regulation or requirement adopted under the provisions of this ordinance shall be construed to apply to land, farmhouses, farm barns, farm outbuildings, or other buildings, structures, or erections which are primarily adapted, by reason of nature and area, for use for agricultural purposes, while so used; provided, however, that such regulations or requirements which relate to any structure, building, dam, construction deposit, or excavation in or on the flood plains of any river or stream shall apply thereto.

**1.4    INTERPRETATION OF PROVISIONS.**   In their interpretation and application, the provisions of this ordinance shall be held to be minimum requirements, adopted for the promotion and protection of the public health, safety, morals, and general welfare.  Whenever the requirements of this ordinance are at variance with the requirements of any other lawfully adopted rules, regulations, ordinances, deed restrictions, or covenants, the most restrictive, or that imposing the higher standards shall govern.

**1.5    VALIDITY.**   If a court of competent jurisdiction should declare any section of this ordinance invalid, such a decision shall not affect the validity of the remainder of the ordinance.

**1.6    EFFECTIVE DATE.**  This ordinance shall be in full effect after its passage, approval, and publication as prescribed by law.

2

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER II

## GENERAL PROVISIONS

**2.1     DEFINITIONS.**  For the purpose of this ordinance, certain terms and words are hereby defined.  Words used in the present tense shall include the future, the singular number shall include the plural and the plural the singular; and the word ˝shall˝ is mandatory and not directory.

1.  Accessory Use or Structure .  A use or structure on the same lot with and for a purpose subordinate to the principal building and its use .

2.  Agriculture .  The use of land for agricultural purposes, including farming, dairying, pasturage, agriculture, horticulture, floriculture, viticulture, and animal or poultry husbandry, and the necessary accessory uses for treating or storing the produce; provided however, that the operation of any such accessory uses shall be secondary to that of normal agricultural activities.

3.  Apartment .  See dwelling, multi-family.

4.  Basement .  A story of a building having part, but not more than one-half, of its height below grade.  A basement is counted as a story for the purpose of height regulation.

5.  Billboard .  An advertising sign for a business, commodity, or service

3

located or offered elsewhere than upon the premises where such sign or billboard is located.

6.  Boarding House .  A building where lodging for no more than five guests is provided for compensation.

7.  Building .  A structure for the shelter or enclosure of persons, animals, or property.

8.  Building Line .  Foundation wall when applicable.

9.  Dwelling, Single-Family .  A building designed for residence by one (1) family.

10.  Dwelling, Two-Family .  A building designed for residence containing two (2) independent living units which share or are joined by a common wall.

11.  Dwelling, Multi-Family .  A building designed for residence containing three (3) or more independent living units within a common structure.

12.  Garage, Private .  An accessory building (attached or detached) to house motor vehicles or trailers owned or used by the residents of the principal dwelling.

13.  Garage, Public .  A building other than a private garage used for parking or repairing motor vehicles for compensation.

14.  Grade .  The average ground elevation at the outside walls of any building.

4

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

15. <u>Height</u> .  The distance from grade to the highest point of the coping on a flat roof, or to the deck line of a mansard roof, or to the average height of the highest gable of a pitch or hip roof.

16. <u>Home Occupation</u> .  Any use conducted within a dwelling by its residents which is secondary to the basic use as a dwelling, which does not change the character of the building, and which only involves the sale of products or services provided within the dwelling by its residents.

17. <u>Hotel</u> .  A building where lodging for six (6) or more guests is provided for compensation.

18. <u>Junkyard</u> .  Land with or without buildings where waste, discarded, or salvaged materials are bought, sold, exchanged, stored, cleaned, packed, disassembled, or handled.

19. <u>Lot</u> .  A parcel of land that is or may be occupied by a building abutting on a right-of-way, with all the space requirements of this ordinance.

    1. <u>Lot Line</u> .  The property boundary of a lot.

    2. <u>Lot Area</u> .  The area within the lot lines.

    3. <u>Lot Width</u> .  The distance between the side lot lines at the minimum building setback lines.

    4. <u>Lot Depth</u> .  The average distance between the front and rear lot lines.

5

5.  _Lot, Corner_ .  A lot which has at least two adjacent lot lines abutting streets which intersect at no more than a 135 degree angle.

6.  _Lot, Interior_ .  A lot, other than a corner lot, which abuts only one street.

7.  _Lot, Double Frontage_ .  A lot, other than a corner lot, which abuts two streets.

20.  _Mobile Home_ .  A portable structure designed for use as a dwelling without a permanent foundation which may be mounted on wheels for conveyance to another location.

21.  _Mobile Home Park_ .  A lot or lots where two or more mobile homes are located with or without compensation to the lot owner.

22.  _Motel_ .  A building or group of buildings where lodging is provided with separate entrances and convenient parking for each unit.

23. _Motor Fuel Station_ .  A location where motor fuel and minor maintenance and repair services and products are offered for sale to the public, and deliveries are made directly into motor vehicles.

24.  _Retail Business_ .  An establishment whose primary business is the sale of goods to the consumer; such a business may include light manufacturing or assembly if subordinate to the sales function.

25.  _Service Establishments_ .  An establishment whose primary use is the sale

6

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

of services to the consumer.

26.  <u>Sign</u> .  Any publicly displayed grouping of words, designs, and/or colors intended to advertise products, persons, or services.  Small displays of house numbers or residents names shall not be denoted as signs.

27.  <u>Story</u> .  The portion of a building between the finished floor and the floor, ceiling, or roof next above it.

28.  <u>Story, Half</u> .  The space under a sloping roof in which the intersection roof line and the wall face is no more than four feet above the floor.  When a half story houses independent apartments, however, it shall be counted as a full story for the purpose of this ordinance.

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

29.  Street .  A public right-of-way set aside for vehicular and pedestrian traffic and placement of utilities which provides access to abutting property.

30.  Structure .  Anything constructed which requires a permanent location or attachment to a permanent location.

31.  Structural Alteration .  Any change to supporting members of a building such as foundations, columns, etc.

32.  Wholesale Business .  An establishment whose primary use is the sale of goods to retail businesses; light to medium manufacturing or assembly, if subordinate to the sales function.

33. Yard .  That portion of a lot occupied by a building which is unobstructed from the ground up excepting as provided herein.

   1.  Yard, Front.  The open area measured between the adjoining right-of-way boundary and the building line, extending across the full width of the lot.

   2.  Yard, Rear.  The open area measured between the rear lot line and nearest point of the main building, excluding steps and unclosed porches or balconies.

   3.  Yard, Side.  The open area measured between the side lot line and the nearest point of the main building, excluding steps and unclosed porches or balconies.

8

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER III

## DISTRICTS, BOUNDARIES, AND MAP

**3.1    OFFICIAL ZONING MAP.**   The Official Zoning Map and the explanatory material thereon, is hereby adopted by reference and declared to be a part of this ordinance.

**3.2    IDENTIFICATION OF OFFICIAL ZONING MAP.**   The Official Zoning Map shall be identified by the signature of the Chairman of the Board of Supervisors and attested to by the County Auditor under the following statement:

> "This is to certify that this is the Official Zoning Map referred to in Chapter III of the Page County, Iowa Zoning Ordinance as adopted the _____ day of _____ , 1997"

The Official Zoning Map shall be on file in the Office of the County Auditor and shall be the final authority as to the current zoning status of land, buildings, and other structures in the County.

**3.3    CHANGES IN OFFICIAL ZONING MAP.**   No changes in the Official Zoning Map shall be made, except by amendment to this ordinance, as provided for under Chapter 15 herein. Such changes shall be promptly made and the ordinance number, nature of change, and date of change shall be noted on the map, with the signature of the Chairman of the Board of Supervisors approving such change.   No amendment to this ordinance which involves matter portrayed on the Official Zoning Map shall become effective until after such change and entry

9

has been made on said map.

Any unauthorized change of any kind whatsoever in the Official Zoning Map by any person or persons shall constitute a violation of this ordinance and be punishable as provided in Chapter 13 of this ordinance.

**3.4**    **ESTABLISHMENT OF DISTRICTS.**  The following districts are hereby established:

|     |                            |
|-----|----------------------------|
| A   | - Agricultural District    |
| R   | - Residential District     |
| C   | - Commercial District      |
| I   | - Industrial District      |
| HWB | - Highway Business District |

**3.5**    **BOUNDARIES.**    The boundaries of the above established districts are hereby established as shown on the map entitled "Zoning Map of Page County", which is hereby made a part of this ordinance.

1.   The boundary lines are intended to follow street and road center lines, corporate limit lines, railroad right-of-way lines, section and quarter-section lines, and drainage centerlines.

2.   Questions of exact location of district boundary lines shall be decided by the Board of Adjustment.

10

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER IV

## GENERAL PROVISIONS

**4.1**    **FARM EXEMPTION.**   No provision of this Ordinance shall be construed to apply to land, farm houses, Farm barns, farm outbuildings, or other buildings, structures or erections which are adapted, by reason of nature and area, for use for agricultural purposes as a primary means of livelihood, WHILE SO USED; in accordance with the provisions of Chapter 335 of the Code of Iowa, as amended.

**4.2**    **APPLICATION.**   The regulations of this ordinance shall apply uniformly as minimums for each class of land or structures within each district.

**4.3**    **COMPLIANCE.**  Except as stated in Section 4.1 and Chapter 12 no land or structures shall be used, constructed, reconstructed, moved, or structurally altered unless in the conformity with the regulations for the district in which it is located.

**4.4**    **DWELLINGS.**

1.  No more than one dwelling may be built on any lot except as provided in Section 10.4(4) .

2.   Minimum Floor Areas.   After the effective date of this Ordinance, a conforming dwelling may be constructed provided it shall contain no less than the following floor areas:

11

a.  One-Story -------------------------- 800 square feet;

b.  One and One-Half Story -------- 900 square feet;

c.  Two-Story ------------------------ 1,000 square feet.

**4.5    SIGHT TRIANGLE AT STREET INTERSECTION.**    After the effective date of this Ordinance, corner lots shall be subject to the following restriction:   No privacy fences, shrubbery or visual barrier, shall be placed that may obstruct traffic visibility within a triangle formed by the centerlines of the intersecting streets a stipulated distance (cited below) from the point of intersection and a line across the corner of the lot connecting these centerline points.   The distance from the intersection point along the street centerlines, which are based on the speed limit on each street, are listed below:

12

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

| Speed Limit | Distance |
|---|---|
| 20 MPH | 50' |
| 25 MPH | 75' |
| 30 MPH | 100' |

For speed limits above thirty (30) MPH, distances shall be determined according to applicable State or County Standards.

13

# CHAPTER V

## AGRICULTURAL DISTRICT

**5.1    PRINCIPAL USES PERMITTED.**    The following uses shall be permitted in the Agricultural District:

1.  Any customary agricultural use, including agronomy, horticulture, animal and poultry husbandry, greenhouses, nursery gardens, and aquatic farming.

2.  Single and two-family dwellings.

3.  Churches.

4.  Schools.

5.  Public parks and public recreational facilities.

6.  Hospitals, nursing homes, or other medical service facilities.

7.  Utility installations, except warehousing and storage.

8.  Cemeteries.

9.  Public facilities such as libraries, museums, fire stations, and

14

auditoriums.

**5.2      ACCESSORY USES PERMITTED.**   The following accessory uses are permitted in an Agricultural District:

    1.  Agricultural Structures, including roadside stands for sale of produce.

    2.  Private garages.

    3.  Home Occupations.

    4.  Dwelling accessory structures.

**5.3      SPECIAL EXCEPTION USES.**  The following special exception uses shall be permitted in an Agricultural District, when authorized in accordance with Section 10.1:

    1.  Private recreational facilities.

    2.  Airports.

    3.  Sanitary landfills.

    4.  Mining or mineral extraction operations.

    5.  Commercial feed lots.

    6. Commercial Stables, riding academies, and clubs.

**5.4      HEIGHT REGULATIONS.**  The following maximum height restrictions shall apply in an

15

Agricultural District:

1.  Principal Structure ---------------------------- 2½ stories.

2.  Accessory Structure --------------------------- 15 feet.

**5.5    LOT AREA, WIDTH, AND YARD REGULATIONS.**  The following shall be the minimum requirements in an Agricultural District:

1.  Lot Area ------------------------------ 1 Acre.

2.  Lot Width ----------------------------- 200 feet.

3.  Yard Requirements (measured from the property line):

a.  Front Yard ------------------- 50 feet.*
b.  Rear Yard ------------------- 50 feet.
c.  Side Yard -------------------- 25 feet.

* - 100 feet along County Roads.

**5.6    PARKING.**  See Chapter 11.

**5.7    SIGNS.**  Signs shall be permitted only in accordance with the following:

1.  Service club signs not to exceed four (4) square feet.

2.  School, church, or other semi-public organization not to exceed twelve (12) square feet.

16

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

*17*

3. Temporary signs advertising construction on, or sale or lease of, property not to exceed fifty (50) square feet and shall be removed upon completion of the construction, sale, or lease.

4. Billboards not exceeding 200 square feet and subject to the Board of Adjustment's review.

**5.8    EXCEPTIONS.**  See Section 10.4.

18

# CHAPTER VI

## RESIDENTIAL DISTRICT

**6.1    PRINCIPAL PERMITTED USES.**   The following uses shall be permitted in the Residential District:

1.  Single and two-family dwellings.

2.  Churches.

3.  Schools.

4.  Public parks and recreational facilities.

5.  Hospitals, nursing homes, or other medical service facilities.

6.  Utility installations, except warehousing and storage.

7.  Cemeteries.

8.  Public facilities such as libraries, museums, fire stations, and auditoriums.

9.   Agricultural uses, including agronomy and horticulture specialties, but excluding animal and poultry husbandry as principal uses.

19

10.   Family homes and residential care facilities.

**6.2     ACCESSORY USES PERMITTED.**  The following accessory uses shall be permitted in a Residential District:

1.   Private garages.

2.   Home occupations.

3.   Dwelling accessory structures.

**6.3     SPECIAL EXCEPTION USES.**  The following special exception uses shall be permitted in a Residential District, when authorized in accordance with Section 10.1:

1.   Private recreational facilities.

2.   Multi-family dwellings.

3.   Mobile home parks.

4.   Boarding houses.

**6.4     HEIGHT REGULATIONS.**  The following maximum height restrictions shall apply in a Residential District:

1.   Principal Structure ------------------------- 2½ stories.

2.   Accessory Structure -----------------------15 feet.

20

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT



**6.5    LOT AREA, WIDTH, AND YARD REGULATIONS.**  The following shall be the minimum requirements in a Residential District:

    1.  Lot Area ----------------------------- 7,500 sq. ft.

    2.  Lot Width --------------------------- 75 feet.

    3.  Yard Requirements (measured from the property line):

        a.  Front Yard                             50 feet.

        b.  Rear Yard                             25 feet.

        c.  Side Yard                             10 feet.

**6.6    PARKING.**  See Chapter 11.

**6.7    SIGNS.**  Signs shall be permitted only in accordance with the following:

    1.  Service club signs not to exceed four (4) square feet.

    2.   School, church, or other semi-public organization signs not to exceed twelve (12) square feet.

    3.   Temporary signs advertising construction on, or sale or lease of, property not to exceed fifty (50) square feet which shall be removed upon completion of the construction, sale, or lease.

    4.  Billboard signs shall be prohibited.

**6.8**   **EXCEPTIONS.**  See Section 10.4.

# CHAPTER VII

## COMMERCIAL DISTRICT

**7.1**   **PRINCIPAL USES PERMITTED.**   The following uses shall be permitted in the Commercial District:

1.  Churches.

2.  Schools.

3.  Public parks and public recreational facilities.

4.  Hospitals, nursing homes, or other medical service facilities.

5.  Utility installations, except warehousing and storage.

6.  Cemeteries.

7.  Public facilities such as libraries, museums, fire stations, and auditoriums.

8.  Retail business or service establishments.

9.  Non-profit institutions.

22

10.   Restaurants

11.   Animal hospitals or veterinary clinics.

**7.2**    **ACCESSORY USES PERMITTED.**  The following accessory uses shall be permitted in

a Commercial District:

1.   Any use customarily incidental to a principal permitted use.

23

**7.3    SPECIAL EXCEPTION USES PERMITTED.**  The following special exception uses shall be permitted in a Commercial District, when authorized in accordance with  Section 10.1:

1.  Mobile Home Park.

2.  Boarding Houses.

3.  Multi-family Dwellings.

4.  Single and Two-Family Dwellings.

5.  Wholesale business

6.  Warehousing.

7.  Motels and Hotels.

**7.4    HEIGHT REGULATIONS.**  The following maximum height restrictions shall apply in a Commercial District:

1.  Principal Structure ------------------------ 2½ stories or thirty-five feet (35').

2.  Accessory Structure ---------------------- 20 feet.

**7.5    LOT AREA, WIDTH, AND YARD REGULATION.**  The following shall be the minimum requirements for cases not involving dwellings; the requirements for lots occupied or to be occupied by dwellings shall meet the same requirements as the residential district:

1.  Lot Area -------------------------- none, except that structures shall not

24

occupy more than 50% of total lot area.

2.  Lot Width ------------------------- 50 feet.

3.  Yard Requirements (measured from the property line):

    a.  Front yard ------------------------- 50 feet.

    b.  Side yard ------------------------- 10 feet.

    c.  Rear yard ------------------------- 25 feet.

**7.6**   **PARKING.**  See Chapter 11.

**7.7**   **SIGNS.**  Signs shall be permitted only as follows:

1.  Service club signs not to exceed four (4) square feet.

2.  School, church, or other semi-public organization's sign not to exceed twelve(12) square feet.

3.  Temporary signs advertising construction on, or sale or lease of, property not to exceed fifty (50) square feet, which shall be removed upon completion of the construction, sale, or lease.

4.  Billboards not exceeding two-hundred (200) square feet, and subject to review by the Board of Adjustment.

5.  Signs advertising the establishment occupying the lot where the sign is located, with the following restrictions:

    1.  Maximum size shall be fifty (50) square feet.

25

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

2.  The top of the sign shall be no more than twenty (20) feet above grade.

3.  Signs shall not project into the street or road right-of-ways.

4.  Illuminated signs shall not be permitted within two-hundred (200) feet of a residential district.

**7.8**    **EXCEPTIONS.**   See Section 10.4.

26

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER VIII

## INDUSTRIAL DISTRICT

**8.1    PRINCIPAL USES PERMITTED.**  The following uses shall be permitted in the Industrial District:

1. Public facilities such as libraries, museums, fire stations, and auditoriums.

2.  Recreational facilities.

3.  Retail business or service establishments.

4.  Non-profit institutions.

5.  Manufacturing, processing, warehousing, and wholesaling, subject to the performance standards.

6.  Machine shops

7.  Feed and seed sales and storage, including grain elevators.

**8.2    ACCESSORY USES PERMITTED.**   All uses customarily incidental to a permitted principal use.

27

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**8.3    SPECIAL EXCEPTION USES PERMITTED.**  The following special exception uses shall be permitted in an Industrial District, when authorized in accordance with Section 10.1:

1.  Airports.

2.  Mining and Extraction.

**8.4    HEIGHT REGULATIONS.**  The following maximum height restrictions shall apply in an Industrial District:

1.  No structure shall exceed three stories or fifty (50) feet in height, except as provided in Section 10.4(1).

**8.5    LOT AREA, WIDTH, AND YARD REGULATIONS.**   The following are the minimum requirements in an Industrial District:

1.  Lot Area ----------------------- None, except structure shall not occupy more than 25% of area.

2.  Lot Width ---------------------- 50 feet.

3.  Yard Requirements (measured from the property line):

    a.  Front Yard -------------------- 100 feet.

    b.  Rear Yard --------------------- 100 feet.

    c.  Side Yard ---------------------- 50 feet.

**8.6    PARKING.**  See Chapter 11.

**8.7    SIGNS.**  Signs shall be permitted only as follows:

28

1.  Service club signs not to exceed four (4) square feet.

2.  School, church, or other semi-public organization signs not to exceed twelve (12) square feet.

3.  Temporary signs advertising construction on, or sale or lease of, property not to exceed fifty (50) square feet which shall be removed upon completion of the construction, sale, or lease.

4.  Billboards not exceeding two-hundred (200) square feet, and subject to review by the Board of Adjustment.

5.  Signs advertising the establishment occupying the lot where the sign is located with the following restrictions:

    a.  Maximum size shall be fifty (50) square feet.

    b.  The top of the sign shall be no more than twenty (20) feet above grade.

    c.  Signs shall not project into street or road right-of-ways.

    d.  Illuminated signs shall not be permitted within two-hundred (200) feet of a Residential District.

**8.8**     **EXCEPTIONS.**  See Section 10.4.

29

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER IX

## HIGHWAY BUSINESS DISTRICT

**9.1    PRINCIPAL USES PERMITTED.**  The following uses shall be permitted in a Highway Business District:

   1.   Hotels and motels.

   2.   Vehicle sales and service.

   3.   In-car retailing sales and services.

   4.   Filling Station.

   5.   Convenience Store.

   6.   Restaurant.

**9.2    ACCESSORY USES PERMITTED.**  The following accessory uses shall be permitted in a Highway Business District:

   1.   All uses customarily incidental to the principal permitted uses.

**9.3    SPECIAL EXCEPTION USES PERMITTED.**  The following special exception uses shall

be permitted in a highway business district, when authorized in accordance with Section 10.1:

1.   Retailing services, wholesaling, and warehousing establishments.

2.   Recreational facilities.

**9.4    HEIGHT REGULATIONS.**   The following maximum height restrictions shall apply in a Highway Business District:

1.  Principal Structure -------------------------------- 2½ stories or 35 feet.

2.   Accessory Structure ------------------------------ 20 feet.

31

**9.5**   **LOT AREA, WIDTH, AND YARD REGULATIONS.**   The following are the minimum requirements in a Highway Business District:

1.  Lot Area ----------------------------------- None, except structure shall not occupy more than 50% of area.

2.  Lot Width ---------------------------------- 50 feet.

3.  Yard Requirements (measured from the property line):

    a.   Front Yard ------------------------   50 feet.

    b.   Rear Yard ------------------------- 25 feet.

    c.   Side Yard ------------------------- 10 feet.

**9.6**   **PARKING.**   See Chapter 11.

**9.7**   **SIGNS.**   Signs shall be permitted only as follows:

1.  Signs shall be permitted only as in the Commercial District.

**9.8**   **EXCEPTIONS.**   See Section 10.4.

32

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER X

## SPECIAL PROVISIONS

**10.1   SPECIAL EXCEPTION  USES.**  The initiation of a special exception use, as specified under the regulations of each zoning district, requires an application, a public hearing, and a favorable ruling of the Board of Adjustment.

1.   The applicant and/or property owner shall file the prescribed application form with the Zoning Administrator.  The application form shall be accompanied by a plot plan of the proposed development, a fee of twenty-five dollars ($25.00), and such other material as may be required by the Zoning Administrator.

2.   The Zoning Administrator shall then review the application and, if it is complete, transmit it, along with all supporting materials, to the Secretary of the Board of Adjustment who shall arrange a public hearing within thirty (30) days.  The Board shall notify all property owners adjoining the proposed development by mail at least five days prior to the hearing and file proof of mailing by affidavit.   The Board shall publish notice of the hearing in a newspaper of general circulation in the County not less than four (4) nor more than twenty (20) days prior to the hearing.

3.   After the hearing, the Board of Adjustment shall have ten (10) days to review and render a decision on the application, at which time the Zoning

33

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Administrator shall be instructed to inform the applicant of the Board's decision.

4.   A record of all Board of Adjustment actions shall be kept in the Zoning Administrator's office as a public record.

**10.2**   **STANDARDS GOVERNING SPECIAL EXCEPTION USES.**   Except as modified below, the requirements for special exception uses shall be those given for the Zoning District involved.

1.   Mobile Home Parks.

a.   Yard Requirements:

34

|  | Park |  |
|---|---|---|
| Home |  |  |
|  | Boundary |  |
| Space |  |  |
| 1. Front yard | 50' | 15' |
| 2. Rear yard | 25' | 10' |
| 3. Side yard | 25' | 10' |
| 4. Area |  | 2 acres |
| 50'x80' |  |  |

  b. Interior Streets: 25' wide, surfaced with a permanent, all weather, dustless material, with a sufficient base as approved by the County Engineer.

 2. Multi-family dwellings - The lot area requirement for multi-family dwelling shall be 8,500 square feet minimum with an additional 1,000 square feet for each additional unit over three (3).

 3. In the consideration of all special use applications, the Board of Adjustment may grant the permit subject to any reasonable conditions they feel are necessary to protect the public health, safety and welfare, and to minimize the adverse effects of excessive heat or vibration.

**10.3 PERFORMANCE STANDARDS.** For the purposes of this ordinance, all uses, whether specifically permitted or initiated under a special use permit, shall be required to meet the following performance standards:

 1. Noise from any assembling or manufacturing process shall be inaudible 200

35

feet from the Industrial District boundary.

2.  Ground vibration caused by any use shall be imperceptible at the boundary of the property involved.

3.  Dust resulting from any use shall be controlled by surfacing, watering, or fencing, or whatever means deemed necessary by the Board of Adjustment.

4.  Heat and excess or unusual light produced by, or necessary to, any use shall not be noticeable at the boundary of the lot involved.

5.  Air emissions from any use shall be regulated according to Iowa Air Pollution Control Commission Standards.

6.  The disposal of solid or liquid wastes from any use shall require Board of Adjustment approval prior to commencement.

7.  All required open areas shall be maintained in an attractive manner which is not detrimental to the character of the surrounding areas.

## 10.4   MISCELLANEOUS PROVISIONS.

1.  Exceptions to height regulations:

   a.   Mechanical appurtenances or special equipment such as communication towers, smoke stacks, water towers, church spires, grain elevators, cooling towers, or other similar uses shall be constructed to heights approved by the Board of Adjustment.

36

      b.   Private and public service structures such as schools, auditoriums, hospitals, shall be constructed to heights approved by the Board of Adjustment, provided that front yard requirements of the district involved are increased one foot for each increased foot of height.

2.  Construction of the Accessory structure before the Principal structure - No building permit for an accessory structure shall be issued before the permit for the principal structure.  Construction of the principal structure shall begin within a year after the issuance of said permit.

3.   Water and Sewer Requirements - For individual dwellings or dwelling developments where no centralized sewer and/or water system is reasonably available, the minimum lot area requirements shall be increased as provided below, except where the minimum established by another agency with jurisdiction is greater than those given below.

     1.  No sewer or water -------------------------- 30,000 square feet

     2.  No sewer ------------------------------------ 15,000 square feet

        a.   In a case where a developer chooses to provide centralized systems for sewer and water, such systems shall be designed by a professional engineer licensed in the State of Iowa and shall conform to the County's Subdivision Ordinance.

4.  Multiple Use Development - In a case where it is proposed to erect two or more dwellings or commercial buildings on the same parcel of land without the customary division into streets and lots and without the intention of such

37

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

division, the Board of Adjustment may waive certain requirements of this ordinance, as long as the development in total is deemed to be in harmony with the surrounding area.  In no case, however, shall the Board reduce the land area requirements, increase the height limitation, or allow any use not permitted in the zoning district involved.

38

**ORIGINAL PETITION**                         **EXHIBIT D**                         **Page 40 of 62**

# CHAPTER XI

## OFF-STREET PARKING AND LOADING REGULATIONS

**11.1    OFF-STREET PARKING REGULATIONS.**    Off-Street Parking shall be provided according to the following schedule:

<u>USE</u>                                                        <u>REQUIRED SPACES</u>

Residential

     Single & Two Family ---------------------------------    2 per unit

     Multi-family ------------------------------------------    1.5 per unit

     Hotel/Motel ------------------------------------------    1 per room, 1 per employee

Institutions

     Hospitals --------------------------------------------    1 per 2 beds

     Nursing homes, correctional institutions ---------    1 per 4 residents

39

Church, auditoriums, arenas ----------------------- 1 per 4 seats

Elementary and Junior High Schools ------------- 1 per classroom &

Administrator

High Schools and Colleges -------------------------- 1 per 5 students

Commercial

Retail -------------------------------------------------------- 1 per 100 sq.
ft.

Service ------------------------------------------------------- 1 per 300 sq.
ft.

Bank and non-medical office ------------------------- 1 per 400 sq. ft.

Medical office and clinic -------------------------------- 1 per 200 sq. ft.

Eating and drinking ------------------------------------- 1 per 100 sq. ft.

Industrial

Manufacturing, processing, warehousing --------- 1 per employee

Wholesaling ------------------------------------------------ 1 per 500 sq.
ft.
sales area

40

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

**11.2    OFF-STREET LOADING REGULATIONS.**  Buildings and structures which will receive and distribute material by truck shall be provided with an adequate number of off-street loading spaces to accommodate their needs.  Each space shall be a minimum of twelve (12) feet by forty (40) feet with fourteen (14) foot clearance.  The following guidelines shall be used to establish a minimum number of loading spaces.

    1.  Establishments up to 5,000 square feet may use off-street parking as loading spaces.

    2.  Establishments over 5,000 square feet shall have a minimum of one space plus an additional space for each additional 20,000 square foot increment.

41

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER XII

## NON-CONFORMITIES

**12.1   NON-CONFORMING USES.**   Any structure or use that is legally established on or before the effective date of this ordinance may continue subject to the following restrictions:

1.  A non-conforming use which has or may be discontinued for one year shall not be renewed.

2.   A non-conforming structure may be repaired as long as no structural alterations are made, unless such alterations are required by law for safety or are  done to bring the structure into conformity.

3.  A structure which is non-conforming by height, size, set-backs, or use shall not be expanded unless the entire structure thereafter is in conformity.

4.  A non-conforming land use, with no substantial investment in a principal structure, as determined by the Board of Adjustment, shall not be expanded, and further shall be discontinued three (3) years after the effective date of this ordinance.

5.  If a non-conforming structure is damaged by flood, fire, explosion, or other uncontrollable act of nature, it may be rebuilt if construction is begun within one year, provided that the restoration cost does not exceed 50% of the fair market

42

value of the original structure.

6.   "Special Exception Uses" as provided in Section 10.1 should not be confused with non-conforming uses.  Once a special exception use permit has been granted, that use is automatically considered to be in conformity.

43

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER XIII

## ADMINISTRATION AND ENFORCEMENT

**13.1   ZONING ADMINISTRATOR.**   The Zoning Administrator, upon appointment by the Board of Supervisors, shall be responsible for the administration and enforcement of this ordinance.   The administrator's duties shall include the following:

1.  Issuing building permits and collecting fees for same.

2.   Handle administrative duties relative to this ordinance for the Zoning Commission and the Board of Supervisors.

3.  Enforce the ordinance and identify site violations.

4.  Explain provisions of the ordinance to citizens requesting information.

**13.2   BUILDING PERMITS.**

1.  When required -  For any construction, altering, moving, or change of use of a structure, a building permit must be issued by the Zoning Administrator prior to commencement of work.

2.  Application procedures - Written application, on an approved form, with two

44

copies of plats or plans drawn to scale, showing the shape, size, and use of the lot and the size, use, and estimated cost and any other pertinent features of the proposed structures.  All dimensions pertaining to the lot size shall be based on an actual land survey performed by a land surveyor licensed in the State of Iowa.  If the use and structure proposed conform to this ordinance, the zoning administrator shall issue a permit.

3.  Fees – Fees for building permits shall be charged as follows:

| Estimated Construction Cost | Fee |
|---|---|
| $0 to $20,000 | $5.00 |
| $20,000 to $50,000 | $0.25 per $1,000 |
| $50,000 up | $12.50 +  $0.10 per $1,000 above $50,000 |

4.  Duration – Permits issued according to this Chapter shall be void after one year if construction has not begun.  All construction shall be complete within three (3) years or a new permit must be issued in accordance with the provisions of Section 13.2 (2).

## 13.3   VIOLATIONS.

1.  Penalty for Violation – In addition to any other remedy granted herein, the violation on any regulation, restriction, or boundary adopted under this chapter or the occupancy or the use of any structure erected, altered, or maintained in violation of this chapter shall constitute a misdemeanor.  Such occupancy or use shall be deemed a continuing violation and may be the subject of repeated prosecutions if so continued.  Every person convicted of a misdemeanor, by

45

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

reason of violations hereinabove set forth, shall be punished by a fine of not more than one-hundred dollars or by imprisonment of not more than thirty (30) days.

2.   Prevention of Violation - In case any building or structure is erected, constructed, reconstructed, altered, repaired, converted, or maintained; or any building structure or land is used in violation of this ordinance, the board of Supervisors in addition to other remedies, may institute any appropriate action or proceedings to prevent such unlawful erection, construction, reconstruction, alteration, repair, conversion, maintenance or use; to restrain, correct, or abate such violation; to prevent the occupancy of said building, structure, or land; or to prevent any illegal act, conduct, business, or use in or about such premises.

46

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER XIV

## BOARD OF ADJUSTMENT

**14.1   COMPOSITION.**   The Board of Adjustment (hereinafter in this section called the "Board") shall consist of five members appointed by the Board of Supervisors.   The first Board members shall be appointed for terms of one, two, three, four, and five years respectively.   All appointments thereafter shall be for five years or the duration of any vacated terms.   Members shall be removable by the Board of Supervisors for cause upon written charge and after public hearing.

**14.2   MEETINGS.**   The Board shall meet upon initial appointment, elect a chairman and a secretary and adopt rules of order.   Thereafter, the Board shall meet at the call of the Chairman or acting chairman.   The secretary shall keep minutes of all meetings showing the vote of each member on each action taken by the Board and file said minutes in the Zoning Administrator's office.   All decisions of the board shall require the concurring vote of three members.   All Board meetings and records shall be open to the public.

**14.3   POWERS.**   The Board shall have the following powers:

1.  To hear and decide appeals where it is alleged that there is an error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this ordinance.

2.  To grant or deny requests for special exception use permits as per Section 10.1 of this ordinance.

3.  To authorize on appeal, in specific cases, such variance from the terms of this ordinance as will not be contrary to the public interest, where owing to special conditions a literal enforcement of the provisions of this ordinance will result in any unnecessary hardship, and so that the spirit of this ordinance shall be observed and substantial justice done.

4.  The decision of the Board is final and the only further appeal is through the courts.  The Board is independent from both the Board of Supervisors and the Zoning Commission.

## 14.4   APPEAL OF BOARD DECISIONS.

1.  Petition to the Court – Any person or persons, jointly or severally, aggrieved by any decision of the Board under the provisions of this ordinance or any taxpayer, officer, department, board, or bureau of the County, may present to a court of record a petition, duly verified, setting forth that such decision is illegal, in whole or in part, specifying the grounds of the illegality.  Such petition shall be presented to the court within thirty (30) days after the filing of the decision in the office of the Board.

2.  Review by Court – Upon the presentation of such petition, the court may allow a writ of certiorari directed to the Board to review such decision of the Board and shall prescribe therein the time within which a return thereto must be made and served upon the realtor's attorney, which shall not be less than ten (10) days and may be extended by the court.  The allowance of the writ shall not stay proceedings upon the decision appealed from, but the court may, on application, on notice to the Board and on due cause shown, grant a restraining order.  The Board shall not be required to return the original papers acted upon

48

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

it, but it shall be sufficient to return certified or sworn copies thereof or of such portions thereof as may be called for by such writ.  The return shall concisely set forth such other facts as may be pertinent and material to show the grounds of the decision appealed from and shall be verified.

3.   Trial to Court - If upon the hearing, which shall be tried de novo, it shall appear to the court that testimony is necessary for the proper disposition of the matter, it may take evidence or appoint a referee to take such evidence as it may direct and report the same to the court with his findings of fact and conclusions of law, which shall constitute a part of the proceedings upon which the determination of the court shall be made.  The court may reverse or affirm, wholly or partly, or may modify the decisions brought up for review.  Costs shall not be allowed against the Board unless it shall appear to the court that it acted with gross negligence, in bad faith, or with malice in rendering its decision.

4.   Precedence - A petition of appeal concerning a decision of the Board shall have preference over all other civil actions and proceedings before the court.

49

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# CHAPTER XV

## CHANGES AND AMENDMENTS

**15.1   INITIATION.**  Procedure to change or amend this ordinance may be initiated by the Planning and Zoning Commission (PZC), individual citizens, or organizations.

**15.2   PROCEDURE.**  Any party desiring to change or amend this ordinance must submit:

1.  A properly completed application form supplied by the Zoning Administrator. In amending the Official Zoning Map, appropriate plats or maps showing the boundary change requested and the property ownership within the area of the proposed changes and within 500 feet of the boundary of said area shall be prepared by the applicant.  When the PZC initiates the procedure to make a change or amendment, it must prepare the same form and maps.

**15.3   PZC ACTION.**  Upon receiving or initiating a request for a change or amendment of this ordinance, the secretary of the PZC shall examine the materials received or prepared for compliance with Section 15.2 (1) and make such materials available to the public at the office of the Zoning Administrator.  The secretary shall then set a date, time, and place for a public hearing on the proposed change or amendment and provide public notice.  In case of a zoning district change, the applicant shall supply proof by affidavit of having mailed written notice to the property owners within 500 feet of the area of the proposed change at least 15 days prior to the hearing.  The notice shall state the date, time and place for the hearing, and that the proposed amendment may be examined at the office of the Zoning Administrator.  At or after the public hearing, the PZC shall determine its recommendations and submit them and the proposed amendment to the Board of Supervisors.  The PZC shall keep detailed records

50

of all proceedings and keep such records available to the public at the office of the Planning Zoning Administrator.

**15.4    BOARD OF SUPERVISORS ACTION.**  When receiving the PZC recommendations and request materials, the Board of Supervisors shall set a date, time, and place for a public hearing on the proposed change or amendment and arrange for public notice of the time and place of the hearing in a newspaper of general circulation in the county at least 15 days prior to the hearing.  The Board shall examine the request materials and then gather public opinion at the hearing.  Based on all information, the Board shall then vote to approve or deny the request; except in a rezoning case, if 20% of the property owners within the area of the proposed change, or 20% of the property owners within 500 feet of the boundary of the proposed change, oppose the change, a 60% majority of the vote of the Board is required to approve the change.  The Board of Supervisors shall keep detailed records of all proceedings and have such records available to the public at the office of the Board.

51

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

# APPLICATION FOR BUILDING PERMIT

# PAGE COUNTY, IOWA

Applicant _____   Date

Address _____   Application No.

Phone # _____   Permit # _____   Expiration Date

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I do hereby request (indicate what request is for):

_____   a Building Permit

Legal                    Description                    of                    Property:

Size of lot, tract, or area _____   Estimated Cost $

Setbacks:

    Front Yard _____   Rear Yard _____   Side Yard: (L) _____ (R)

Height: _____   Zoning District _____   # of Family Units

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Signs _____   Off-Street Parking _____   Off-Street Loading

Principal                                                                                           Use

Accessory                                                                                       Use

Other                                                                               Information

*********************************************************************************
***********************I Certify that the above information is true and accurate.

Applicant's                                                                          Signature

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Scale: _____                                                    North Point

FOR USE BY THE ZONING ADMINISTRATOR

Building Permit is hereby:  _____  Approved          _____  Denied

Comments:

Date: _____          Fee:

_____          Date:

_____          Zoning Administrator

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

## PETITION FOR REZONING

To The Page County Zoning Commission

Page County, Iowa

Zoning Ordinance

Gentlemen:

    We (I), the undersigned, owner(s) of the property described in paragraph 1. below, do hereby respectfully petition your Honorable Body to amend the present Zoning Ordinance as hereinafter designated, and in support thereof, the following facts are presented:

    1.  That the area to be rezoned is contained in the following legal description:

_____

_____

    2.  That it is requested and desired that the foregoing property be rezoned from the

_____ District to the _____ District.

    3.  That the reasons for requesting the change are as follows:

_____

_____

_____

    4.  That the undersigned below own(s) property within the area which is requested to be rezoned.

    5.  That the undersigned have been fully appraised and acquainted with the uses to which the area to be rezoned may be put if the rezoning takes place.

    6.  That in addition to the undersigned name(s) given below there is attached a plat, showing the

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

area to be rezoned and giving the names and mailing addresses of the property owners within 500 feet of the perimeter of the proposed change.

Respectfully submitted,

_____    _____    _____

Name                                                         Address                                             Phone


_____    _____    _____

Name                                                         Address                                             Phone


_____    _____    _____

Name                                                         Address                                             Phone


_____    _____    _____

Name                                                         Address                                             Phone

E-FILED 2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

## PETITION FOR A CHANGE OR AMENDMENT
## TO THE PAGE COUNTY ZONING ORDINANCE

To The Page County Planning and Zoning Commission

Page County, Iowa

Zoning Ordinance

Gentlemen:

     We (I), the undersigned, owner(s) of the property described in paragraph 1. below, do hereby respectfully petition your Honorable Body to change or amend the present Zoning Ordinance as hereinafter designated, and in support thereof, the following facts are presented:

     1.   That the area to be change or amended is contained in the following legal description:

_____

_____

     2.   That it is requested and desired that a change or amendment  be made described as

_____

_____

     3.   That the reasons for requesting the change are as follows:

_____

_____

_____

     4.   That the undersigned below own(s) property within the area which the change or amendment is requested.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

    5.   That the undersigned have been fully appraised and acquainted with the uses to which the area to be changed or amended may be put if the change or amendment takes place.

    6.   That in addition to the undersigned name(s) given below there is attached a plat, showing the area to be changed or amended and giving the names and mailing addresses of the property owners within 500 feet of the perimeter of the proposed change or amendment.

Respectfully submitted,


_____     _____     _____
Name                                 Address                            Phone


_____     _____     _____
Name                                 Address                            Phone


_____     _____     _____
Name                                 Address                            Phone

Book 596   Page 528

FILE NO. 001737
FEE —
BOOK 596 PAGE 528

ORDINANCE NO. 97-1

97 JAN 28  PM 3: 45

BRENDA ESAIAS
PAGE CO. RECORDER
CLARINDA, IOWA

AN ORDINANCE ADOPTING "PAGE COUNTY, IOWA, ZONING AND
SUBDIVISION ORDINANCE, 1997"

BE IT ENACTED BY THE BOARD OF SUPERVISORS OF PAGE COUNTY, IOWA:

SECTION 1.  PURPOSE.  The purpose of adopting this Ordinance is to enable Page
County, Iowa, to adopt "Page County, Iowa, Zoning and Subdivision Ordinance, 1997".

SECTION 2.  ADOPTION.  The County of Page, Iowa, hereby adopts "Page County,
Iowa, Zoning and Subdivision Ordinance, 1997" pursuant to the provisions of the Code
of Iowa.

SECTION 3.  CONTENT.  "Page County, Iowa, Zoning and Subdivision Ordinance,
1997" is composed of all the zoning and subdivision regulations presently in effect.

SECTION 4.  ADOPTING ORDINANCE.  "Page County, Iowa, Zoning and Subdivision
Ordinance, 1997" shall include this adopting ordinance and the Auditor's certification of
its adoption and passage.

SECTION 5.  OFFICIAL COPY.  The County Auditor shall be responsible for the
compilation, organization, and maintenance of the Zoning and Subdivision Ordinance
and shall keep an official copy on file in the office of the County Auditor.

SECTION 6.  PUBLIC COPIES.  Additional copies of the Zoning and Subdivision
Ordinance shall be kept in the office of the County Engineer and shall be available for
public inspection and purchase.

SECTION 7.  ADDITIONAL ORDINANCE PERTAINING TO ZONING OR
SUBDIVISIONS.  All ordinances adopted after the effective date of the "Page County,
Iowa, Zoning and Subdivision Ordinance, 1997" shall be in the form of an amendment
to, or an addition to, the "Page County, Iowa, Zoning and Subdivision Ordinance, 1997".

SECTION 8.  REPEALER.  All ordinances or parts of ordinances in conflict with the
provisions of this ordinance, and amendments thereto, are hereby repealed to the extent
necessary to give this ordinance full force and effect.

SECTION 9.  VALIDITY.  Should any section or provision of this ordinance be declared
by the courts to be invalid or unconstitutional, such decision shall not affect the validity
of the ordinance as a whole, or any part thereof other than the part so declared to be
unconstitutional or invalid.

E-FILED  2022 SEP 19 4:05 PM PAGE - CLERK OF DISTRICT COURT

Book   596   Page   529

SECTION 10.  EFFECTIVE DATE.  This ordinance shall be in effect from and after its adoption and publication as required by law.

PASSED AND ADOPTED THIS ___28th day of January , 1997, BY THE PAGE COUNTY BOARD OF SUPERVISORS.

*Robert L Anderson* AYE

*Elaine Armstrong* AYE

*Maurice F. Reasis* AYE

Page County Board of Supervisors

ATTEST:

Page County Auditor

### Certification

I hereby certify that the foregoing ordinance adoption was published as Ordinance No. 97-1 in the Clarinda Herald Journal and the Valley News Today on the __5th__ day of February, 1997, and the Essex Independent on the __6th_ day of February, 1997. The complete Ordinance will be available for viewing at the Page County Engineer's Office.

*Judy Clark*

Judy Clark, Page County Auditor

ORIGINAL PETITION                    EXHIBIT D                    Page 62 of 62